# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

AMBER SHERMAN, RACHAEL SPRIGGS, KERMIT MOORE, BLACK CLERGY COLLABORATIVE OF MEMPHIS, MEMPHIS A. PHILIP RANDOLPH INSTITUTE, EQUITY ALLIANCE,

     *Plaintiffs*,

     *v.*

TRE HARGETT, in his official capacity as Secretary of State of Tennessee, MARK GOINS, in his official capacity as Coordinator of Elections for Tennessee, STATE ELECTION COMMISSION, and DONNA BARRETT, JUDY BLACKBURN, JIMMY ELDRIDGE, MIKE MCDONALD, SECONDRA MEADOWS, VANECIA BELSER KIMBROW, and KENT YOUNCE, in their official capacities as members of the State Election Commission,

     *Defendants.*

**THREE-JUDGE PANEL REQUESTED**

Civil Action No._____

## <u>VERIFIED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF</u>

**INTRODUCTION**

1.      In May 2026, over the course of mere days, a White-dominated supermajority of the Tennessee General Assembly redrew Tennessee's congressional map to crack the predominantly Black city of Memphis into three pieces and destroy the only district in which Black voters are able to elect representatives of their choice, shutting Black voters completely out of power in federal elections in Tennessee. The May 2026 redistricting, which took place after the qualification deadline to run for Congress in 2026 had passed and with the campaign season already underway, was not prompted by the release of a decennial Census, a court order, a preference to replace a court-drawn map, or any other legitimate state interest.

2.      The cracking of Memphis unlawfully targeted Black voters in violation of the Fourteenth and Fifteenth Amendments. The racial impact and motivations behind the dismemberment of the State's largest predominantly Black city, in order to deprive Black residents of the power to elect even a single member of the State's congressional delegation, are evident on the face of the hastily enacted congressional map as well as the statements and actions of the all-White legislators who advanced the scheme. The new plan carves through the center of Tennessee's second largest city, dividing neighborhoods that have voted together for decades, splitting numerous counties and precincts, and cutting the Black population into thirds with suspect precision. The districts then run hundreds of miles east towards the Nashville suburbs, snaking through predominantly White and rural counties to dilute the voting power of now-divided Black Memphians.

3.      The process for drawing and enacting the May 2026 Map was marked by extreme haste and disorder, willful disregard for tradition and existing state law, and repeated dissembling to the public and to Black legislators. Tennessee had never before engaged in gratuitous

1

mid-decade congressional redistricting, and indeed state law had affirmatively outlawed the practice for over fifty years. But the all-White supermajority faction controlling the General Assembly ran roughshod, rolling out and then enacting a new congressional map within a span of forty-eight hours. The White legislators who led the efforts gave bizarre, robotic answers to the most basic questions about the map they were sponsoring, and their attempts to avoid admitting the obvious racial targeting involved in destroying a longstanding, compact, Black-majority congressional district that had been based in Memphis for the better part of a century produced almost comical dishonesty. None of the sponsors of the plan would admit who actually drew it, and the lead Senate sponsor—a White legislator with over a decade of service in the Tennessee General Assembly *who had attended law school in Memphis*—would not say whether Memphis was predominantly Black and claimed not to know that Congressional District 9 was a majority-Black district.

4.      Targeting Black voters in the Memphis area in this manner also constituted unlawful retaliation against these voters, including Plaintiffs, for their political speech and association, in violation of the First Amendment. The May 2026 redistricting was not initiated to advance any legitimate state interest, such as equalizing populations after a Census, replacing a court-ordered plan, or complying with a court order, and thus presents an unprecedented set of circumstances: a totally gratuitous round of mid-decade redistricting, undertaken solely to punish Black Memphians for their associating and organizing to build political power in Memphis and Shelby County and for their opposition to the White-dominated faction that controls all the levers of political power in Tennessee. Engaging the machinery of government to punish the Black citizens of Memphis for their political activities and expression by separating them out into different districts where their association will be less effective is unlawful and un-American.

2

5. And the White-controlled General Assembly's actions are not merely unlawful. What they have done and are doing is inconsistent with any notion of civic virtue. It is an appalling repeat of the shameful tactics that were illegally deployed by all-White governments in prior eras to shut Black voters out of power. It is the corruption of a republican form of government with the constitutional sin of racial discrimination. It is morally wrong and must be stopped by those who have the power to stop it.

6. Individual Plaintiffs Amber Sherman, Rachael Spriggs, and Kermit Moore are Black registered voters in Tennessee. Organizational Plaintiffs Black Clergy Collaborative of Memphis, Memphis A. Philip Randolph Institute, and the Equity Alliance serve the Black community in Tennessee and have members who are Black registered voters. Plaintiffs seek a preliminary and a permanent injunction against the May 2026 Map and a declaration that the General Assembly's intentional actions to strip power from Black Memphians is unlawful and violates the United States Constitution.

**JURISDICTION AND VENUE**

7. This Court has subject matter jurisdiction because Plaintiffs' claims arise under the Constitution of the United States and are brought pursuant to 42 U.S.C. § 1983. *See* 28 U.S.C. § 1331.

8. Venue lies in the U.S. District Court for the Middle District of Tennessee because Defendants reside in this judicial district and because the claims arose in this judicial district, which is where the General Assembly met to enact the May 2026 Map. *See* 28 U.S.C. § 1391.

9. Because this action "challeng[es] the constitutionality of the apportionment of congressional districts," Plaintiffs request a three-judge court be convened pursuant to 28 U.S.C. § 2284(a).

3

## PARTIES

10. Plaintiff Amber Sherman is a Black citizen of the United States and of the State of Tennessee. She is a lifelong resident of Memphis and Shelby County and is the Lead Tennessee Regional Organizer for Black Voters Matter Fund. Prior to the enactment of the May 2026 Map, Ms. Sherman lived in Congressional District 9. Under the May 2026 Map, Ms. Sherman has been placed in a fractured Congressional District 9. Ms. Sherman is a registered voter who has regularly voted in the past and intends to vote in the future. In the 2024 election, she voted for Vice President Harris and other Democratic candidates for federal and state offices. Ms. Sherman has lobbied at the General Assembly for the past six years and has found that the Tennessee Republican Party is not supportive of, or responsive to, the Black community in Memphis. She notes that the Tennessee General Assembly has preempted several ordinances from the Memphis local government aimed at improving quality of life in the city, has targeted Black protestors in retaliation for their speech, predominantly, and has targeted Black governmental bodies in Memphis and Shelby County, including by taking over the school board. The passage of the May 2026 Map will severely harm Ms. Sherman's ability to organize and advocate for Black voters in Memphis, as the new maps are already causing significant confusion for voters who do not know what districts they are in or where to cast ballots. The new map makes Ms. Sherman feel disenfranchised and that the General Assembly is trying to remove political power from Black voters in Memphis.

11. Plaintiff Rachael Spriggs is an African American citizen of the United States and of the State of Tennessee. She has been a resident of Memphis for more than 20 years and is the Director of Power Building for the Equity Alliance, a Black-led grassroots organization that promotes civic engagement among Black communities in Tennessee. In her professional role, Ms. Spriggs has spoken with Black voters across Memphis and developed an understanding of their

4

needs and preferences. Prior to the enactment of the May 2026 Map, Ms. Spriggs lived in Congressional District 9. Under the May 2026 Map, Ms. Spriggs has been placed in a fractured Congressional District 9, which would likely be represented by State Senator Brent Taylor. Ms. Spriggs does not know any Black people who would support Senator Taylor for Congress. Ms. Spriggs is a registered voter who has regularly voted in the past and intends to vote in the future. She is a registered Democrat who has voted for Representative Steven Cohen for Congress and Kamala Harris, Joe Biden, and Barack Obama for President. Ms. Spriggs believes that the Republican supermajority in the Tennessee General Assembly advocates for policies that directly harm Black people. Ms. Spriggs does not believe that Senator Taylor will be responsive to the needs of Memphis voters, and she is troubled by how the Tennessee General Assembly ignored the needs of Black voters in passing the May 2026 Map.

12. Plaintiff Kermit Moore is an African American citizen of the United States and of the State of Tennessee. He is a resident of Memphis, where he has lived almost his entire life, and is the President of and a member of the Memphis A. Philip Randolph Institute. Prior to the enactment of the May 2026 Map, Mr. Moore lived in Congressional District 9. Under the May 2026 Map, Mr. Moore has been placed in Congressional District 5. Mr. Moore is a registered voter who has regularly voted in the past and intends to vote in the future. In past elections, he has supported Democratic candidates like Representative Cohen for Congress, and Kamala Harris, Joe Biden, and Barack Obama for President. Mr. Moore also regularly petitions his representative in Congress on matters of concern and has found Representative Cohen accessible and responsive. By contrast, Mr. Moore has found that the Republican Party is hostile to Black people in Tennessee and that they do not want to hear from him. In particular, Mr. Moore notes that the Tennessee General Assembly has consistently preempted laws passed by local governments in Memphis and

5

Shelby County aimed at helping Black residents in those areas. Mr. Moore fears that he will not have a representative who is responsive to the issues that matter to him and the Black community. Mr. Moore is also concerned about how dividing Memphis into three congressional districts will affect funding for roads and other infrastructure.

13. Plaintiff Black Clergy Collaborative of Memphis ("BCCM") is a non-profit membership organization, made up of the ministers of approximately 20 Black churches and their congregations. All the members of BCCM live in Shelby County, in and around Memphis. Nearly all BCCM members are Black. For members above 18, most are also registered voters who vote regularly in local, state, and federal elections in Memphis and Shelby County, and plan to vote in the congressional elections this year.

14. Plaintiff BCCM has members who (1) are registered voters self-identifying as Black or African American, and (2) resided and voted in Congressional District 9 prior to the enactment of the May 2026 Map, and (3) have been moved into Congressional Districts 5 and 8 under the May 2026 Map. Plaintiff BCCM also has members who (1) are registered voters self-identifying as Black or African American, and (2) resided and voted in Congressional District 9 prior to the enactment of the May 2026 Map, and (3) remain in a fractured Congressional District 9 under the May 2026 Map but have now been stripped of their ability to elect the candidates they support. The vast majority of BCCM's members voted for Kamala Harris for President in 2024 and other Democratic candidates for office, including for Representative Cohen for Congress.

15. Plaintiff BCCM's mission is to unite and empower the Black church as a catalyst for social justice. BCCM believes that the Black church has a unique role to play in advancing economic empowerment, advocating for criminal justice reform, and promoting civic engagement. BCCM is committed to fostering a supportive network of clergy and congregations, cultivating

6

voices of leadership and empowerment, and building a more just and equitable democracy for all. It is a core part of BCCM's mission to engage the Black community in Memphis and Shelby County in civic life, including through voting and communicating with our elected officials.

16. BCCM works through volunteers from its affiliated churches to engage the Black community in Shelby County in civic life, including through voting and other engagement with the government. BCCM is known in the community as a trusted source for voter engagement and education in Memphis and Shelby County. In support of its civic engagement work, BCCM holds information sessions, sends postcards to voters (8,500 already sent this year, with a goal of 30,000), holds phone and text banks, and hosts candidate forums. BCCM has already engaged in substantial voter engagement work for the 2026 elections.

17. The May 2026 Map will make it more difficult for BCCM and its members to engage voters in Memphis for many reasons, including that the new districts in which Memphis sits are geographically much larger than before. This is especially true for members and volunteers who do not have access to a vehicle.

18. Plaintiff Memphis A. Philip Randolph Institute ("APRI") is a non-profit membership organization with seventy members in Memphis and Shelby County. It is the Memphis chapter of the national A. Philip Randolph Institute. A majority of Memphis APRI's individual members reside in Memphis and share APRI's mission. These members are also registered voters who vote regularly in local, state, and federal elections and plan on voting in the 2026 congressional elections this year. Plaintiff APRI has members who (1) are registered voters self-identifying as Black or African American, and (2) resided and voted in Congressional District 9 prior to the enactment of the May 2026 Map, and (3) have been moved into different congressional districts under the May 2026 Map. Plaintiff APRI also has members who (1) are

7

registered voters self-identifying as Black or African American, and (2) resided and voted in Congressional District 9 prior to the enactment of the May 2026 Map, and (3) remain in a fractured Congressional District 9 under the May 2026 Map but have now been stripped of their ability to elect the candidates they support.

19. APRI was organized in 1970 by Black union activists determined to champion the cause of workers, voters of color, and marginalized communities by, in part, increasing voter participation in government. APRI's mission is to bridge the gap between organized labor and the Black community to register, educate, and activate voters and the community on issues that are affecting them.

20. In line with its mission to educate voters, APRI has engaged in voter education efforts around the 2026 elections in Memphis. For example, APRI plans on canvassing in the community to speak with voters about different issues on the ballot and encourage voters to go out and vote for representatives of their choice. APRI relies on volunteers for our voter advocacy efforts, which include Get Out the Vote campaigns ("GOTV"), and election monitoring, which are at the heart of APRI's mission. Volunteers also assist with APRI's phone banking and email campaigns about issues important to APRI members and the Memphis community.

21. During the special session in which the May 2026 Map was enacted, APRI diverted staff time and resources from its core operations to advocate for fair maps. For example, the organization diverted volunteer resources from canvassing in Memphis to lobby in-person in Nashville during the special session. During this time, APRI staff reached out to every Republican representative in the General Assembly about the May 2026 Map's impact on Memphis and Black voters, but they were ignored. Now that the new map has passed, APRI will need to spend more

time and resources on canvassers and voter education materials, and in reaching out to members that are now split across three congressional districts.

22. Plaintiff Equity Alliance is a non-profit, Black-led grassroots organization promoting civic engagement among Black communities in Tennessee. The organization's goal is to educate, empower, and mobilize Black Tennesseans, including in Memphis, to hold the government accountable. Since 2016, the Equity Alliance has registered more than 90,000 voters.

23. The 2026 Maps make it more difficult for the Equity Alliance to organize and advocate for issues that matter to Black voters in Shelby County. It will also force the Equity Alliance to revise its voter education materials and tailor education and advocacy to each voter depending on which congressional district they have been placed.

24. The Individual Plaintiffs as well as the members of the Organizational Plaintiffs are injured by the actions challenged herein. In particular, the destruction of Congressional District 9 and the three-way dissection of the City of Memphis via Tennessee's gratuitous mid-decade redrawing of the congressional lines discriminates against them on the basis of race, causes them dignitary harms and other harms by targeting and singling them out for mistreatment on the basis of their race and in retaliation for their political expression and association, deprives them of an equal and effective vote, severs their connection with their existing representation including for purposes of petitioning for redress of grievances, and imposes tangible burdens on their ability to organize, leverage their long-cultivated social and political networks in their political activities, and participate effectively in the political process, especially with respect to congressional elections.

25. Defendant Tennessee Secretary of State Tre Hargett appoints the Coordinator of Elections who serves "at the pleasure of the secretary of state." Tenn. Code § 2-11-201(a). Along

9

with the Governor, Attorney General, and Recorder, the Secretary of State is responsible for certifying the results of congressional elections in Tennessee. Tenn. Code § 2-8-110.

26. Defendant Tennessee Coordinator of Elections Mark Goins is the Coordinator of Elections, who is tasked with supervising all elections and "[a]uthoritatively interpret[ing] the election laws for all persons administering them." Tenn. Code § 2-11-202(a)(1), (4).

27. Defendant State Election Commission consists of seven members, including Donna Barrett, Judy Blackburn, Jimmy Eldridge, Mike McDonald, Secondra Meadows, Vanecia Belser Kimbrow, and Kent Younce, who are sued in their official capacities. The State Election Commission appoints the county election commissioners in each county, who are responsible for promulgating policies for the electoral process. Tenn. Code §§ 2-12-101; 2-12-116.

## FACTUAL ALLEGATIONS

### *Tennessee's Post-2020 Congressional Plan*

28. In January 2022, following the 2020 Census, Tennessee enacted a congressional plan, which was signed into law on February 6, 2022 (the "2022 Plan"). The plan included Congressional District 9, which was centered in Memphis and Shelby County. Memphis is a majority-Black city (61.3% Black voting age population) and is home to the largest concentration of Black people in the State (401,033 total persons). Shelby County, which contains Memphis, is a majority-Black County (51.4% Black voting age population). 492,757 Black people live in Shelby County, which is over 40% of the Black population of the State of Tennessee. Consistent with those demographics, Congressional District 9 was also majority Black (61.1% Black voting age population).[1]

---

[1] This data and all other demographic data herein unless otherwise specified is drawn from the 2020 U.S. Census Bureau's PL 94-171 file for Tennessee, which is available on the U.S. Census Bureau website (https://www.census.gov/programs-surveys/decennial-census/about/rdo/summary-files.html#P1) and via the Tennessee Data Center at the University of

29. Congressional District 9 was not drawn pursuant to a court order. Nor has it ever been held to have been drawn predominantly based on race.[2]

30. Indeed, at least since the Supreme Court's 1962 holding in *Baker v. Carr* which helped establish the principle of one-person, one-vote in legislative districting, the Tennessee congressional map has always included a compact district centered around Memphis.[3]

### Tennessee's Ban on Mid-Decade Redistricting

31. Tennessee's political traditions have long included a total ban on mid-decade redistricting of its congressional lines.

32. Since 1972 (and until days ago), Tennessee law has required that the General Assembly redraw congressional lines only once after the decennial Census and that "The districts may not be changed between apportionments." Tenn. Code § 2-16-102; *see* Tenn. 1972 Pub. Acts, ch. 740, § 1.

### White Control Over Tennessee Politics

33. Prior to 1965, Black Tennesseans were effectively barred from voting and political participation altogether, and state government was controlled by a White-dominated Democratic

---

Tennessee – Knoxville (https://tnsdc.utk.edu/data-and-tools/2020-census/2020-pl-94-171-redistricting-data-summary-file/).

[2] *See, e.g.*, *Tenn. State Conf. of NAACP v. Lee*, 746 F. Supp. 3d 473, 511 (M.D. Tenn. 2024) (three-judge panel) (dismissing a complaint without prejudice for failure to plausibly allege that Tennessee's 2022 plan was drawn based on race).

[3] *See Tennessee Congressional*, American Redistricting Project, https://thearp.org/maps/congress/1964/TN (click through to view the congressional maps through the 2024 election) (last visited May 9, 2026); *see also* Matt Brown, *Tennessee Redistricting Plan Splits Memphis Neighbors and Reshapes Midterms as Other States Follow*, Associated Press (May 9, 2026), https://apnews.com/article/tennessee-redistricting-memphis-black-voters-south-b35a4b19c2c4818a660d3689cb8b1f82 (noting that "[t]he Memphis district predates the Voting Rights Act. For at least a century, well before Congress acted to protect minority voting rights, Tennessee has believed it made sense for its metropolis on the Mississippi River to have its own U.S. House district").

Party. Racially discriminatory laws like poll taxes prevented any participation by Black voters and attempts to participate were met with economic or legal penalties by employers and landowners, and deadly violence by White militant groups. This system existed for the better part of a century after the end of Reconstruction.

34. In the 1960s, the first handful of Black officials were elected to state office since Reconstruction, particularly from predominantly Black areas like Memphis, which first sent A.W. Willis to the General Assembly in 1964.[4] In the years that followed, as Black voters gained the right to vote following the passage of the Voting Rights Act in 1965, a realignment occurred. Newly enfranchised Black voters supported candidates for office in the then-dominant Democratic Party, whose national leaders had supported civil rights legislation.[5] But White voters left the Democratic Party, and rallied to the Republican Party, whose leaders, beginning with Barry Goldwater in 1964 and then Richard Nixon in 1968, increasingly opposed to civil rights legislation.[6] Between 1965 and the 1990s, Tennessee's White majority realigned to the Republican Party, and Tennessee

---

[4] Toby Sells, *Archie Willis*, Memphis Magazine (Apr. 2018), https://memphismagazine.com/features/archie-willis/ ("A.W. Willis is remembered for many things, for working to desegregate the Memphis City Schools, or for being the first African American elected to the Tennessee General Assembly since Reconstruction."); Robert J. Booker, *Black Tennesseans Have a 150-Year History of Serving in State Legislature*, Knox News (May 2, 2023), https://www.knoxnews.com/story/opinion/2023/05/02/opinion-black-citizens-have-long-history-of-serving-in-legislature/70168587007/ ("A.W. Willis became the [ ] first Black citizen elected to the Tennessee House in modern times. He was elected from Memphis in 1964.").

[5] Karen Grigsby Bates, *Why Did Black Voters Flee the Republican Party in the 1960s?*, NPR (July 14, 2014), https://www.npr.org/sections/codeswitch/2014/07/14/331298996/why-did-black-voters-flee-the-republican-party-in-the-1960s.

[6] *Id*.

gradually became a stronghold for a White-dominated Republican Party.[7] By 2011, White officials from the Republican Party had established total control over state government in Tennessee.[8]

35. Today, this White-dominated faction holds a supermajority of seats in the General Assembly. There are zero Black Republicans in either chamber of the General Assembly. The White supermajority in the General Assembly appointed White politicians from their White-dominated faction to the offices of Secretary of State and Treasurer. Tennessee's governor is also a White politician from this White-dominated faction and he, in turn, appointed another White politician from their faction as Attorney General, as well as the five White justices of the Tennessee Supreme Court. Thus, as in the period prior to 1965, a White-dominated political faction again holds total power over state government in Tennessee.

36. While White voters in Tennessee, who comprise a majority of the state, now heavily support the Republican Party, Black voters in Tennessee have continued to support candidates

---

[7] *See* Video of *S. Floor Sess.* at 3:10:54–3:15:20, 114th Gen. Assemb., 2d Extraordinary Special Sess. (Tenn. May 7, 2026) (statement of Sen. Oliver), https://tnga.granicus.com/player/clip/33451?view_id=777&redirect=true; *see also, e.g.*, Ilyana Kuziemko & Ebonya Washington, *Why Did the Democrats Lose the South? Bringing New Data to an Old Debate*, 108 American Economic Review 2830 (2018), https://www.aeaweb.org/articles?id=10.1257/aer.20161413 ("The exodus of Southern whites from the Democratic Party is one of the most transformative, and controversial, political developments in twentieth-century American history. Using newly available data, we conclude that defection among racially conservative whites just after Democrats introduce sweeping Civil Rights legislation explains virtually all of the party's losses in the region."); Jonathan Knuckey, *Explaining Recent Changes in the Partisan Identifications of Southern Whites*, 59 Political Research Quarterly, 57–70 (2006), http://www.jstor.org/stable/4148075 (discussing how "racial attitudes" helped drive the shift towards the Republican Party for White voters in the South); Nicholas Valentino & David Sears, *Old Times There Are Not Forgotten: Race and Partisan Realignment in the Contemporary South*, 49 American Journal of Political Science 672-688 (2005) https://doi.org/10.1111/j.1540-5907.2005.00136.x (discussing how "racial conservatism" drove shift of White voters in the South to the Republican Party).

[8] Vivian Jones, *GOP Control Deeply Rooted in TN but Challenges Persist*, The Tennessean (Feb. 15, 2026), https://www.tennessean.com/story/news/politics/2026/02/15/republicans-tennessee-legislature-executive-brance/88181103007/.

13

aligned with the Democratic Party, which has remained open to their participation and responsive to their desire for government that promoted racial inclusion and equality, including with respect to the provision of critical public services. Given the high degree of racial division and polarization in Tennessee politics, as well as specific Tennessee laws and policies that continue to impede Black political participation—such as draconian felony disenfranchisement laws that bar one in every five Black citizens from voting[9]—Black voters are almost never able to elect the candidates they support except in districts where they comprise a working majority.

37. Congressional District 9, a longstanding, compact congressional district anchored in the predominantly Black City of Memphis, whose majority-Black composition is driven naturally by the demographics of Memphis, has been one such district. In Congressional District 9, Black voters, including Plaintiffs, have long organized to elect candidates responsive to Black communities, working through longstanding civic institutions and advocacy organizations, as well as social, family, and professional networks.

38. All of Tennessee's other congressional districts are majority-White and thus elect White candidates from the White-dominated faction in power in the State.

### *White Politicians in the General Assembly Demonstrate Animus Towards Black Tennesseans and Opposition to Black Tennesseans' Aspirations for Dignity and Equality.*

39. White politicians from the White-dominated supermajority faction in the General Assembly have demonstrated animus towards Black Tennesseans, including and especially Black Tennesseans who assert the right to equal dignity and treatment by powerful Whites.

---

[9] Bianca Fortis, *How Tennessee Disenfranchised 21% of Its Black Citizens*, ProPublica (Nov. 8, 2022), https://www.propublica.org/article/tennessee-black-voters-disenfranchised.

14

40. White politicians from the White-dominated supermajority faction in the General Assembly have an extensive, recent history of making racist comments about Black Tennesseans, including their own colleagues in the General Assembly. A few examples:

a. In 2015, Rep. Sheila Butt, of the White-dominated supermajority, advocated for the creation of an "NAAWP," which stands for the National Association for the Advancement of White People and is a term used by White supremacist organizations.[10]

b. In 2016, Rep. Courtney Rogers, of the White-dominated supermajority, co-sponsored a bill to defund the diversity office at the University of Tennessee, referring to White and Black students as "light meat" and "dark meat."[11]

c. In 2018, Rep. Jerry Sexton, of the White-dominated supermajority, touted his hometown as having had "the first white baby in the state of Tennessee."[12]

d. In 2019, investigative reporters discovered that Cade Cothren, the chief of staff to then-House Speaker Glen Casada of the White-dominated supermajority, texted his friends that "black people are idiots." Cothren also reportedly used a racial slur to

---

[10] Andrea Zelinski, *Rep. Sheila Butt Says We Need an NAAWP*, Nashville Scene (Feb. 25, 2015), https://www.nashvillescene.com/news/rep-sheila-butt-says-we-need-an-naawp/article_fce06e6a-eeef-5871-a51d-3c4e9ee5ed5b.html; *see also* Lois Beckett, *Twitter Bans White Supremacist David Duke After 11 Years*, The Guardian (July 31, 2020), https://www.theguardian.com/technology/2020/jul/31/david-duke-twitter-ban-white-supremacist (describing how White supremacist David Duke founded an organization by that name).

[11] Joel Ebert & Natalie Allison, *'We're Sick of It,' Black Tennessee Lawmakers Say of Racial Insensitivity*, The Daily Herald (June 15, 2020), https://www.columbiadailyherald.com/story/news/state/2020/06/15/8216we8217re-sick-of-it8217-black-tennessee-lawmakers-say-of-racial-insensitivity/112301216/.

[12] *Id.*

refer to a prominent Black professional football player.[13] Speaker Casada himself, invoking his status as a state representative for standing purposes, had served as a plaintiff in a lawsuit contending that President Barack Obama was not a natural-born citizen of the United States and therefore ineligible to be President of the United States. *Barnett v. Obama*, No. 09-cv-0082, 2009 WL 3861788, at *6 (C.D. Cal. Oct. 29, 2009). And Casada and other legislative leaders from the White-dominated supermajority also resisted the removal of the bust of Confederate general Nathan Bedford Forrest from the state Capitol for decades.[14] Forrest, a slave trader who was born in Tennessee, is known for his role in the massacre of Black Union troops at Fort Pillow, Tennessee after their surrender, and for being the first grand wizard of the Ku Klux Klan.[15]

e. In 2020, Rep. Mike Carter, of the White-dominated supermajority, said that a Black colleague was not paying attention because he was looking for a fried chicken recipe.[16]

---

[13] Eli Watkins & Pamela Kirkland, *Tennessee GOP Speaker Faces Calls to Resign After Top Aide Steps Down Amid Scandal*, CNN (May 7, 2019), https://www.cnn.com/2019/05/07/politics/tennessee-speaker-casada-cothren.

[14] Paige Pfleger, *After Decades-Long Fight, Nathan Bedford Forrest's Bust is Out of the Tennessee Capitol*, WPLN (July 22, 2021), https://wpln.org/post/after-decades-long-fight-nathan-bedford-forrests-bust-is-out-of-the-tennessee-capitol/; Brook Wanser, *Casada Flips on Removal of Nathan Bedford Forrest Bust from State Capitol*, Williamson Herald (Aug. 28, 2020), https://www.williamsonherald.com/news/casada-flips-on-removal-of-nathan-bedford-forrest-bust-from-state-capitol/article_f87b1272-e95e-11ea-81e8-1bfaef8d944d.html.

[15] The Associated Press, *A Confederate General's Remains Are Being Moved Out of Memphis*, NPR (June 19, 2021), https://www.npr.org/2021/06/19/1008371491/confederate-general-remains-memphis-moved; *see also* National Civil War Museum, *Civil Conversations - Nathan Bedford Forrest: Reckoning with the Devil*, https://www.nationalcivilwarmuseum.org/civil-conversations/nathan-bedford-forrest-reckoning-with-the-devil/?

[16] Joel Ebert, *Tennessee Lawmaker Apologizes for 'Fried Chicken' Remark to Black Colleague*, The Tennessean (June 8, 2020),

f.  In 2020, another legislative leader from the White-dominated supermajority referred to a Black activist (future State Representative Justin Jones) and another Black lawmaker as "baboons."[17]

g.  In 2023, Rep. Paul Sherrell, another politician from the White-dominated supermajority, joked about lynching during a committee hearing, asking if the state would consider adding "hanging by a tree" to its list of execution methods.[18] He stated: "I think it's a very good idea, and I was just wondering . . . could I put an amendment on that it would include hanging by a tree, also?" In response to these comments, Rep. Justin Pearson, who is Black, read the names of those who had been lynched in Shelby County while on the House floor "to recognize in memoriam some beloved community members," but House Speaker Sexton, of the White-dominated supermajority, cut off Rep. Pearson's microphone and warned that he was out of line.[19]

41.  White politicians from the White-dominated supermajority in the General Assembly have also repeatedly advanced legislation premised on racial stereotypes about Black Tennesseans or on rejecting the existence of racism altogether. A few examples:

---

https://www.tennessean.com/story/news/politics/2020/06/08/tennessee-lawmaker-apologizes-fried-chicken-remark-black-colleague/5323462002/.

[17] Natalie Allison, *No One Should Be That Shocked by What's Happening in Tennessee*, Politico (Apr. 8, 2023), https://www.politico.com/news/magazine/2023/04/08/tennessee-descent-statehouse-mag-00091090.

[18] Matthew Brown, *Problematic Things Tenn. Republicans Have Done Without Getting Expelled*, Wash. Post (Apr. 8, 2023), https://www.washingtonpost.com/politics/2023/04/08/tennessee-republicans-expelled/.

[19] Kimberlee Kruesi, *Tennessee Lawmaker Apologizes over 'Hanging' Comment*, AP News (Mar. 2, 2023), https://apnews.com/article/tennessee-9e059fd97d4831f3d1080dc7a9342cf4.

17

a. In 2020, a majority of the Tennessee House refused to advance a resolution commemorating the death of a seventeen-year-old Black girl who was shot and killed in her car, after a representative from the White-dominated supermajority made unproven allegations that the teenager had participated in a marijuana sale.[20]

b. In 2021, the Tennessee General Assembly passed H.B. 580,[21] a law aimed at removing the teaching of so-called critical-race theory from schools. That law is now being used by White parents to attempt to forbid students from reading certain children's books about the history of desegregation, including "Ruby Bridges Goes to School" and a picture book about school segregation in California.[22]

c. In 2022, Rep. Bud Hulsey, of the White-dominated supermajority, filed a resolution reprimanding the Associated Press for publishing an investigation that revealed racism and discrimination in the U.S. armed forces. The resolution declared that such racism "does not exist."[23]

---

[20] Kimberlee Kruesi, *Tenn. GOP Spike Resolution Honoring Black Teen Shot, Killed*, AP News (June 16, 2020), https://apnews.com/general-news-71b6214129d718dd68c32f42c4289e77.

[21] 2021 Tenn. Pub. Acts, ch. 493 (codified at Tenn. Code Ann. § 49-6-1019).

[22] Gabriella Borter, *Insight: 'Critical Race Theory' Roils a Tennessee School District*, Reuters (Sep. 21, 2021), https://www.reuters.com/world/us/critical-race-theory-roils-tennessee-school-district-2021-09-21/; Hannah Joy, *Parents Criticize Ruby Bridges Book in Debate over CRT, Tenn. Curriculum*, The Grio (July 8, 2021), https://www.yahoo.com/news/parents-criticize-ruby-bridges-book-212700985.html.

[23] H.J.R. 709, 112th Gen. Assemb. (Tenn. 2022) ("[I]t is the sense of this General Assembly that the May 2021 Associated Press article alleging 'deep-seated racism' and a 'culture of discrimination' in the U.S. military is manifestly untrue and disingenuously presents data to identify a problem that does not exist, and we reprimand the AP for engaging in the lowest form of incendiary journalism.")

18

d. In 2022, White politicians from the White-dominated supermajority revised a resolution honoring Martin Luther King Jr. Day to omit mention of Dr. King's efforts to combat racism.[24] Dr. King was shot and killed in Memphis in 1968.

e. In 2023, the official social media account for the White-dominated supermajority in the Tennessee House of Representatives stated that Rep. Pearson, who is Black, "should explore a different career opportunity" after he wore a dashiki, which is a traditional West African tunic, on the House floor.[25]

f. In 2025, the Tennessee General Assembly passed legislation co-sponsored by White Senator John Stevens of the White-dominated supermajority terminating Tennessee's Human Rights Commission, which is responsible for enforcing civil rights laws in employment, housing, and public accommodations in Tennessee.[26] The independent agency had operated for sixty years to protect Black people and other minorities from discrimination.

42. Another recent, high-profile instance of racial discrimination by White politicians from the White-dominated supermajority in the General Assembly occurred in April 2023 around the General Assembly's expulsion of two Black lawmakers—Representative Justin Jones for the 52nd district, and Representative Pearson for the 86th district—for participating in a protest against gun violence in Tennessee.

---

[24] Kimberlee Kruesi and Jonathan Mattise, *Black Lawmakers Say Tennessee GOP Ignores Racism Concerns*, Fox 17 (Jan. 25, 2022), https://fox17.com/news/local/black-lawmakers-say-tennessee-gop-ignores-racism-concerns.

[25] Kelli Cook, *State Rep. Justin Pearson Criticized on House Floor for Wearing Traditional West African Garb*, Action 5 News (Feb. 10, 2023), https://www.actionnews5.com/2023/02/11/state-rep-justin-pearson-criticized-house-floor-wearing-traditional-west-african-garb/.

[26] S.B. 861, 114th Gen. Assemb., 1st Extraordinary Sess. (Tenn. 2025), https://wapp.capitol.tn.gov/apps/BillInfo/Default?BillNumber=SB0861&GA=114.

19

43.     Since the Civil War, only two elected members of the Tennessee General Assembly have been expelled, each following investigations or official reviews of serious misconduct.[27] But no investigative committee was formed prior to the General Assembly's votes to expel Rep. Jones and Rep. Pearson. White lawmakers who also participated in the April 2023 demonstrations, like Representative Gloria Johnson, were, however, not expelled. When asked why the vote on her expulsion came out differently from the votes regarding Representatives Jones and Pearson, Representative Johnson stated: "I'll answer your question; it might have to do with the color of our skin."[28]

44.     White politicians from the White-dominated supermajority in the General Assembly have also repeatedly attacked the predominantly Black City of Memphis, including in racial terms, attempting to nullify the will of the voters and take control over the city's education and law enforcement systems.

   a. In 2017, the city of Memphis sold two of its parks in order to allow statues of Confederate President Jefferson Davis and Confederate General and Ku Klux Klan leader Nathan Bedford Forrest to be taken down, in advance of the city's

---

[27] In 2016, Representative Jeremy Durham was expelled by a 70-2 vote following allegations of sexual misconduct while in office, which were bolstered by a thorough investigation led by the Tennessee Attorney General. *See* Andy Sher, *A First in 4 Decades, Tennessee House Ousts One of Its Own*, Governing (Sept. 14, 2016), https://www.governing.com/archive/tns-durham-tennessee.html. In 1980, the Tennessee House voted 92-1 to expel Rep. Robert Fisher after he was convicted of soliciting a bribe while in office. Fisher's expulsion was the first time in which a member of the Tennessee General Assembly was expelled from office for official misconduct. A special committee reviewed Fisher's case prior to the expulsion. *See* Joel Ebert & Natalie Allison, *The Tennessee House Expelled a Member by Resolution in 1980. Will They Do It Again?*, The Tennessean (Aug. 20, 2019), https://www.tennessean.com/story/news/politics/2019/08/21/rep-david-byrd-tennessee-house-expelled-robert-fisher-1980/1960692001/.

[28] Nina Lakhani, *Harris Visits Ousted Tennessee Lawmakers as Republicans Accused of 'Overt Racism'*, The Guardian (Apr. 7, 2023), https://www.theguardian.com/us-news/2023/apr/07/tennessee-republicans-racism-democrats-expelled.

20

commemoration of the 50th anniversary of the assassination of Dr. Martin Luther King Jr. in the city.[29] This move was widely celebrated and sought after by members of the Memphis Black community.[30] But in open retaliation, the White officials from the White-dominated supermajority in control of the General Assembly voted to strip $250,000 earmarked for the city's bicentennial celebrations the following year.[31] The retaliation was no secret: Rep. Gerald McCormick and other White officials defended the decision to withhold funding from the bicentennial celebrations, indicating there had to be consequences for defying the General Assembly.[32]

b. In 2024, the White-dominated supermajority in the General Assembly passed S.B. 2572, which purported to nullify policing reforms that the City of Memphis passed in the aftermath of the police killing of Tyre Nichols, a Black Memphis resident, including a prohibition on pretextual traffic stops.[33] S.B. 2572 was passed over the objections of Mr. Nichols' parents and Rep. Pearson, who represents part of Memphis. At the March 14, 2024 Senate Floor Session, Sen. London Lamar, who

---

[29] Laurel Wamsley, *Finding a Legal Loophole, Memphis Takes Down Its Confederate Statues*, NPR (Dec. 21, 2017), https://www.npr.org/sections/thetwo-way/2017/12/21/572654031/finding-a-legal-loophole-memphis-takes-down-its-confederate-statues.

[30] *Id.*

[31] Chas Sisk, *Tennessee Strips $250,000 from Memphis as Payback for Removing Confederate Statues*, NPR (Apr. 18, 2018), https://www.npr.org/2018/04/18/603525897/tennessee-strips-250-000-from-memphis-as-payback-for-removing-confederate-statue.

[32] *Id*.

[33] Jacob Gallant, Kelli Cook, and Joyce Peterson, *Senate Passes Bill Removing Local Control of Police Policies*, Action News 5 (Mar. 14, 2024), https://www.actionnews5.com/2024/03/14/senate-passes-bill-removing-local-control-police-policies/.

represents Memphis and the district in which Mr. Nichols was killed, called the bill "a slap in the face" to Memphis because "we're telling them you are not smart enough to decide policies that help govern your own city."[34]

c. Also in 2024, White leaders from the White-dominated supermajority, including House Speaker Cameron Sexton and Senate Speaker Randy McNally, issued a statement threatening to withhold tens of millions of dollars in state funding from Memphis in retaliation for the city council's approval of a ballot initiative asking voters if they wanted to amend the city charter to require certain gun control measures.[35]

d. This past legislative session, the White-dominated supermajority in the General Assembly passed H.B. 662/S.B. 714, which authorizes an "unprecedented" state takeover of Memphis-Shelby County Schools. One school board member called the law "racist," noting that Memphis has "the Blackest public school system [] in the state of Tennessee." And Memphis residents and Black legislators opposed the legislation, pointing out that supplanting Memphis's elected school board would disenfranchise voters.[36] But the bill's sponsor, State Senator Brent Taylor of the White-dominated faction, said that Memphis' democratically-elected school board,

---

[34] *Id.*

[35] Kimberlee Kruesi, *Tennessee Republican Leaders Threaten to Withhold Funds as Memphis Preps to Put Guns on the Ballot*, AP News (Aug. 26, 2024), https://apnews.com/article/gun-control-tennessee-6a475238d8aa3d5a833a16e0ef25fb5c.

[36] *See, e.g.*, Lauren Turman, *MSCS Board Votes to Challenge State Takeover*, Local Memphis (Apr. 21, 2026), https://www.localmemphis.com/article/news/local/mscs-board-votes-to-legally-challenge-state-oversight-as-governor-bill-lee-signs-bill-blocking-them-from-it-memphis/522-cea218c9-e5a5-4838-af98-52f527c640fb; Deja Davis & Shay Arthur, *House Bill for State Control of MSCS Advances*, WREG (Mar. 18, 2025), https://wreg.com/news/local/house-bill-for-state-control-of-mscs-advances/.

of which eight out of its nine members are Black, was "as credible as my mother's Facebook page. Just because somebody was elected, if they're incompetent to do the job, then they have to be held accountable."[37]

e. This legislative session, the General Assembly also passed S.B. 443/H.B. 483, which authorizes the Tennessee Attorney General to request an audit of the Shelby County District Attorney's Office and ultimately to seek the replacement of Shelby County's elected District Attorney.[38] White officials promoted the legislation as being "focused on one of the most dangerous areas of Tennessee," essentializing Memphis to a broad stereotype.[39] Opponents of the legislation, like Sen. Lamar, who is Black and represents Memphis, pointed out that by targeting only Shelby County, the White-dominated supermajority was singling out or, "trying to degrade Memphis' rightfully elected officials because we don't like who they are or their political party's stance."[40] Legislators and other opponents pointed out that the legislation provided no basis for why it was focused only on Shelby County and

---

[37] Sky Arnold, *Legislation Allowing State Intervention into Memphis-Shelby County Schools Advances Following Debate by Two Memphis Lawmakers*, Tenn. Firefly (Mar. 27, 2025), https://tnfirefly.com/news/legislation-allowing-state-intervention-into-memphis-shelby-county-schools-advances-following-debate-by-two-memphis-lawmakers.

[38] Sam Stockard, *Tennessee House Passes Shelby County District Attorney Removal Bill*, Tenn. Lookout (Apr. 16, 2026), https://tennesseelookout.com/2026/04/16/tennessee-house-passes-shelby-county-district-attorney-removal-bill/.

[39] Video of *Hearing of H. Crim. J. Subcomm.* at 40:49–40:53, 114th Gen. Assemb., 1st Extraordinary Sess. (Tenn. Apr. 7, 2026) (statement of Rep. Lamberth), https://tnga.granicus.com/player/clip/33211?view_id=796&redirect=true.

[40] Video of *Hearing of S. Jud. Comm.* at 44:25–44:31, 114th Gen. Assemb., 1st Extraordinary Sess. (Tenn. Apr. 8, 2026) (statement of Sen. Lamar), https://tnga.granicus.com/player/clip/33225?view_id=775&redirect=true.

treated Shelby County differently from other district attorneys' offices across the state.[41]

45. These repeated attempts by the General Assembly's White supermajority to undermine self-government in predominantly Black Memphis and Shelby County and to strip a predominantly Black community of the right to elect its officials based on flimsy, stereotyped, or racist assertions of criminality and incompetence occurred just in the last few months and weeks, in the period immediately leading up to May 2026 redistricting at issue in this action.

***White Politicians Initiate a Hasty, Unprecedented, and Extremely Irregular Mid-Decade Redistricting Session to Punish Black Voters and Strip Them of Political Power.***

46. On April 29, 2026, the U.S. Supreme Court decided *Louisiana v. Callais*. *Callais* involved a challenge to a Louisiana congressional district that was redrawn by the Louisiana legislature.[42] The district challenged in *Callais* was drawn by the Louisiana legislature specifically in response to a finding of likely violation of Section 2 of the Voting Rights Act and the grant of a preliminary injunction on that basis.[43] In *Callais*, the Supreme Court changed the legal standard governing when race-based districting is justified by compliance with Section 2.[44]

47. Congressional District 9 was not drawn pursuant to a court order or injunction and is simply a compact Black-majority district that occurs because of the demographics of the city on which it is centered, *i.e.*, the Black-majority city of Memphis. Nevertheless, almost immediately after the *Callais* decision's issuance, White leaders in Tennessee were calling for an unprecedented

---

[41] Sam Stockard, *Tennessee House Passes Shelby County District Attorney Removal Bill*, Tenn. Lookout (Apr. 16, 2026), https://tennesseelookout.com/2026/04/16/tennessee-house-passes-shelby-county-district-attorney-removal-bill/.

[42] *Louisiana v. Callais*, No. 24-109, 2026 WL 1153054 (U.S. Apr. 29, 2026).

[43] *Id*. at *8–10.

[44] *Id*. at *15.

round of mid-decade redistricting targeting Memphis-based Congressional District 9 for dismemberment.[45] White officials' express aim was breaking up the lone majority-minority district representing the largest majority-Black city in the State, targeting Black Memphians for their political expression and support for candidates disfavored by the White officials in power, and stripping those Black voters of political power.

48. On April 29, 2026, the same day *Callais* came down, White U.S. Senator Marsha Blackburn of the White-dominated faction stated, "I urge our state legislature to reconvene to redistrict another Republican seat in Memphis."[46] And Senate Speaker Randy McNally of the White-dominated supermajority, while acknowledging that Tennessee's existing 2022 Plan was "strong, fair and legal,"[47] urged the cracking of Memphis's Black population anyway: "Tennessee now has the opportunity to send another Republican voice to Washington. We intend to seize it."[48]

49. White State Representative Andrew Farmer of the White-dominated supermajority, who served as Chairman of the Tennessee House Judiciary Committee, stated that the General Assembly would not have returned if not for the U.S. Supreme Court's ruling regarding the Voting

---

[45] Staff, *Sen. Blackburn Calls for Redistricting TN to Remove Congressional Seat in Memphis*, Fox13 (Apr. 29, 2026), https://www.fox13memphis.com/news/sen-blackburn-calls-for-redistricting-tn-to-remove-congressional-seat-in-memphis/article_5f1ceb6e-8699-4a32-a1ab-4497470cf4a0.html.

[46] Marsha Blackburn (@VoteMarsha), X (Apr. 29, 2026, at 11:45 ET), https://x.com/VoteMarsha/status/2049515547910381782.

[47] Stuart Dyos & Vivian Jones, *After Supreme Court Ruling, Blackburn, GOP Allies Push Tennessee Map Redraw*, The Tennessean (Apr. 29, 2026), https://www.tennessean.com/story/news/politics/elections/2026/04/29/blackburn-legislature-redistrict-tennessee-congressional-map/89857822007.

[48] Randy McNally (@ltgovmcnally), X (May 1, 2026, at 18:06 ET), https://x.com/ltgovmcnally/status/2050335993643855905.

25

Rights Act in *Louisiana v. Callais*, effectively acknowledging that Memphis and Congressional District 9 were being targeted because of their majority-Black status.[49]

50. On May 1, 2026, Governor Lee called a special session, which began on May 5, 2026. The official proclamation calling the Extraordinary Session stated that "following the renewed nationwide action around congressional representation," "we owe it to Tennesseans to ensure our congressional districts accurately reflect the will of Tennessee voters."[50]

51. Redrawing congressional lines mid-decade and in May of an election year was completely unprecedented in modern Tennessee history. As noted, Tennessee law had long forbidden congressional districts from being "changed between apportionments." Tenn. Code. Ann. § 2-16-102. In other words, the Extraordinary Session had been called to do something expressly contrary to state law. Moreover, campaign season in the existing districts was already underway, with the qualifying deadline having run in March 2026. Speaker McNally openly acknowledged this extreme irregularity and inconsistency with existing law and practice: "With the filing deadline passed and qualified candidates already running for election, redistricting congressional seats at this time would present several logistical challenges."[51]

52. Yet the General Assembly's White supermajority steamrolled these traditions and numerous procedural constraints in their zeal to gut majority-Black Congressional District 9.

---

[49] Sam Stockard *et al.*, *Tenn. GOP to Limit Public Input on Redrawing U.S. House Map as Protesters Descend on Capitol*, Tennessee Lookout (May 5, 2026), https://tennesseelookout.com/2026/05/05/tenn-gop-to-limit-public-input-on-redrawing-u-s-house-map-as-protesters-descend-on-capitol/.

[50] Tenn. Office of the Gov., *Gov. Lee Calls for Special Session to Review Congressional Map* (May 1, 2026), https://www.tn.gov/governor/news/2026/5/1/gov--lee-calls-special-legislative-session-to-review-congressional-map.html.

[51] Associated Press, *Supreme Court Ruling on Race-Based Redistricting Prompts Quick Action in Some States*, WTOP News (Apr. 29, 2026), https://wtop.com/national/2026/04/supreme-court-ruling-on-race-based-redistricting-prompts-quick-action-in-some-states/.

53. On the first day of the Extraordinary Session, White officials introduced and quickly advanced legislation to override the prohibition on mid-decade redistricting that had been unchanged in Tennessee law since 1972, following the very first census after the Supreme Court mandated the use of equipopulous districts in congressional elections.[52] During a hearing of the Senate State and Local Government Committee the next day, the legislation's sponsor, Senator Jack Johnson of the White-dominated supermajority, admitted that Tennessee had never before defied or made exceptions to this ban on mid-decade congressional redistricting since its enactment.[53]

54. Black legislators called attention to this gross departure repeatedly. For example, Representative Harold Love pointed out on the House floor that "this process" was "not being done the right way. 1981, 1992, 2001, 2012, 2022. Each of those moments were moments when a redistricting process took place. Bills were filed, bills were deliberated, bills were passed after data was collected from the 10-year, what we call the census. The reason that was done, because we wanted to make sure that if there were population shifts in the state, we didn't want any district

---

[52] Tenn. Code § 2-16-102 (prohibiting mid-decade redistricting); *see* Tenn. 1972 Pub. Acts, ch. 740, § 1 (original form of the mid-decade redistricting ban); *see also Baker v. Carr*, 369 U.S. 186 (1962).

[53] Video of *Hearing Before S. State and Local Gov. Comm*. at 30:28–30:52, 114th Gen. Assemb., 2d Extraordinary Special Sess. (Tenn. May 6, 2026) (statement of Senator Johnson), https://tnga.granicus.com/player/clip/33461?view_id=844&redirect=true. The last time Tennessee had conducted mid-decade redistricting was 1965, as a direct result of *Baker v. Carr*, and the Supreme Court's ruling that Tennessee was required to draw equipopulous legislative districts. Video of *S. Floor Sess*. at 59:48–1:00:11, 114th Gen. Assemb., 2d Extraordinary Special Sess. (Tenn. May 7, 2026) (statement of Sen. Watson), https://tnga.granicus.com/player/clip/33451?view_id=777&redirect=true. Prior to *Baker*, Tennessee had not redistricted since 1901. Video of *Hearing Before S. State and Local Gov. Comm*. at 11:56–12:02, 114th Gen. Assemb., 2d Extraordinary Special Sess. (Tenn. May 6, 2026), https://tnga.granicus.com/player/clip/33461?view_id=844&redirect=true.

27

having fewer people or one district having more people and the representation not being fair. And this was the process, and it has worked."[54]

56. The measure to hurriedly toss aside a 50-plus-year tradition and allow for the mid-decade redrawing of congressional lines over the course of mere days, in May of an election year, was ultimately enacted by the White-dominated supermajority with no support from any Black legislators.[55]

56. Also on the first day of the Extraordinary Session, the Ad Hoc Committee on Rules, which was controlled by White officials from the White-dominated supermajority, rejected proposed rules that would have allowed for public hearings on redistricting legislation and would have required legal analysis for compliance with the statutes and laws of Tennessee and the United States.[56] The White-controlled Committee instead took measures to reduce the transparency of the already lightning-fast process, by shortening the time frame for the public to view any new U.S.

---

[54] Video of *H. Floor Sess.* at 35:51–36:54, 114th Gen. Assemb., 2d Extraordinary Special Sess. (Tenn. May 7, 2026) (statement of Rep. Love), https://tnga.granicus.com/player/clip/33468?view_id=776&redirect=true.

[55] H.B. 7001, 114th Gen. Assemb., 2d Extraordinary Special Sess. (Tenn. 2026), Floor and Committee Votes, https://wapp.capitol.tn.gov/apps/BillInfo/Default?BillNumber=HB7001&ga=114 (select "Votes" from links at top); H.B. 7002, 114th Gen. Assemb., 2d Extraordinary Special Sess. (Tenn. 2026), Floor and Committee Votes, https://wapp.capitol.tn.gov/apps/BillInfo/Default?BillNumber=HB7002&ga=114 (select "Votes" from links at top); H.B. 7003, 114th Gen. Assemb., 2d Extraordinary Special Sess. (Tenn. 2026), Floor and Committee Votes, https://wapp.capitol.tn.gov/apps/BillInfo/Default?BillNumber=HB7003&ga=114 (select "Votes" from links at top); H.B. 7005, 114th Gen. Assemb., 2d Extraordinary Special Sess. (Tenn. 2026), Floor and Committee Votes, https://wapp.capitol.tn.gov/apps/BillInfo/Default?BillNumber=HB7005&ga=114 (select "Votes" from links at top).

[56] Video of *Hearing Before the Ad Hoc Comm. on Rules* at 13:48–16:04, 22:15–22:38, 114th Gen. Assemb., 2d Extraordinary Special Sess. (Tenn. May 5, 2026) (statement of Rep. Camper), https://tnga.granicus.com/player/clip/33436?view_id=784&redirect=true.

House map.[57] Allowing for public input regarding redistricting legislation is normal practice in Tennessee.[58]

57. White officials from the White-dominated supermajority faction on the Tennessee Ad Hoc Rules Committee also rejected a proposal from House Minority Leader Karen Camper, who is Black and represents Memphis, that would have brought transparency to the redistricting process by, among other things, requiring the financial impact of any proposed plan to be considered and requiring House members who participate in drawing the district map to disclose any entity and all data involved in the process.[59] This proposal was rejected.[60]

58. In addition to limiting transparency for the hasty and irregular mid-decade redistricting process, White officials from the White-dominated supermajority on the Rules Committee adopted rules to punish protest or dissent, barring anyone who "disrupts" meetings for

---

[57] *Id.* at 50:14–52:45; 1:12:57–1:13:08.

[58] Mary Darby, *2022 Redistricting Update*, Think Tennessee (Jan. 26, 2022), https://www.thinktennessee.org/blog/2022-redistricting-update/ (describing transparency procedures for the 2022 redistricting, including posting of maps with demographic information, setting up websites where the public could submit proposed maps, taking questions from the public during committee hearings); Stephen Eliot, *Legislature Beginning Public Redistricting Process*, NashvillePost (Aug. 30, 2021), https://www.nashvillepost.com/politics/elections/legislature-beginning-public-redistricting-process/article_aefc05c6-09a5-11ec-a048-3323a028c448.html.

[59] Video of *Hearing Before Ad Hoc Comm. on Rules* at 13:46–20:07, 114th Gen. Assemb., 2d Extraordinary Special Sess. (Tenn. May 5, 2026) (statement of Rep. Camper), https://tnga.granicus.com/player/clip/33436?view_id=784&redirect=true.

[60] *Id.* at 22:12–23:21; Deborah Fisher, *House Rules Committee Rejects Proposal to Make Redistricting Maps Public 72 Hours Before Vote*, Tenn. Coal. for Open Gov. (May 5, 2026), https://tcog.info/house-rules-committee-rejects-proposal-to-make-redistricting-maps-public-72-hours-before-vote/.

the entire Extraordinary Session.[61] Nevertheless, hundreds of protesters descended on the State Capitol in Nashville to push back against the redistricting effort.[62]

59.     By the close of the first day of the Extraordinary Session, no proposed maps had been made public or even made available to Black members of the General Assembly.[63]

***The White Officials Sponsoring the May 2026 Map Refuse to Answer Even the Most Basic Questions About the Map or the Process for Creating It.***

60.     On the second day of the Extraordinary Session, in a Senate Judiciary Committee hearing, White Senator John Stevens from the White-dominated supermajority faction revealed a proposed map that cracked Memphis and Congressional District 9 into three pieces. The map was designed to strip Black Memphians of political power: "This legislation, which is really a map today, is the proposed district lines for nine of members, which are the Tennessee representatives in the House of Representatives. Tennessee is a conservative state. When our congressional representation in Washington should reflect that, this map ensures that."[64] Senator Stevens introduced the May 2026 Map in the same way before the Senate Finance, Ways, and Mean

---

[61] Video of *Hearing Before Ad Hoc Comm. on Rules* at 50:23–53:36; 59:03–59:33; 1:12:49–1:13:55, 114th Gen. Assemb., 2d Extraordinary Special Sess. (Tenn. May 5, 2026) (statement of Rep. Boyd; vote on proposal), https://tnga.granicus.com/player/clip/33436?view_id=784&redirect=true; *see also* H.R. 114th Gen. Assemb. Permanent Rules of Order, 2d Extraordinary Sess. (Tenn. 2026) (See changes to Rule 4 and addition of Rule 21).

[62] Sam Stockard et al., *Tenn. GOP to Limit Public Input on Redrawing U.S. House Map as Protesters Descend on Capitol*, Tennessee Lookout (May 5, 2026), https://tennesseelookout.com/2026/05/05/tenn-gop-to-limit-public-input-on-redrawing-u-s-house-map-as-protesters-descend-on-capitol/.

[63] Madeleine Nolan, *Rule Changes, Protests and No Maps: What Happened on Day 1 of Tennessee's Special Session*, News 9 (May 6, 2026), https://newschannel9.com/news/local/rule-changes-protests-and-no-maps-what-happened-on-day-1-of-tennessees-special-session-tennessee-state-capitol-redistricting-jason-zachary-justin-jones.

[64] Video of *Hearing Before S. Jud. Comm.* at 2:58–3:20, 114th Gen. Assemb., 2d Extraordinary Special Sess. (Tenn. May 6, 2026) (statement of Sen. Stevens), https://tnga.granicus.com/player/clip/33465?view_id=841&redirect=true.

Committee: "We have nine congressional members from the state of Tennessee. Tennessee is a conservative state, and our congressional representation in Washington should reflect that. This map ensures that it does. With that, I'll ask for a favorable vote on the map."[65] Senator Stevens did not elaborate on what "conservative" meant or why the continued inclusion of a Memphis-based Congressional District in which Black voters exercise power, which had existed for decades, did not "reflect" Tennessee.

61. When asked basic questions about the map he introduced and sponsored and the map-drawing process, Senator Stevens gave bizarre responses. For example, in the Senate Judiciary Committee hearing, Senator Lamar asked Senator Stevens if Memphis and Shelby County were predominantly African American—a rudimentary demographic question about the second-largest city in the state. Senator Stevens, who attended law school in Memphis, would only say "I think you know the answer." Senator Stevens also nonsensically claimed he did not know if Congressional District 9 was a majority-Black district or the only majority-Black congressional district in the state.[66]

62. Senator Stevens also would not answer basic questions about the geography of the map he introduced. He would not answer the question of how many districts Memphis was being split across under his proposed map.[67] And when asked by Senator Lamar asked if the voters of

---

[65] Video of *Hearing Before S. Fin., Ways and Means Comm.* at 4:30–4:52, 114th Gen. Assemb., 2d Extraordinary Special Sess. (Tenn. May 6, 2026) (statement of Sen. Stevens), https://tnga.granicus.com/player/clip/33459?view_id=834&redirect=true.

[66] Video of *Hearing Before S. Jud. Comm.* at 56:25–56:52, 114th Gen. Assemb., 2d Extraordinary Special Sess. (Tenn. May 6, 2026) (exchange between Sen. Lamar and Sen. Stevens), https://tnga.granicus.com/player/clip/33465?view_id=841&redirect=true.

[67] *Id*. at 56:53–57:25.

Congressional District 9 "who were previously in a single majority Black district would now be split into several districts," he responded, "I don't know."[68]

63. In response to numerous questions from Senator Raumesh Akbari, who is Black and represents Memphis, about whether the map drawers considered keeping either Shelby County, Memphis, or related communities of interest whole in a single district, Senator Stevens would only say, "The consideration for drawing these maps was to maximize the Republican potential to maintain the majority in the United States House of Representatives." Sen. Stevens refused to respond to questions about what specific factors or data were considered in the changes made to the Shelby County area, simply repeating, "all of these questions are going to get the same answer."[69]

64. Similarly, on the House Floor, White Representative Jason Zachary of the White-dominated supermajority, one of the map's House sponsors, claimed, "the map that you have in front of you was drafted based on the census population related to the last census, but it was absolutely drafted on politics." Representative Zachary did not describe what it meant for the map to have been "drafted on politics" other than to claim that it would allow Tennessee "to send an all-Republican delegation."[70]

65. Despite being repeatedly asked, at no point during the Extraordinary Session did Senator Stevens or Representative Zachary or any of the other White sponsors or proponents of the May 2026 Map disclose (1) the identity of the person or persons who actually drew the map or

---

[68] *Id*. at 58:05–58:16.

[69] *Id*. at 1:13:43–1:14:59 (exchange between Sen. Akbari and Sen. Stevens).

[70] Video of *H. Floor Sess.* at 2:02:58–2:03:20, 114th Gen. Assemb., 2d Extraordinary Special Sess. (Tenn. May 7, 2026) (statement of Rep. Zachary in response to Rep. Jesse Chism), https://tnga.granicus.com/player/clip/33468?view_id=776&redirect=true.

(2) the specific partisan or electoral data, if any, that was used to purportedly "maximize the Republican potential" of the maps. To the contrary, the only specific data source that any official acknowledged was used was Census data,[71] which as a general matter includes racial demographic data but not political or election data.[72]

66. Meanwhile, throughout the Extraordinary Session, witnesses and legislators pointed out that the new map had sliced up the City of Memphis so exactly that now each of the three congressional districts that contained a piece of the City had almost exactly the same Black voting-age population: 27% (CD 8), 28% (CD 5), and 32% (CD 9).[73] None of the White officials who sponsored or supported the May 2026 Map disputed this neat three-way division of Black voters in Memphis or offered any specific explanation for how it was accomplished.

67. White proponents of the May 2026 Map were also unable to provide any explanation for why altering the congressional map mid-decade and in the middle of an ongoing election seasons was necessary in the first place, again providing bizarre, robotic answers in response to basic questions.

68. During a Senate Finance, Ways, and Means Committee meeting on the second day of the Extraordinary Session, Senator Heidi Campbell asked if the prior 2022 Plan had created any risk of litigation. In response, Senator Stevens said, "The proposed map mitigates the risk of litigation." Senator Campbell then asked, "why?" In response, Senator Stevens said, "Because

---

[71] *See, e.g.*, Video of *H. Floor Sess.* at 2:02:20–2:03:09, 114th Gen. Assemb., 2d Extraordinary Special Sess. (Tenn. May 7, 2026) (statement of Rep. Zachary), https://tnga.granicus.com/player/clip/33468?view_id=776&redirect=true.

[72] *See* U.S. Census Bureau, Decennial Census P.L. 94-171 Redistricting Data (2023), https://www.census.gov/programs-surveys/decennial-census/about/rdo/summary-files.html (last visited May 11, 2026).

[73] Expert analysis of Dr. Kassra Oskoii, on file with counsel.

33

that's what it does. It mitigates the risk of litigation." Trying once again, Senator Campbell followed up asking, "I guess I'm asking you to be more specific. Why exactly?" Senator Stevens once again would only say, "And my response is: It mitigates the risk of litigation."[74]

69. This canned, unexplained statement was inconsistent with the concession of other White-dominated supermajority legislators that the prior 2022 Plan was "strong, fair, and legal."[75] Indeed, throughout the Extraordinary Session, witnesses and legislators accurately testified that Congressional District 9 was not drawn in response to any court order or Voting Rights Act challenge, but was simply a naturally-occurring majority-minority district due to the demographics of Memphis.[76] No legislator challenged these assertions, nor was there any suggestion whatsoever that this was not the case.

70. Notwithstanding White legislators' wooden, scripted references to "the Census" and "politics," their bizarre refusal to acknowledge basic demographic facts about Black-majority status of the State's largest county, and their total inability to explain why redistricting was necessary in the first place, comments from White Representative Lowell Russell, Chairman of the House Congressional Redistricting Committee and a politician from the White-dominated supermajority, affirmatively highlight the White supermajority's racial motives. Representative Russell suggested, during a committee meeting on the second day of the Extraordinary Session,

---

[74] Video of *Hearing Before S. Fin., Ways and Means Comm.* at 27:10–27:56, 114th Gen. Assemb., 2d Extraordinary Special Sess. (Tenn. May 6, 2026) (exchange between Sen. Campbell and Sen. Stevens), https://tnga.granicus.com/player/clip/33459?view_id=834&redirect=true.

[75] Stuart Dyos & Vivian Jones, *After Supreme Court Ruling, Blackburn, GOP Allies Push Tennessee Map Redraw*, The Tennessean (Apr. 29, 2026), https://www.tennessean.com/story/news/politics/elections/2026/04/29/blackburn-legislature-redistrict-tennessee-congressional-map/89857822007.

[76] *See, e.g.*, Video of *Hearing Before S. State and Local Gov. Comm.* at 7:36–8:02, 114th Gen. Assemb., 2d Extraordinary Special Sess. (Tenn. May 6, 2026) (statement of Dr. Sekou Franklin), https://tnga.granicus.com/player/clip/33461?view_id=844&redirect=true.

that cracking Memphis across three congressional districts would reduce crime and add resources to make Memphis "safer."[77] He claimed a "friend" in the Memphis police department was happy to see the dismemberment of Memphis-based Congressional District 9 for that reason.[78] Black legislators like Representative Justin Jones understood this nonsensical suggestion that hurriedly splitting Memphis into three congressional districts would reduce crime to be a dog whistle reference to race and racial stereotypes of Black criminality.[79]

***The White Supermajority's Steamrolling of Applicable Rules, Norms, and Traditions Continues on the Third and Final Day of the Extraordinary Session.***

71. The General Assembly's White supermajority continued to bend or break established procedures and norms on the third and final day of the Extraordinary Session.

72. On the last day of the Extraordinary Session, the General Assembly's White supermajority passed H.B. 7001, which amended Tennessee law to do away with the one-year residency requirement for candidates qualifying to run for office and alter the qualifying period to run for Congress.[80] For the 2026 midterm elections alone, the White supermajority altered Tennessee law to give candidates who had not previously qualified to run for a congressional seat just *eight days* after the bill passed the General Assembly (until May 15) to qualify.[81] This new

---

[77] Video of *Hearing Before H. Cong. Redistricting Comm.* at 2:07:16–2:07:30, 114th Gen. Assemb., 2d Extraordinary Special Sess. (Tenn. May 6, 2026) (statement of Rep. Lowell Russell, Chairman), https://tnga.granicus.com/player/clip/33444?view_id=775&redirect=true.

[78] *Id.*

[79] Video of *H. Floor Sess.* at 1:22:28–1:23:12, 114th Gen. Assemb., 2d Extraordinary Special Sess. (Tenn. May 7, 2026) (statement of Rep. Jones), https://tnga.granicus.com/player/clip/33468?view_id=776&redirect=true.

[80] Video of *H. Floor Sess.* at 1:47:18–1:48:08, 114th Gen. Assemb., 2d Extraordinary Special Sess. (Tenn. May 7, 2026), https://tnga.granicus.com/player/clip/33468?view_id=776&redirect=true.

[81] H.B. 7001, § 1, 114th Gen. Assemb., 2d Extraordinary Special Sess. (Tenn. 2026) (signed by the Governor May 7, 2026) (amendment to Tenn. Code § 2-16-204).

qualification deadline was just eighty-three days before the August primary. The normal qualification deadline was noon on March 10, 2026: 149 days prior to the August primary. Tenn. Code § 2-5-101(a)(2). The White supermajority also repealed the ordinary residency requirement for congressional candidates.[82] Normally, congressional candidates have to "meet the residency requirements for state senators and representatives contained in the Tennessee constitution." Tenn. Code § 2-13-209.

73. The General Assembly's White supermajority also tossed aside all concern for proper election administration. Senator Charlane Oliver, who is Black, asked the White Chairman of the State and Local Government Committee how it was possible for elections to be administered in "a fair way" given the unprecedented nature of the mid-campaign-season changes wrought by S.B. 7001.[83] She pointed out that numerous election administrators had given sworn testimony in a 2022 court case that implementing a new congressional map five weeks earlier in the election calendar would be impossible from an election-administration perspective.[84] Senator Oliver expressed concern that Defendant Mark Goins, Tennessee's Coordinator of Elections, "who preaches about election integrity" had refused to show up to testify about how the 2026 election could be administered "with integrity" despite these late changes.[85]

74. These concerns were well-founded. In the 2022 court case, the Assistant Coordinator of Elections for Tennessee swore under oath that changing the maps and having a filing deadline later than April 7 of that year would make it infeasible to undertake all of the

---

[82] *Id.*

[83] Video of *Hearing Before S. State and Local Gov. Comm.* (Part 2) at 7:12–7:24, 114th Gen. Assemb., 2d Extraordinary Special Sess. (Tenn. May 6, 2026), https://tnga.granicus.com/player/clip/33463?view_id=844&redirect=true.

[84] *Id.* at 8:29–8:46.

[85] *Id.* at 8:52–9:09.

required steps to conduct an August primary election in compliance with state and federal law.[86] And the Election Administrators for Shelby, Knox, and Wilson Counties testified that changing the maps and pushing the filing deadline for the August primary later than April 7 would "disenfranchis[e] . . . voters" and is "likely to cause significant[ voter] confusion."[87] Yet the measures ultimately enacted by the White supermajority as part of the May 2026 redistricting pushed the filing deadline back to May 15.

75. And in another break from normal procedures, the White supermajority in the General Assembly refused to consider numerous amendments to the measures that they were jamming through the Extraordinary Session.

76. On the House Floor, numerous amendments from Black legislators were deemed not timely filed because it was *literally impossible* to timely file an amendment given the speed with which the White supermajority's legislation was being rushed to passage. As Representative Jones explained, "I want to state for the record that the reason why they're not timely filed was that there was no way to file timely considered amendments because we were rushed through this process in less than twenty-four hours, given less than twenty-four hours to consider this map. That's why these are untimely for the clerk."[88]

---

[86] *See* Declaration of Beth Henry Robertson ¶¶ 7, 9, 21, *Moore v. Lee*, No. 22-0287-IV (Tenn. Ch. Ct. Davidson Cnty. Mar. 22, 2022) (Assistant Coordinator of Elections, State of Tennessee).

[87] *See* Declaration of Chris Davis ¶¶ 13–17, 25–26, *Moore v. Lee*, No. 22-0287-IV (Tenn. Ch. Ct. Davidson Cnty. Mar. 22, 2022) (Knox County Administrator of Elections); Declaration of Tammy Smith ¶¶ 9, 10, 23, *Moore v. Lee*, No. 22-0287-IV (Tenn. Ch. Ct. Davidson Cnty. Mar. 22, 2022) (Wilson County Administrator of Elections); Declaration of Linda Phillips ¶¶ 11, 12, 27, *Moore v. Lee*, No. 22-0287-IV (Tenn. Ch. Ct. Davidson Cnty. Mar. 21, 2022) (Shelby County Administrator of Elections).

[88] Video of *H. Floor Sess.* at 1:15:50–1:16:02, 114th Gen. Assemb., 2d Extraordinary Special Sess. (Tenn. May 7, 2026), https://tnga.granicus.com/player/clip/33468?view_id=776&redirect=true.

37

77. An amendment by Representative Pearson—who represents Memphis and was actively a candidate in the primary election for Congressional District 9—was not even voted on, with the White Chair cutting him off while he was still speaking, saying "It fails for lack of a motion," and calling for the next amendment.[89]

78. The White supermajority in the House voted down multiple amendments aimed at bringing transparency to the process, including one that would have required disclosure of who drew the maps, one that would have required that proposed maps, shapefiles, demographic data, and written findings to be publicly released before passage of the bill,[90] and one that would have required that written findings identifying the legal basis for, necessity of, and impact on minority voting opportunity be provided for proposed maps.[91]

79. On the House Floor, Representative Salinas presented an amendment requiring that districts be reasonably compact. The amendment was rejected.[92]

80. In the end, the White supermajority in the General Assembly enacted the following measures, with zero support from any Black lawmakers: H.B. 7001, which alters candidate qualification and other rules to accommodate the mid-decade, mid-election-season change in the congressional districts; H.B. 7002, which repealed the longstanding ban on mid-decade redistricting; H.B. 7003, which set out the new map, and H.B. 7005, a companion appropriations measure.[93]

---

[89] *Id*. at 48:40–48:52.

[90] *Id*. at 51:03–52:22.

[91] *Id*. at 52:27–53:45.

[92] *Id*. at 1:01:56–1:03:07.

[93] H.B. 7001, 114th Gen. Assemb., 2d Extraordinary Special Sess. (Tenn. 2026) (signed by the Governor May 7, 2026); H.B. 7002, 114th Gen. Assemb., 2d Extraordinary Special Sess. (Tenn. 2026) (signed by the Governor May 7, 2026); H.B. 7003, 114th Gen. Assemb., 2d Extraordinary

81.     The entire process departed sharply from the ordinary manner in which Tennessee had conducted redistricting in the decades since *Baker v. Carr* in almost every possible respect. It happened mid-decade, contrary to governing law; it was in a special session, instead of a regular session; it happened after the candidate filing deadlines had already passed; it happened over only a matter of mere days; there were no robust public hearings; no alternative maps were presented and debated; it suspended the residency requirements for candidates to office; it allowed candidates to switch what district in which they had qualified to run; and it imposed all these changes in an election year, at a point in the election calendar when numerous election officials had sworn in 2022 it was too late for changes to electoral systems.

82.     The May 2026 redistricting process also departed drastically from even the truncated process for redistricting that occurred following the delayed release of the 2020 U.S. Census. Following the release of census data in August of 2021, for example, both houses of the General Assembly enacted Redistricting Guidelines and held public hearings around the state to solicit public input several months *before* the legislative session began on January 11, 2022.[94] Moreover, the public was afforded the opportunity to submit congressional districting plans for consideration by the General Assembly *before* the legislative session began.[95]

---

Special Sess. (Tenn. 2026) (signed by the Governor May 7, 2026); H.B. 7005, 114th Gen. Assemb., 2d Extraordinary Special Sess. (Tenn. 2026) (signed by the Governor May 7, 2026).

[94] Think Tennessee, *2021-2022 Redistricting Process in Review* (July 2022), www.thinktennessee.org/wp-content/uploads/2022/07/2021-2022-redistricting-process-in-review.pdf.

[95] Guidelines for Submission of Senate or Congressional Redistricting Plans, S. Ad Hoc Comm. on Redistricting, 112th Leg., *available at* https://www.capitol.tn.gov/Archives/senate/112GA/committees/redistricting/senredistrictingcriteria.pdf.

83.     The drastic nature of the proposed changes to the congressional districts also required significant and drastic changes for county election administration. Defendant Goins' May 4, 2026, memorandum to county election administrators exemplifies the significant and drastic nature of the changes wrought by the state's adoption of a new congressional map when preparations were long underway for a rapidly approaching midterm election.[96] The memo noted, among other things, that the General Assembly's proposed changes would "have operational impacts on counties, including voter assignment, election programming, publication requirements, and candidate qualifying timelines."[97] These operational impacts on election administrators included rapidly "reprogram[ming] election management systems" to "address new county or precinct splits," "updat[ing] voter registration systems" and "retrain[ing] poll officials."[98]

84.     In a speech on the floor on the Extraordinary Session's last day, Senator Oliver also directly challenged the (robotic, rehearsed, and unsubstantiated) assertions by White politicians like Senator Stevens that the cracking of Black-majority Memphis was merely for partisan purposes:

> The racial effect is not incidental to the partisan goal. The racial effect is the partisan goal. Now, the sponsor's argument rests on a foundational assumption that Black people vote Democratic, that Black voters and Democratic voters are the same thing. That cracking a majority Black city is the same as cracking a Democratic city. And, therefore, partisan, not racial.
>
> That assumption has two problems, Mr. Speaker.

---

[96] Memorandum from Mark Goins, Tenn. Coordinator of Elections, to All County Election Commissions (May 4, 2026), https://tennesseelookout.com/wp-content/uploads/2026/05/GoinsMemo.pdf.

[97] *Id.*

[98] *Id.*

The first problem is historical. My colleagues on the other side of the aisle love to remind us that it was Southern Democrats who enforced Jim Crow, that it was Southern Democrats who founded the Ku Klux Klan, that the parties have switched, and therefore they are the party of Lincoln and we are the party of Bull Connor. But they only tell half the story. Yes, the parties did change. But let me tell you exactly when and why. Black Americans did not always vote Democratic. From the Civil War through the 1950s, Black voters voted predominantly Republican. The party of Lincoln. The party of abolition. The party of the 13th, 14th, and 15th Amendments. The shift began during the New Deal in the 1930s when Franklin Roosevelt's economic programs offered relief to Black families devastated by the Great Depression. But the definitive realignment, the moment that made Black Americans overwhelmingly Democratic, was in 1964. Not because anything Democrats did, because of what Republicans did. Barry Goldwater opposed the Civil Rights Act of 1964. The Republican Party in its 1964 platform positioned itself against federal civil rights enforcement. Richard Nixon launched the Southern Strategy in 1968, deliberately courting white Southern voters who were leaving the Democratic Party in reaction to civil rights legislation. The Republican Party made a deliberate strategic choice to build a coalition built on white racial resentment in the South. Sounds familiar. And Black Americans respond . . . rationally to that choice.

So when my colleagues say that this is partisan and not racial, I want them to understand what they are actually saying. They are saying that because their own party's history drove Black voters to the Democratic Party, they are now entitled to use that partisan alignment as legal cover to eliminate Black political representation.

But here is the second and more devastating problem with the partisan argument. If this is truly about partisan advantage, if it's about 9-0, then I have a simple question. What does a 9-0 delegation give you that an 8-1 delegation does not? Tennessee's congressional influence is determined by seniority, by committee chairmanships in Congress, by leadership positions, relationships built with other members over decades. None of these things change with a 9th Republican seat.

You already have 8 Republicans and 1 Democrat. You already have an overwhelming majority. . . . So what does a 9-0 actually give you?

It gives you the permanent silencing of Shelby County's Black community. That is the only answer. That is the only thing that changes when you change this map. And if the only legislative purpose of a map is the permanent silencing of a [ ] specific racial community, that is not partisan gerrymandering. That is racial discrimination with a partisan cloak.[99]

85.     And Senator Lamar also spoke to this point:

This is one of the most consequential votes any of us in this chamber will ever take in our lifetime. Not because of lines on a map, because of what those lines are designed to do: erase representation, dilute Black voting power, and tell Memphis that our voice only matters when it is controlled. So, let's stop acting like this is ordinary redistricting. There hasn't been a new census data. There is no emergency for the people. The only emergency here is for Republicans in this chamber saw a political opportunity after a Supreme Court decision weakened the Voting Rights Act that they have moved immediately to attack Black voting power.

This map does not reflect Memphis. It diminishes Memphis. It slices our city into pieces and stretches our communities hundreds of miles away to places of different needs, different economies, different histories, and different lived realities. You cannot take a majority Black city, fracture its voting power, and then tell us race has nothing to do with it.

Racism does not become less racist because it's called partisan.[100]

86.     The White politicians from the White-dominated faction jamming the May 2026 redistricting through the General Assembly had no retort.

---

[99] Video of *S. Floor Sess.* at 3:10:54–3:15:21, 114th Gen. Assemb., 2d Extraordinary Special Sess. (Tenn. May 7, 2026) (statement of Sen. Oliver), https://tnga.granicus.com/player/clip/33451?view_id=777&redirect=true.
[100] *Id.* at 1:54:29–1:55:50 (statement of Sen. Lamar).

***The White Supermajority Enacts a Map that Egregiously Cracks the Predominantly Black City of Memphis.***

87.     The May 2026 Map cracked the Black population in the City of Memphis across Congressional Districts 5, 8, and 9. The result was three separate majority-White districts with very similar percentages of Black voting age population (28%, 29%, and 32%, in each district respectively) that begin in Memphis but then run east across dozens of counties to pick up White and rural population, dilute the voting strength of Black Memphians and destroying the one district where Black Tennesseans were able to exercise power and elect candidates to federal office.

88.     Notably, the May 2026 Map moved Justin Pearson, one of the Democratic primary candidates in Congressional District 9 and a formidable challenger to District 9's long-serving White Democratic incumbent, into Congressional District 5, which has the lowest Black population of the three cracked districts. Pearson is a Black state representative from Memphis who rose to prominence for protesting gun violence and advocating for police and gun reform and who has been described as the Black legislator most "hated" by the White legislators from the General Assembly's White-dominated supermajority.[101]

89.     As noted, under the prior 2022 Map, Memphis was almost entirely contained within a single compact district, as it had been for decades. The district is shown below, with purple shading indicating the concentration of Black voting age population:

---

[101] Bridget Bowman, *'Tennessee Three' Legislator Justin Pearson Launches Primary Challenge Against Longtime House Democrat*, NBC News (Oct. 8, 2025), www.nbcnews.com/politics/2026-election/tennessee-three-legislator-justin-pearson-launches-primary-challenge-l-rcna235918. Congressman Cohen also acknowledged that Representative Pearson was "more significant than any primary opponent [he'd] had before," and that he started campaigning when he learned Pearson was running in his district. Video of *Hearing Before S. Jud. Comm.* at 48:34–48:46, 114th Gen. Assemb., 2d Extraordinary Sess. (Tenn. May 6, 2026) (statement of U.S. Rep. Steven Cohen, Congressional Representative District 9), https://tnga.granicus.com/player/clip/33465?view_id=841&redirect=true.



90.     But under the May 2026 Map, predominantly Black neighborhoods all across South Memphis are now divided between Districts 5 and 9, with the boundary between the two districts knifing northward from the Mississippi line through neighborhoods like Whitehaven. Around Midtown Memphis, that boundary line intersects with new District 8, trisecting the City of Memphis and Shelby County and dividing predominantly Black neighborhoods and communities across the three districts:

44



91. The three districts then trace a winding path. District 8, which includes predominantly Black areas of central Shelby County around Bartlett as well as Whiter areas like Germantown, then runs east about 150 miles through rural, predominantly White areas, ending in Perry County in central Tennessee. But District 8 is the *least* irregularly shaped of the three districts.

92. The other two—Districts 5 and 9—run around District 8 like pincers. District 5, the northern pincer, starts in South Memphis along the Mississippi border, then runs north hugging the Mississippi River and the Arkansas line in a tendril that cinches as thin as 3 or 4 miles in some places. Having picked up a significant portion of Shelby County's Black voting age population (117,967 people, or 33.1%), District 5 then runs north past Missouri, up to and then along the Kentucky border, and then balloons out in two directions to pick up vast swaths of rural, predominantly White counties in north and central Tennessee, hundreds of miles away from

45

Memphis. District 5's overall form resembles a 250-mile-long gulper eel,[102] with a sizable segment of its population (and nearly 75% of its Black voting age population) residing at the very tip of its long, thin tail.

93.     District 9, the southern pincer, runs from South Memphis east along the Mississippi and Alabama state lines, almost to Georgia, before jutting north into central Tennessee. District 9 also cinches to just a few miles thin in the dense and predominantly Black portions of Shelby County at the far western end of the district, before fattening up at the outskirts of Shelby County to pick up low BVAP precincts north of Collierville. District 9 runs east along the state line through 15 counties, jutting north into central Tennessee to connect with the southern part of District 5. The pincers ultimately meet in predominantly White Williamson County in the Nashville suburbs, hundreds of miles from Memphis.

94.     The District 5 and 9 pincers appear to divide the bulk of Memphis's Black population between them with mathematical precision. District 5 contains 39.7% of Memphis's Black voting age population (115,383 people) and District 9 contains 39.8% (115,635 people)—an extremely precise degree of parity. District 8 then receives the remaining 20.5% (59,499 people). Looking at Shelby County as a whole, the effect of the May 2026 Map is to divide the county's Black voting-age population into rough thirds, with 33.1% of Shelby County's total BVAP (117,967 people) in District 5, 26.7% (95,076 people) in District 8, and 40.3% (143,634 people) in District 9.[103]

---

[102] Melissa Hobson, *It Has Enormous Jaws, a Tail that Glows Pink, and Can Eat Prey Bigger Than Itself – Meet the Deep-Sea Animal Rarely Seen by Humans*, Discover Wildlife, https://www.discoverwildlife.com/animal-facts/marine-animals/gulper-eel (last visited May 11, 2026).
[103] Expert analysis of Dr. Kassra Oskoii, on file with counsel.

46

95.	The May 2026 Map thus divides the predominantly Black population of Memphis and Shelby County in three ways, and then combines each of the fractured portions of Black Memphis with large numbers of rural White voters hundreds of miles away, rendering the Black Memphians a minority in each of the three districts:



96.	Accomplishing this dismemberment and dilution of Memphis and the Black communities in Memphis and Shelby County involved splitting numerous precincts and counties and introducing additional fragmentation of counties and precincts in Memphis, Shelby County, and elsewhere.[104]

97.	And the effect on Plaintiffs and other Black voters in Memphis is devastating. The White supermajority's political violence against Black Memphians who dared to build power for themselves will not only rob them of that power, but will disrupt the organizing ties carefully

---

[104] Expert analysis of Dr. Kassra Oskoii, on file with counsel.

cultivated by Plaintiffs and others and lead to greater voter apathy and decreased voter and civic engagement.

98.     Across this Nation, schoolchildren learn that, in our not-too-distant past, White-dominated political factions held total control of state governments like Tennessee's and that they locked their Black citizens out of political power. We are taught that this was wrong, a betrayal of our most basic constitutional ideals, and also that those days are over, in no small part because the rule of law and independent courts were able to secure for Black citizens the rights guaranteed by our Constitution.

99.     But the past is not past. Today in Tennessee, a White-dominated political faction, exercising total control over the levers of power, has viciously targeted Black Memphians in an effort to dilute their votes and silence their voices. Now just as then, this is wrong, a betrayal of our most basic constitutional ideals. And so, this Court must enforce the Constitution's guarantees.

## CLAIMS

### Count 1

***Intentional Discrimination in Violation of the Fourteenth and Fifteenth Amendments***

100.     Plaintiffs reallege and reincorporate by reference the allegations set forth above.

101.     Where racial discrimination was "a motivating factor" behind state action, that is sufficient to show that the State engaged in unconstitutional discrimination. *Foster v. Chatman*, 578 U.S. 488 (2016) (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977)).

102.     "[D]iscriminatory intent need not be proved by direct evidence." *Rogers v. Lodge*, 458 U.S. 613, 618 (1982). Intent can be inferred from all the "relevant circumstances that bear upon the issue of racial discrimination." *Flowers v. Mississippi*, 588 U.S. 284, 302 (2019). Thus,

even without direct evidence, "objective evidence" may still "strongly" suggest an intent. *Bush v. Vera*, 517 U.S. 952, 970 (1996). "Outright admissions of impermissible racial motivation are infrequent and plaintiffs often must rely upon other evidence." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999). Thus, the rule that intentional discrimination may be based on circumstantial evidence alone is especially true in voting cases. *See North Carolina v. Covington*, 585 U.S. 969, 977 (2018); *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 440 (2006) ("*LULAC*"); *City of Pleasant Grove v. United States*, 479 U.S. 462, 466–67 (1987).

103.    Assessing a legislature's intent in enacting a law is "a complex task requiring a 'sensitive inquiry into such circumstantial and direct evidence as may be available.'" *Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471, 488 (1997) (quoting *Arlington Heights*, 429 U.S. at 266). Factors that may provide direct or circumstantial evidence of intentional discrimination include the challenged law's "impact" on different racial groups; the "legislative . . . history," including "contemporary statements by members of the decisionmaking body" or other decisionmakers; the "historical background" and the "sequence of events leading up to the challenged" law's enactment; and, "any departures from the normal legislative process." *Arlington Heights*, 429 U.S. at 265-68.

104.    The "impact of an official action is often probative of why the action was taken in the first place since people usually intend the natural consequences of their actions." *Reno*, 520 U.S. at 487. An action that is clearly designed with the "essential inevitable effect" of discriminating based on race is unconstitutional on its face. *Gomillion v. Lightfoot*, 364 U.S. 339, 341 (1960).

105.    Here, there is both strong circumstantial and direct evidence that the Tennessee General Assembly intentionally acted to dilute the voting strength of Black people.

106.     The initiation of completely gratuitous mid-decade redistricting and the egregious cracking of the predominantly Black city of Memphis and of the Black population in the Memphis area across three different congressional districts was done with an intent to discriminate based on race as a motivating factor in violation of the Fourteenth and Fifteenth Amendments to the U.S. Constitution. *See, e.g.*, *Arlington Heights*, 429 U.S. 252; *Gomillion*, 364 U.S. at 341.

107.     The White supermajority in the Tennessee General Assembly adopted the May 2026 Map with the purpose of disadvantaging voters of color in the majority-Black Memphis area and diluting their voting strength, and will have its foreseeable and intended effects. The White supermajority's actions intentionally dilute and destroy the voting and political power of Black voters in the Memphis area including Plaintiffs and their members such that they can no longer elect a candidate of their choice to represent Memphis in Congress. Indeed, the White supermajority made no secret of its desire to achieve that result.

108.     Moreover, and as set forth above, numerous other indicia of discriminatory motive are present here and confirm that the White supermajority initiated the unprecedented mid-decade redistricting process and enacted the egregious Memphis-cracking map not merely in spite of but because of race. These include:

   a.   The complete power exerted by a White-dominated political faction controlling all the levers of political authority in Tennessee state government.

   b.   Repeated, recent expressions of racial animus and racial stereotypes toward and about Black Tennesseans by members of the White-dominated political faction controlling the General Assembly, including in relation to the policy-making process.

50

c. Repeated, recent efforts by the White-dominated political faction controlling the General Assembly to target the Black-majority City of Memphis and strip Memphis of the ability to elect its own officials and set local policy, which leaders of the White-dominated political faction advanced based on anti-Black stereotypes.

d. The completely unprecedented nature of mid-decade congressional districting in Tennessee, which had been expressly outlawed for over half a century.

e. The rush to introduce and enact a congressional map over the course of mere days, with no public hearings or comments, via a special session, completely inconsistent with the usual practice in redistricting.

f. The initiation of the redistricting process in May of an election year, after the candidate qualifying deadline has passed, with the campaign season already under way, at a point in the calendar when Tennessee election officials testified under oath only a few years ago that substituting new maps would be infeasible or downright impossible.

g. The May 2026 Map sponsors' refusal to answer even basic questions about their own legislation or Tennessee's demographics, such as who drew the map, what data was used, and whether Memphis was majority Black, and the sponsors' provision of bizarre, canned, robotic, and/or contradictory statements when pressed with basic questions about their map, the redistricting process, or the need for mid-decade redistricting at all given the lack of a Census or court order requiring it.

51

h. The May 2026 Map's destruction of a compact, Memphis-based congressional district, which had existed as part of Tennessee's congressional plan for the better part of a century, and its obvious dilution of Black Memphians' voting power.

i. The May 2026 Map's splitting of additional counties, precincts, communities to divide the Black population of Memphis and Shelby County into thirds and combine those fractured chunks with White rural populations hundreds of miles away.

109. Plaintiffs have a right of action to challenge Defendants' unconstitutional actions via 42 U.S.C. § 1983. Section 1983 authorizes suits for the deprivation of a right secured by the Constitution or the laws of the United States caused by a person acting under the color of state law.

<u>**Count 2**</u>

***Retaliation for Protected Expression and Association in Violation of the First Amendment***

110. Plaintiffs reallege and reincorporate by reference the allegations set forth above.

111. "[P]olitical belief and association constitute the core of those activities protected by the First Amendment." *Elrod v. Burns*, 427 U.S. 347, 356 (1976) (plurality opinion). Consistent with that fundamental precept, expressing one's beliefs by organizing in one's community, associating with others to build political power, opposing the actions and policies of those in power, and supporting, affiliating with, and voting for chosen candidates and issues through the formal processes of democracy are all acts that reside in the heartland of the First Amendment's protections. *See, e.g.*, *Cal. Democratic Party v. Jones*, 530 U.S. 567, 574 (2000); *Kusper v. Pontikes*, 414 U.S. 51, 56–57 (1973); *accord Williams v. Rhodes*, 393 U.S. 23, 30–31 (1968).

112. "[T]he First Amendment prohibits government officials from subjecting an individual to retaliatory actions" for engaging in protected activity, including speech and petition.

*Hartman v. Moore*, 547 U.S. 250, 256 (2006). Government officials simply may not use "their power selectively to punish or suppress speech." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 198 (2024).

113. The federal Constitution also prohibits states from enacting rules out of a "bare . . . desire to harm a politically unpopular group." *United States v. Windsor*, 570 U.S. 744, 770 (2013) (quoting *Department of Agriculture v. Moreno*, 413 U.S. 528 (1973)). The Elections Clause, which authorizes States to regulate federal elections and conduct redistricting in the first place, likewise is "a grant of authority to issue procedural regulations, and not . . . a source of power to dictate electoral outcomes, to favor or disfavor a class of candidates, or to evade important constitutional restraints.'" *Cook v. Gralike*, 531 U.S. 510, 523 (2001) (quoting *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 833–34 (1995)). Electoral rules that are designed to "place their targets at a political disadvantage" thus are "not authorized by the Elections Clause." *Id.* at 525–26.

114. Just like with any other official government action, the Constitution forbids the government from redrawing electoral district lines in order "to punish or suppress speech." *Vullo*, 602 U.S. at 198. When redistricting is undertaken gratuitously, solely to punish certain voters for their protected association or expression, courts can determine that such adverse government action violates the First Amendment without any "political judgment about how much representation particular political parties *deserve*." *Rucho v. Common Cause*, 588 U.S. 684, 705 (2019) (emphasis in original). No complex metrics or subjective assessments of "partisanship" are required to prevent or remedy unconstitutional government action under such circumstances.

115. The May 2026 Map sponsors claimed to have drawn the map based on "politics." To the extent that the vote-dilutive maps were in fact simply drawn based on race, whether or not it was also a proxy for "politics," that would violate the 14th and 15th Amendments. *See supra*.

But to the extent that the redistricting process was initiated to punish Black voters for their protected association and expression, that also violates the First Amendment.

116. Here, Black voters in Congressional District 9, including Ms. Sherman, Ms. Spriggs, Mr. Moore, and members of BCCM and APRI, engaged in protected speech and association when they organized to build political power in Black communities in Memphis and Shelby County and when they voted in the 2024 election and in prior elections for candidates and policies not favored by the White-dominated supermajority in control of the Tennessee General Assembly, such as Democratic candidates for Congress or for President who would support government efforts to promote racial inclusion and racial justice.

117. According to the sponsors of the May 2026 Map, these voters' protected actions in organizing and associating to build electoral power among Black voters and expressing their views through their organizing and at the ballot box were at least a substantial and motivating factor in the decision of the General Assembly to engage in mid-decade redistricting, to target Congressional District 9, and to crack the Black population in and around Memphis. The General Assembly initiated the redistricting process and broke up Black voters including Ms. Sherman, Ms. Spriggs, Mr. Moore, and members of BCCM and APRI from their associational community, assigning them across Districts 5, 8, and 9 based on the speech and expression of Plaintiffs and persons with whom they associated. The General Assembly initiated this redistricting process gratuitously, in the middle of the decade, with the sole purpose of diminishing (and effectively precluding) the ability of Black voters in Memphis and Shelby County to again organize and associate with others to exercise political power and to elect candidates of their choice to Congress.

118. Defendants' redrawing of the congressional lines in the Memphis area to punish Black voters for their political activity cannot be justified as serving any legitimate (let alone

54

compelling) government interest. The State of Tennessee has no legitimate interest in enacting laws that retaliate against voters for their speech and beliefs in order to favor one political viewpoint over another. Nor can Defendants point to any necessary or legitimate, non-retaliatory grounds for undertaking the May 2026 districting, such as the need or prerogative (1) to draw a new map following the release of the U.S. Census (*e.g.*, *Gill v. Whitford*, 585 U.S. 48, 55 (2018)); (2) to replace a map invalidated by a court (*e.g.*, *Rucho*, 588 U.S. at 691); or (3) to replace a court-drawn map with a legislature-drawn map (*e.g.*, *LULAC v. Perry*, 548 U.S. 399, 411–13 (2006) (opinion of Kennedy, J.)). Nor can the defendants point to the U.S. Supreme Court's decision in *Callais* as a legitimate, non-retaliatory ground for undertaking the May 2026 districting, because nothing in *Callais* required or allowed gratuitous mid-decade redistricting in Tennessee or blessed in any way the destruction of longstanding, naturally-occurring Black-majority districts that were not the product of any court order.

119. Where a legislature has legitimate, non-retaliatory grounds *to engage in the redistricting process in the first place*—the legislature "may pursue partisan ends" as part of that process. *See Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 6 (2024). And once the legislature has redrawn district lines as part of a legitimately initiated redistricting process, federal courts may be ill-equipped to review those lines to "decid[e] how much partisan dominance is too much." *Rucho*, 588 U.S. at 704 (quoting *LULAC*, 548 U.S. at 420 (opinion of Kennedy, J.)).

120. Here, though, the General Assembly had no valid, non-retaliatory reason to engage in the May 2026 redistricting at all. Even crediting the May 2026 Map's proponents' dubious assertion that they were focused on "politics" and not race, they initiated the redistricting process *solely* to punish Black voters for their past political expression, association, and petitioning activity. That constitutes impermissible First Amendment retaliation.

121. Plaintiffs are adversely affected by the challenged retaliatory action in multiple ways, each of which independently supports a First Amendment retaliation claim here.

122. *First*, Defendants removed Plaintiffs including Mr. Moore and members of BCCM and APRI from Congressional District 9 and reassigned them to other districts, thereby depriving them of the right to vote for—and be represented by—their sitting congressional representative. *See Burdick v. Takushi*, 504 U.S. 428, 433–34 (1992) (affirming that voters' First Amendment rights are implicated when a state prevents them from casting a ballot for a particular candidate); *Lubin v. Panish*, 415 U.S. 709, 716 (1974) ("[A] voter hopes to find on the ballot a candidate who comes near to reflecting his policy preferences on contemporary issues."). *Cf. Gomillion*, 364 U.S. at 341 (1960) (voters are injured when the government "fenc[es]" them out of district "so as to deprive them of their pre-existing . . . vote").

123. *Second*, Defendants burdened and deprived Plaintiffs including Ms. Sherman, Ms. Spriggs, Mr. Moore, and members of BCCM and APRI of the right to associate with like-minded citizens in their neighboring communities. *See Jones*, 530 U.S. at 574; *see also Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 186 (1979) ("[A]n election campaign is a means of disseminating ideas as well as attaining political office."); *Elrod*, 427 U.S. at 355–56 (recognizing that the First Amendment protects an "individual's ability to act according to his beliefs and to associate with others of his political persuasion"). Removing voters (including Plaintiffs) from their prior district, where their associational activities as engaged citizens, organizers, and activists will be directed towards and in concert with the people and communities they know and live in proximity to, and forcing them to conduct those activities in unfamiliar and far-away places, due to their speech activity and the speech of their associates, constitutes First Amendment retaliation.

124. *Third*, Defendants have made it significantly harder for Plaintiffs including Ms. Sherman, Ms. Spriggs, Mr. Moore, members of BCCM and APRI, and the Equity Alliance, to act collectively to elect candidates who represent their shared interests. In doing so, Defendants have "burden[ed] [Plaintiffs'] representational rights." *Vieth v. Jubelirer*, 541 U.S. 267, 315 (2004) (Kennedy, J., concurring); *see also Baker v. Carr*, 369 U.S. 186, 206 (1962) (recognizing that vote dilution may infringe individual voting rights). Removing Plaintiffs from a congressional district in which they had the ability to elect candidates of their choosing, and placing them into new districts where they will almost certainly be unable to do so, as part of an utterly gratuitous redistricting process, due to their speech activity and the speech of their associates, constitutes First Amendment retaliation.

125. Plaintiffs have a right of action to challenge Defendants' unconstitutional actions via 42 U.S.C. § 1983.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Court:

1. Issue a declaratory judgment that the May 2026 Map was enacted with a discriminatory purpose in violation of the Fourteenth and Fifteenth Amendments, and/or constitutes unlawful retaliation in violation of the First Amendment;

2. Preliminarily and permanently enjoin Defendants from calling, holding, supervising, or certifying any elections under the May 2026 Map. Plaintiffs have no other adequate remedy at law other than the judicial relief sought herein and will be irreparably harmed through violation of their constitutional and statutory rights without this relief;

3. Declare that the congressional plan enacted by the General Assembly in 2022 remains in effect, including for the 2026 election for United States House of Representatives;

4. Award Plaintiffs their costs and reasonable attorneys' fees pursuant to Fed. R. Civ. P. 54(d) and 42 U.S.C. § 1988, or any other applicable provision providing such relief;

5. Issue an order retaining jurisdiction over this matter until the Defendants, their agents, employees, and those persons acting in concert with them have complied with all orders and mandates of this Court; and

6. Grant such other and further relief as it deems is proper and just.

Dated this 11th day of May, 2026.

Respectfully submitted,

/s/ Lucas Cameron-Vaughn

Ari J. Savitzky*
Theresa J. Lee*
Dayton Campbell-Harris*
Jonathan Topaz*
Sophia Lin Lakin*
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
asavitzky@aclu.org
tlee@aclu.org
dcampbellharris@aclu.org
jtopaz@aclu.org
slakin@aclu.org

*motion for admission *pro hac vice* forthcoming

Lucas Cameron-Vaughn (36284)
Zee Scout (042637)
ACLU FOUNDATION OF TENNESSEE
P.O. Box 120160
Nashville, TN 37212
(615) 320-7142
lucas@aclu-tn.org
zscout@aclu-tn.org