## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

AMBER SHERMAN, RACHAEL SPRIGGS, KERMIT MOORE, BLACK CLERGY COLLABORATIVE OF MEMPHIS, MEMPHIS A. PHILIP RANDOLPH INSTITUTE, THE EQUITY ALLIANCE,

        *Plaintiffs*,

    *v.*

TRE HARGETT, in his official capacity as Secretary of State of Tennessee, MARK GOINS, in his official capacity as Coordinator of Elections for Tennessee, STATE ELECTION COMMISSION, and DONNA BARRETT, JUDY BLACKBURN, JIMMY ELDRIDGE, MIKE MCDONALD, SECONDRA MEADOWS, VANECIA BELSER KIMBROW, and KENT YOUNCE, in their official capacities as members of the State Election Commission,

        *Defendants*.

**THREE-JUDGE PANEL REQUESTED**

Civil Action No 26 Civ. 616

Judge Crenshaw

## MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND MEMORANDUM OF LAW IN SUPPORT

**TABLE OF CONTENTS**

TABLE OF CONTENTS..............................................................................................................i

INTRODUCTION ...................................................................................................................2

STATEMENT OF FACTS .......................................................................................................3

LEGAL STANDARD...............................................................................................................3

ARGUMENT............................................................................................................................4

    I.     PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.......................................4

        A.    Plaintiffs Are Likely to Establish Unconstitutional Racial Discrimination.....................4

           1.    Race Was a Motivating Factor in the White-Dominated General Assembly's Cracking and Dilution of Majority-Black Memphis ...........................................................5

           2.    Pure Partisanship Does Not Independently Explain the General Assembly's Actions...............................................................................................................................11

        B.    Plaintiffs Are Likely to Establish Impermissible First Amendment Retaliation. ..........13

           1.    Defendants Redrew the Congressional Map to Punish Black Voters for Exercising Their First Amendment Rights. ......................................................................................14

           2.    Retaliation Through Redistricting Remains Unlawful. ..............................................20

    II.    IMMEDIATE RELIEF IS REQUIRED TO AVOID IRREPARABLE HARM. ...............22

    III.   THE EQUITIES AND THE PUBLIC INTEREST FAVOR RELIEF. .............................24

CONCLUSION .......................................................................................................................25

Plaintiffs move by this motion and memorandum of law incorporated herein, as well as the Verified Complaint (ECF No. 1) and the appended Declarations, Expert Reports, and other materials, including the Declaration of Amber Sherman, the Declaration of Rachael Spriggs, the Declaration of Kermit Moore, the Declaration of Rev. Dr. Lawrence J. Turner, the Declaration of Lucas Cameron-Vaughn and the exhibits thereto, and the Expert Reports of Dr. Kasra Oskoii, Dr. Marvin King, Dr. Jonathan Cervas, and L. Arthi Krishnaswami, for a Temporary Restraining Order (TRO) and/or a Preliminary Injunction preventing the implementation and use of the unlawful congressional map enacted by the Tennessee General Assembly in May 2026.

Notwithstanding the applicability of 28 U.S.C. § 2284, which requires the convening of a three-judge Court in this case, a single judge is empowered to "grant a temporary restraining order on a specific finding, based on evidence submitted, that specified irreparable damage will result if the order is not granted." 28 U.S.C. § 2284(b)(3). Here, immediate temporary relief is urgently needed. Specifically, in enacting the May 2026 map, the General Assembly provided that candidates have to commit to which district they are running in or whether they are withdrawing, by this Friday, May 15, at noon. H.B. 7001, § 1 (amended Tenn. Code Ann. § 2-16-204). If this deadline passes, voter confusion will increase, and it will become more difficult to revert later on to the lawful congressional map enacted following the 2020 Census. Plaintiffs need a TRO to prevent these harms and preserve the status quo while awaiting a full three-judge panel.

Plaintiffs provided notice of their motion for a Temporary Restraining Order, first by email notice that the motion was forthcoming and requesting conferral or the Defendants' position on the afternoon of Tuesday, May 12, and then emailing the Motion and Memorandum in Support to counsel for Defendants before filing today, Wednesday, May 13. Defendants oppose the motion.

1

## INTRODUCTION

Last week, in an unprecedented exertion of raw power, the Tennessee General Assembly redrew Tennessee's congressional map over a matter of days in order to dilute the votes of Black citizens in Memphis and to punish Black Memphians for their political expression and association. The statements of the new map's own sponsors and other legislators from the White-dominated supermajority faction controlling the General Assembly evidence their intent to target Memphis-based Congressional District 9 on the basis of race. The map itself does too, cracking Black Memphis into three neat pieces, and then running each piece hundreds of miles out to the Nashville suburbs in a textbook example of vote dilution. So does the stunning procedural and substantive irregularity of last week's events: The hastily-called and chaotically executed special session that produced the May 2026 map defied virtually every tradition and rule governing redistricting in Tennessee—indeed, the General Assembly repealed a half-century-old outright ban on mid-decade congressional redistricting as part of its efforts. The evidence—direct, circumstantial, and expert analysis alike—point to an impermissible racial motive behind a White-dominated legislative faction's move to destroy District 9 and shut Black voters out of federal elections in Tennessee.

Nor can Defendants claim that White legislators' racial cracking of a longstanding, naturally-occurring, compact majority-Black district in Memphis and Shelby County was simply an incidental result of partisan motivations. That explanation is belied by the legislative record, by the White legislators' own statements, and by qualitative and quantitative expert analysis showing, among other things, that the May 2026 Map perfectly calibrates the Black population into the three districts that now divide Memphis in order to dilute the effectiveness of Black voters' ballots, and that this result is an extreme outlier that is statistically impossible to achieve through any normal application of traditional districting principles. And even if partisan motives could somehow be

2

given credence to the exclusion of racial ones (and they can't), gratuitously spinning up the redistricting process mid-decade, simply to punish Black Memphians for their successful organizing, power-building, and associational conduct by dispersing them across multiple far-flung districts, would independently be unconstitutional under the First Amendment.

Plaintiffs—Black Memphians and organizations representing Black Memphians, who have spent years and decades building political power in Memphis and Shelby County—seek a temporary restraining order, or in the alternative, a preliminary injunction, which is necessary to prevent irreparable harm. The General Assembly enacted the unconstitutional map here in May of an election year, with the August primary fast approaching, and with the candidate qualifying deadline already past. The ad hoc candidate qualification deadlines set by the General Assembly during the special session are imminently approaching, and in prior years Tennessee election officials have warned that they would be unable to alter congressional maps even earlier in the election calendar without compromising the election. Relief is needed now before the maps are locked in and Black voters are irrevocably forced to use an illegal, discriminatory map to elect representation in Congress for the next two years.

## STATEMENT OF FACTS

Plaintiffs incorporate by reference their Verified Complaint, which details the relevant facts and circumstances of the General Assembly's unprecedented mid-decade redistricting to crack the predominantly Black City of Memphis and Shelby County. *See* Verified Compl. ¶¶ 28–99.

## LEGAL STANDARD

Courts consider four factors in deciding whether to issue a preliminary injunction: whether (1) the movant has a strong likelihood of success on the merits; (2) the movant would suffer irreparable harm without the injunction; (3) issuance of the injunction would cause substantial

3

harms to others; and (4) the public interest would be served by issuance of the injunction. *Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001); *see also Workman v. Bredesen*, 486 F.3d 896, 905 (6th Cir. 2007) (same factors applicable to motion for temporary restraining order). No single factor is a prerequisite to prevailing and the Court must balance all four factors. *Performance Unlimited v. Questar Publishers, Inc.*, 52 F.3d 1373, 1381 (6th Cir. 1995). The primary purpose of a preliminary relief is to maintain the status quo until a final decision on the merits can be reached. *Blaylock v. Cheker Oil Co.*, 547 F.2d 962, 965 (6th Cir. 1976).

**ARGUMENT**

## I.     PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

### A.     <u>Plaintiffs Are Likely to Establish Unconstitutional Racial Discrimination.</u>

Government action is unlawful whenever an "invidious discriminatory purpose was a motivating factor" in the decision to undertake it. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977). This is because "[r]arely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern, or even that a particular purpose was the 'dominant' or 'primary' one." *Id.* at 265.

"[D]iscriminatory intent need not be proved by direct evidence." *Rogers v. Lodge*, 458 U.S. 613, 618, 625 (1982). Assessing a legislature's intent in enacting a law is "a complex task requiring a 'sensitive inquiry into such circumstantial and direct evidence as may be available.'" *Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471, 488 (1997) (quoting *Arlington Heights*, 429 U.S. at 266). "Outright admissions of impermissible racial motivation are infrequent and plaintiffs often must rely upon other evidence." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999); *see also Flowers v. Mississippi*, 588 U.S. 284, 302 (2019) (intent can be inferred from all "relevant circumstances that bear upon the issue of racial discrimination"). Thus, courts have repeatedly found intentional discrimination based on circumstantial evidence alone in voting cases, *see North Carolina v.*

4

*Covington*, 585 U.S. 969, 977 (2018); *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 440 (2006) ("*LULAC*"); *City of Pleasant Grove v. United States*, 479 U.S. 462, 469 (1987).

Several factors—commonly known as the "*Arlington Heights* factors"—may provide direct or circumstantial evidence of intentional discrimination. These include the challenged law's "impact" on different racial groups; the "legislative . . . history," including "contemporary statements by members of the decision making body" or other decisionmakers; the "historical background" and the "sequence of events leading up to the challenged" law's enactment; and "[d]epartures from the normal procedural sequence." *Arlington Heights*, 429 U.S. at 265–68. The list is not exhaustive; additional relevant factors include the foreseeability of the disparate impact and knowledge of that impact. *See Columbus Bd. of Educ. v. Penick*, 443 U.S. 449, 464 (1979); *NAACP v. Lansing Bd. of Educ.*, 559 F.2d 1042, 1047–48 (6th Cir. 1977).

Especially in the districting context, the shape of the district lines at issue, and the changes made to those lines, may themselves be important evidence, and may demonstrate in themselves "a clear pattern, unexplainable on grounds other than race," to disadvantage one racial group. *Arlington Heights*, 429 U.S. at 266–67; *see Gomillion v. Lightfoot*, 364 U.S. 339 (1960) ("uncouth" redrawing of Tuskegee, Alabama municipal lines demonstrated invidious intent supporting Fifteenth Amendment violation).

Here, the evidence all points in one direction: Race and racial discrimination was a motivating factor in the passage of the May 2026 map. Against the weight of the evidence, Defendants cannot hide behind mere assertions of pure partisanship. Plaintiffs are likely to succeed on their claim that the May 2026 map was motivated at least in part by discriminatory purpose.

### 1. Race Was a Motivating Factor in the White-Dominated General Assembly's Cracking and Dilution of Majority-Black Memphis

Based on the evidence here, and applying the *Arlington Heights* factors, Plaintiffs are likely

to succeed in demonstrating that racial discrimination was a motivating factor in the enactment of the May 2026 redistricting plan.

*First*, the plan will have a severe disparate impact on Black voters in Memphis and Shelby County, who comprise over 40% of Tennessee's Black population. Ex. 1, Report of Dr. Marvin King ("King Report") at 5. District 9, in the prior 2022 map, was a majority-Black district in which Black residents comprised nearly 60% of the voting-age population (VAP), and the Black majority has consistently had the opportunity to elect candidates of choice in that district. *See* Ex. 2, Expert Declaration of Dr. Kassra AR Oskooii ("Oskooii Decl.") ¶ 29 & fig. 3, ¶ 101 & fig. 14. The May 2026 Map cracked the Black population of Memphis and Shelby County into thirds, dividing the city and county into three separate districts—Districts 5, 8, and 9—and spreading the Black population across three districts which then run deep into central Tennessee. *See id.* ¶¶ 48, 52 & tbls. 6–7; *see also* Verified Compl. ¶¶ 87-96; Ex. 3, Report of L. Arthi Krishnaswami ("Krishnaswami Report") 7–10. Black voters make up between 26–31.1% of the total VAP in each of these districts, rendering them unable to elect candidates of choice in any of those three districts.[1] *See* Oskoii Decl. ¶ 102 & fig. 15, tbls. 2, 4; *see also* King Report at 7 (discussing the "calibration" of BVAP under the May 2026 Map). This is because there is stark racially polarized voting in these areas of Tennessee—meaning that White voters tend to vote as a bloc against the candidates preferred by Black voters, such that in White-majority districts, Black voters' preferred candidates are defeated. *See* Oskoii Decl. ¶¶ 74–94, 102 & figs. 6–13, 15.

This maneuver of dividing a concentrated Black population into multiple districts and then spreading those districts outwards to lower the total Black voting age population and prevent Black

---

[1] In his Declaration, Dr. Oskooii uses Non-Hispanic Any Part Black to determine the districts' Black voting age population. Including Hispanic and Non-Hispanic Black persons leads to a very slight increase in these districts' BVAP: between 26.6%–31.7%, as used in the Verified Complaint.

voters from effectively exercising electoral power is quintessential vote dilution. *See, e.g.*, *Singleton v. Allen*, 782 F. Supp. 3d 1092, 1338–39 (N.D. Ala. 2025) (finding purposeful vote dilution where plan "crack[ed] the Black vote in South Alabama [so as to] submerge much of the Black Belt in one majority-White district and submerge the Black Alabamians in Mobile in a different majority-White district"), *vacated Allen v. Caster*, No. 25-243, 2026 WL 1282800 (U.S. May 11, 2026).

*Second*, by definition, this disparate impact was foreseeable and the General Assembly had knowledge of it. *See Columbus Bd. of Educ.*, 443 U.S. at 464. District 9 is a naturally occurring majority-Black district centered on majority-Black Memphis, the second-largest city in Tennessee and home to almost half of Black Tennesseans. Verified Compl. ¶¶ 28, 37; Ex. 4, Report of Dr. Jonathan Cervas ("Cervas Report") ¶ 27, 30–31 & fig. 2. The district was not drawn to comply with any court order, under the Voting Rights Act (VRA) or otherwise, but simply because of Memphis' geographically compact Black population. *E.g.*, Verified Compl. ¶ 69. District 9 has been largely unchanged for more than a century, *see* Cervas Decl. ¶ 24 & fig. 1, and it is common knowledge that Memphis and Shelby County are majority Black, *see* Verified Compl. ¶ 28; Oskooii Decl. tbls. 1, 3. And the *acknowledged* purpose of this mid-decade redistricting was to dismantle majority-Black District 9. Mere hours after the U.S. Supreme Court decided *Louisiana v. Callais*, a case involving the permissibility of intentionally drawing Black-majority congressional districts to comply with the VRA, White political leaders called for District 9's destruction. Verified Compl. ¶¶ 46–48. The obvious implication of this timing is that these White politicians sought to destroy Congressional District 9 *because* they recognized that it was majority Black. *E.g.*, Verified Compl. ¶¶ 48–49 (White legislators acknowledging that the prior districts were "fair and legal" and that they sought to redraw the congressional lines anyway due to *Callais*).

7

*Third*, the May 2026 Map is part of a long history of discrimination and animus toward Black voters, particularly Black Memphians, which stretches right into the present. *See* King Report at 10–11. An all-White political faction controls a supermajority of the Tennessee General Assembly. Verified Compl. ¶¶ 33–35; King Report at 3–5. Majority-Black Memphis has faced an onslaught of attacks in recent years from this White-controlled political faction, targeting the ability of majority-Black Memphis to govern itself. King Report at 8–10; *see* Verified Compl. ¶ 44–45. Those attacks culminated this session—*i.e.*, in just the past few months and weeks—with measures authorizing an unprecedented takeover of the Memphis-Shelby County Schools from the locally elected school board, *see id.* ¶ 44(d), and authorizing the Tennessee Attorney General to request an audit of the Shelby County District Attorney's Office and seek a replacement for the locally elected District Attorney, *see id*. ¶ 45(e). White legislators from the supermajority faction moreover argued for stripping predominantly Black Memphis of the right to elect its officials based on stereotyped assertions of criminality and incompetence. *Id*. ¶ 44–45.

And more broadly, in recent years, various White legislators in the supermajority faction have repeatedly expressed animus against Black Tennesseans and especially Black legislators, including through the use of slurs and epithets like "baboons" to describe Black political activists and colleagues, and relied on racial stereotypes and negative racial tropes in addressing matters of public policy. Verified Compl. ¶¶ 39–43.

*Fourth*, the enactment of the May 2026 map involved significant procedural irregularities and an extraordinary sequence of events indicating discriminatory purpose. Verified Compl. ¶¶ 46–83, 108. Just two days after the Supreme Court issued its decision in *Callais*, the Governor had called a special session to redraw the congressional lines, even though doing so was, at the time, expressly forbidden under state law. Verified Compl. ¶ 50–51; *see also id*. ¶¶ 31–32; Tenn.

8

Code Ann. § 2-16-102 (statute on the books for more than 50 years stating that "districts may not be changed between apportionments"). A frantic and lawless process ensued, with the General Assembly hurriedly repealing the 1972 law prohibiting mid-decade redistricting, restricting public access to view the new map, rejecting proposals for transparency, adopting rules to punish dissent, and declining to make proposed maps available to Black members of the General Assembly even by the end of the first day of the session. Verified Compl. ¶¶ 51–59. Maps were not released to Black lawmakers until the second day of the three-day session, less than 48 hours before they were enacted into law. *Id*. ¶¶ 60, 80.

And all of this took place in an election year, *after* candidate filing deadlines had already passed, with campaign season well underway under the old districts, with no acknowledgement of the fact that Tennessee election officials had previously testified that changing congressional districts at this point in the election calendar would be infeasible. Verified Compl. ¶¶ 51–59; *see also id*. ¶¶ 73–74. The General Assembly's only acknowledgment that it was disrupting an election cycle already in progress was its hurried repeal of the existing residency requirement and altering the qualifying period to run for Congress. *Id*. ¶¶ 71–81. The May 2026 map was jammed through while refusing to consider numerous amendments and alternative maps, and ignoring traditional districting criteria and the fierce protests of Black lawmakers. *See id*. ¶¶ 54–55, 71–81. This unprecedented melee was the very definition of an irregular process. *Id*. ¶¶ 46–83, 108.

*Finally*, there is the map itself, which is unexplainable on grounds other than race, evincing a laser focus on Black voters. The General Assembly cracked the Black population in former District 9 into near-perfect thirds; in fact, there is only a 252-voter BVAP difference between the new Districts 5 and 9. Oskooii Decl. ¶¶ 56–61. Indeed, expert analysis confirms that the May 2026 Map is a statistical impossibility without considering race as a factor. In a set of 5,001 race-blind

congressional redistricting plans created by an algorithm using traditional districting criteria like county lines and compactness, 98.9% contained at least one majority Black district and 100% contained at least one district where Black voters had an opportunity to elect a candidate of choice. Cervas Decl. ¶¶ 31, 33. *All* of those maps contained at least one district with a 39% BVAP or higher. *Id*. ¶ 31. And yet, the May 2026 Map has *no* majority-BVAP districts, *no* districts where Black voters have an opportunity to elect preferred candidates, and *no* districts with a BVAP over 31.1%, let alone 39%. *See* Oskooii Decl. ¶ 29 & tbl. 4, ¶ 102 & fig. 14. Consistent with that, quantitative analysis also shows that a disproportionate number of voters in majority-Black Memphis and Shelby County were forced to move districts and face the high likelihood in a change in representation as compared to the rest of the state. *See id*. ¶ 30 & fig. 3. These quantitative analyses strongly corroborate the conclusion that the map was designed to target Black voters.

And visually, the May 2026 Map's purpose is obvious. The plan carves through predominantly Black Memphis neighborhoods like Whitehaven and splits Shelby County three ways right in the heart of Midtown Memphis. *See* Krishnaswami Report 11–12; *see also* Verified Compl. ¶¶ 90–95. It then dilutes the Black population of each district by ballooning outwards towards central Tennessee to pick up White population. *Id*. District 5 is especially monstrous: Snaking from the Mississippi line in South Memphis and past Beale Street, the district picks up nearly 120,000 Black voters in Shelby County, then heads up Tennessee's western border with Arkansas and Missouri in a long tendril, all the way to the Kentucky line to the north, and then east and south again to spill into the Nashville suburbs. Verified Compl. ¶¶ 90–95; *see also* Krishnaswami Report 9–10; Oskooii Decl. ¶ 59. And to accomplish its racial goals, the May 2026 Map sacrifices numerous race-neutral districting principles: Its districts are less compact than the previous, 2022 map, Oskooii Decl. ¶¶ 37–42 & tbl. 5, and split more counties, municipalities, and

precincts, *id*. ¶¶ 43–55 & tbls. 6–8, especially in Memphis and Shelby County, *see id*. ¶¶ 48–49, 52–53 & figs. 4–5. The evidence strongly supports the conclusion that diluting Black voting strength was a motivating factor in the enactment of the May 2026 Map.

### 2. *Pure Partisanship Does Not Independently Explain the General Assembly's Actions*

The evidence also shows that race operated independently of partisanship in the General Assembly's enactment of the May 2026 Map. Critical legislators admitted that the General Assembly would not have returned to take up redistricting but for the Supreme Court's decision in *Louisiana v. Callais*, which involved a challenge to a Black-majority congressional district that was drawn after a VRA lawsuit. Verified Compl. ¶ 49. The invocation of *Callais* gives away the game. Because Congressional District 9 was not drawn in response to any court finding or lawsuit, Verified Comp. ¶¶ 29, 47; *see also* Cervas Decl. ¶ 24 & fig. 1 (showing a compact, Memphis-centered congressional district since before the passage of the VRA), the decision in *Callais* would rightly not have any bearing on the construction of the district. But it did to the General Assembly, where White legislators apparently took *Callais* as license to attack an existing Black-majority district. *See supra* at 7–8. And the timing as relates to *Callais* serves as further evidence of this connection. *See Arlington Heights*, 429 U.S. at 267. On the same day the case came down, U.S. Senator Blackburn, who is aligned with the White-dominated political faction in control of the General Assembly, called for redistricting, as did the Speaker of the Senate, a leader of the supermajority. Verified Compl. ¶ 48. The Governor then called the special session to conduct redistricting contrary to law within two days of *Callais*. *Id*. ¶ 50.

During the special session, members of the General Assembly stated that the map was "drafted on politics." Verified Compl. ¶ 64. But their story did not add up. Key legislators who were leading the redistricting effort refused to ever say who drew the map, or what specific data was used to draw it "on politics." *Id*. ¶¶ 3, 64–65, 78. When asked simple questions about

11

demographics and data, they provided bizarre and robotic answers; the lead Senate sponsor, who attended law school in Memphis, would not acknowledge that Memphis was a majority-Black city and risibly claimed not to know Congressional District 9 was majority-Black. *Id*. ¶¶ 61–63; 67–68. Apparently prepared with canned sound bites that provided no actual information, the sponsors of the map would only admit to using census data. *Id*. ¶¶ 64–65. But census data as a general matter includes racial demographic data, not political or election data. *Id*. ¶ 65. Thus, the General Assembly's own admissions support the conclusion that the May 2026 Map was drawn using racial data to determine where and how to crack Shelby County and Memphis.

And indeed, beyond White legislators' wooden, scripted references to "the census" and "politics," their bizarre refusal to acknowledge basic demographic facts about the Black-majority status of the State's largest county, and their total inability to explain why redistricting was necessary in the first place, their aim of targeting Black voters slipped out in other more overt ways as well. For one, the Chair of the House Congressional Redistricting Committee highlighted this motive. During the second day of the Extraordinary Session, he aimed to justify the cracking of Memphis across three congressional districts by suggesting it would somehow reduce crime and make Memphis "safer." Verified Compl. ¶ 70. This nonsensical suggestion was a dog whistle reference to racial stereotypes of Black criminality. *Id*.; *see also Edmonson v. Leesville Concrete Co*., 500 U.S. 614, 630–31 (1991) ("If our society is to continue to progress as a multiracial democracy, it must recognize that the automatic invocation of race stereotypes retards that progress and causes continued hurt and injury."). Additionally, the May 2026 Map excises Representative Justin Pearson, a Black state representative and a formidable Black candidate in the ongoing congressional primary, from District 9 and places him and the State House district he represents into District 5, which has the lowest Black population of the three districts. Verified Compl. ¶ 88.

Targeting a Black candidate, who already had demonstrated support from the targeted Black community, and who the current Congressman from District 9 described as "more significant than any primary opponent [he'd] had before," *id*. ¶ 88 n.101, is another proof-point showing race operated independent of partisanship in driving the choices underpinning the May 2026 Map.

Finally, the nearly equal division of the Black voting age population across the three cracked districts demonstrates the General Assembly's racial motivation in drawing the Map. Congressional Districts 5, 8, and 9 were constructed with Black voting age population of 27.3%, 26.0%, and 31.1% respectively. Oskooii Decl. tbl. 4. These are not the only almost exact splits of the Black voting age population: District 5 contains 39.7% of Memphis's Black voting age population (115,383 people) and District 9 contains 39.8% (115,635 people)—an extremely precise degree of parity. Verified Compl. ¶ 94; Oskooii Decl. ¶ 61. The precision with which Black voters were split across these districts provides further evidence that race operated independent of partisanship in the May 2026 Map. *See, e.g.*, *United States v. Jennings*, 985 F.2d 562 (6th Cir. 1993) (recognizing that "statistical proof of some sort" can provide "a strong inference" that the government actors "engaged in intentional discrimination"). The exact percentages of racial sorting across these districts, combined with the clear visual evidence and the algorithmic statistical analysis, at least approaches "a pattern as stark as that in *Gomillion* or *Yick Wo*," *Arlington Heights*, 429 U.S. at 266. And Plaintiffs have offered substantial "other evidence," as well, including the direct statements of key legislators. *Id*. (citation omitted); *see supra* 6–11. On the strength of all this extensive evidence, Plaintiffs are likely to succeed in establishing impermissible racial discrimination as a motivating factor in enacting the May 2026 Map.

### B. <u>Plaintiffs Are Likely to Establish Impermissible First Amendment Retaliation.</u>

Defendants initiated gratuitous mid-decade redistricting to retaliate against Black voters, including Plaintiffs, for their associating and organizing to build political power in Memphis and

Shelby County and for their opposition to the White-dominated faction that controls all the levers of political power in Tennessee. Even if the evidence here did not strongly support a racial discrimination claim, the General Assembly's actions would still violate the First Amendment.

"[T]he First Amendment prohibits government officials from subjecting an individual to retaliatory actions" for engaging in protected activity, including speech, petition, and association. *Hartman v. Moore*, 547 U.S. 250, 256 (2006). Government officials simply may not use "their power selectively to punish or suppress speech." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 198 (2024). The government may not stop someone from exercising their First Amendment rights in advance, nor may it punish someone for exercising those rights "after the fact." *Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022).

Unlike the partisan gerrymandering disputes the Supreme Court has deemed nonjusticiable, Plaintiffs' retaliation claim concerns not how lines are drawn, but whether the hasty, mid-decade decision to redraw the map was itself legitimate. While "a legislature may pursue partisan ends when it engages in redistricting," *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 6 (2024), it may not engage the redistricting process gratuitously simply to punish citizens for exercising their First Amendment rights.

### 1. *Defendants Redrew the Congressional Map to Punish Black Voters for Exercising Their First Amendment Rights.*

To prevail on a First Amendment retaliation claim, a plaintiff must establish "(1) that she engaged in First Amendment protected activity; (2) that [defendants] undertook 'an adverse action' that would deter 'a person of ordinary firmness from continuing to engage in that conduct'; and (3) that there is a 'causal connection' between [the] protected activity and [the] adverse action." *MacIntosh v. Clous*, 69 F.4th 309, 315 (6th Cir. 2023). Here, Plaintiffs are likely to succeed in establishing all three.

*Protected Activity*. "[P]olitical belief and association constitute the core of those activities protected by the First Amendment." *Elrod v. Burns*, 427 U.S. 347, 356 (1976) (plurality opinion); *see also NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460 (1958) ("[F]reedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of . . . freedom of speech"). That expression includes "the freedom to join together in furtherance of common political beliefs." *Cal. Democratic Party v. Jones*, 530 U.S. 567, 574 (2000) (citation omitted); *see also Kusper v. Pontikes*, 414 U.S. 51, 56–57 (1973).

Here, Black voters in Congressional District 9, including Plaintiffs, engaged in protected expression and association when they organized to build political power in Black communities in Memphis and Shelby County. *See* Ex. 5, Declaration of Amber Sherman ("Sherman Decl.") ¶¶ 4–10; Ex. 6, Declaration of Rachael Spriggs ("Spriggs Decl.") ¶¶ 4–10, 13–15; Ex. 7, Declaration of Kermit Moore ("Moore Decl.") ¶¶ 3–14, 20–24; Ex. 8, Declaration of Rev. Dr. J. Lawrence Turner ("Turner Decl.") ¶¶ 4–5, 8–9, 11. That includes voting for and encouraging others to vote for candidates and policies not favored by the White-dominated supermajority in control of the Tennessee General Assembly: A majority of voters in District 9, including Plaintiffs, engaged in protected activity in 2024 when they voted for and joined in association with other voters (including an estimated 95.9% of Black voters) to support Vice President Kamala Harris, a candidate disfavored by the White officials in power. Oskooii Decl. ¶ 74 & fig. 6, ¶ 101 & fig. 14; Sherman Decl. ¶¶ 8–9; Spriggs Decl. ¶¶ 14–15; Moore Decl. ¶¶ 20–21; Turner Decl. ¶¶ 4–5; *see also* Oskooii Decl. ¶ 75. It also includes building political power—and in particular Black political power—through other associational conduct, such as mobilizing voters and citizens for civic engagement, engaging voters by strengthening and leveraging social, family, and professional networks in and around Memphis and Shelby County, and organizing in Plaintiffs' communities

15

neighborhoods and communities. *See* Sherman Decl. ¶¶ 4–10; Spriggs Decl. ¶¶ 3–5, 7–11, 13–15; Moore Decl. ¶¶ 10–14; Turner Decl. ¶¶ 4–9; *see also* Verified Compl. ¶¶ 10–12, 15–16, 19–20, 22, 37, 97; King Report at 5–6 (discussing the process of building Black political power in Memphis).

*Causal Relationship.* To establish causation, Plaintiffs must demonstrate that their protected First Amendment activity "was a 'substantial' or 'motivating' factor in the defendant[s'] decision to take action against [them]," in which case "the burden shifts to the defendant[s] . . . to show that [they] would have taken the same adverse action even in the absence of the protected [First Amendment activity]." *Gonzalez v. Trevino*, 602 U.S. 653, 662–63 (2024) (Alito, J., concurring) (quoting *Mt. Healthy City Sch. Dist. Bd. of Ed. v. Doyle*, 429 U.S. 274, 287 (1977)).

And here, in the General Assembly's own telling, it redistricted to retaliate against Plaintiffs and other Black Memphians for their protected speech and activity. By their own account, the Governor called a special session and the General Assembly supermajority redrew District 9, cracking it into three separate congressional districts, to punish Black Memphians for organizing to build a powerful working majority in the Memphis area, and for using that power to oppose policies harmful to the Black community and to ensure Black Memphians had a voice in government, including by joining with others to support candidates disfavored by the state elected officials. Verified Comp. ¶¶ 60, 63–64, 87–97. The White supermajority faction in the General Assembly sought to disrupt Plaintiffs' and Black Memphians' ability to continue to succeed in these efforts and to render those efforts ineffective. *Id*. To achieve this aim, Governor Lee and the General Assembly targeted Memphis, a majority-Black city. The result was three separate bizarrely shaped majority-White districts with very similar percentages of Black voting age population both in Memphis and Shelby County, in which it will be effectively impossible both due to geography and to racially polarized voting patterns for Plaintiffs and Black Memphians to build and wield

16

organizing power to influence federal elections in support of the candidates supported by Black voters. Verified Compl. ¶¶ 87, 94, 97; Oskooii Decl. ¶¶ 59, 61. And again, in their own telling, the General Assembly initiated the redistricting process *solely* to target Black Memphians, including Plaintiffs, based upon their political expression and association.

<u>*Adverse Action.*</u> Finally, Defendants "undertook an 'adverse action' that would deter 'a person of ordinary firmness from continuing to engage in that conduct.'" *MacIntosh*, 69 F.4th at 315; *see also Houston Cmty. Coll. Sys.*, 595 U.S. at 477–78. Because "nothing justifies 'harassing people for exercising their constitutional rights,'" "the deterrent effect on speech 'need not be great' to be actionable." *Anders v. Cuevas*, 984 F.3d 1166, 1176 (6th Cir. 2021) (citation omitted). Indeed, "government actions, which standing alone do not violate the Constitution, may nonetheless be constitutional torts if motivated in substantial part by a desire to punish an individual for exercise of a constitutional right." *McIntosh*, 69 F.4th at 316.

It does not matter whether Plaintiffs have any legal entitlement to the benefit Defendants stripped away because the First Amendment prohibits retaliation even when it withdraws discretionary benefits as a tool to punish protected expression. *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 72 (1990); *see generally Sherbert v. Verner*, 374 U.S. 398, 404–05 (1963) (government may not withhold unemployment benefits or tax exemptions to penalize protected activity even though there is no constitutional right to receive them). Here, Defendants' decision to undertake mid-decade redistricting gives rise to three independent adverse actions, each of which has chilled—and will continue to chill—Plaintiffs from exercising their First Amendment rights for fear of being retaliated against again.

*First*, Defendants removed certain Plaintiffs from District 9 and reassigned them to other districts, thereby depriving them of the right to vote for—and be represented by—their sitting

congressional representative. *See Lubin v. Panish*, 415 U.S. 709, 716 (1974) ("[A] voter hopes to find on the ballot a candidate who comes near to reflecting his policy preferences on contemporary issues."); *see also Burdick v. Takushi*, 504 U.S. 428, 433–34 (1992) (affirming that voters' First Amendment rights are implicated when a state prevents them from casting a ballot for a particular candidate); *cf. Gomillion*, 364 U.S. at 341 (1960) (voters are injured when the government "fenc[es]" them out of a district "so as to deprive them of their pre-existing . . . vote").

*Second*, Defendants deprived Plaintiffs of the right to associate with like-minded citizens in their neighboring communities. *See Jones*, 530 U.S. at 574; *see also Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 186 (1979) ("[A]n election campaign is a means of disseminating ideas as well as attaining political office."); *Elrod*, 427 U.S. at 355–56 (First Amendment protects an "individual's ability to act according to his beliefs and to associate with others of his political persuasion"). Cracking Black voters (including Plaintiffs) from their prior district, where they partook in associational activities in their communities, and forcing them to conduct those activities in unfamiliar and far-away places, constitutes First Amendment retaliation.

Plaintiffs have spent decades strengthening community ties and building political power to advance their interests at the ballot box, often in association with groups like BCCM, APRI, and the Equity Alliance. Plaintiffs all engage in substantial organizing and voter engagement activities, including across organizing networks that they have cultivated for years. Sherman Decl. ¶¶ 4–10; Spriggs Decl. ¶¶ 3–5, 7–11, 13–15; Moore Decl. ¶¶ 10–14; Turner Decl. ¶¶ 4–9. The May 2026 Map burdens their associational activity, breaking up communities that have long been together and materially increasing the difficulty of the work. For example, now in District 5, Mr. Moore has been removed from the community he has spent a lifetime working in, breaking up a "unique community of interest" and connecting South Memphis, which borders Mississippi, with Franklin,

Tennessee, "over 200 miles away." Moore Decl. ¶ 27. "Organizing [his] network, APRI, and [his] community to turn out and vote will be much harder to do now because of the way Memphis is divided." *Id*. ¶ 32. Likewise, BCCM members, for example, are now faced with "districts connecting the core of Memphis with extremely rural areas hundreds of miles away." Turner Decl. ¶ 10. This "physical distance itself will also prevent [BCCM and its members] from doing civic engagement work across a congressional district" as "[t]he distance that [they] have to travel would make it all but impossible,. . . particularly . . . as many [BCCM] members and volunteers do not have a vehicle, and there is no reliable public transportation, and nothing connecting Shelby County to the rural areas across western to middle Tennessee." *Id*.; *see Rutan*, 497 U.S. at 73 (upholding retaliation claim of employees "denied transfers to workplaces reasonably close to their homes" in part because they "will feel a daily pressure from their long commutes").

*Third*, Defendants have made it significantly harder for Plaintiffs to act collectively to elect candidates who represent their shared interests. In doing so, Defendants have "burden[ed] [Plaintiffs'] representational rights." *Vieth v. Jubelirer*, 541 U.S. 267, 315 (2004) (Kennedy, J., concurring); *see also Baker v. Carr*, 369 U.S. 186, 206 (1962) (recognizing that districting schemes that "disadvantage" plaintiff may cause them actionable individual harm). Removing Plaintiffs from a congressional district in which they had the ability to elect candidates of their choosing and placing them into new districts where they are unable to do so due to their expression and associational activity constitutes First Amendment retaliation.

These adverse actions all would deter a person of ordinary firmness. The cracking of Memphis is already "causing voter apathy among Black Memphians because they feel that the General Assembly is intentionally shutting them out of the democratic process." Sherman Decl. ¶ 24; *see also* Turner Decl. ¶ 10 ("It will become more difficult for the Black Clergy Collaborative

to engage voters in Memphis, who are now well aware that the map was drawn to shut them out of the process"). As Ms. Spriggs described it, the May 2026 redistricting "process made me feel like we cannot find refuge in legislation to protect Black voters in Memphis. The General Assembly took away legislation that has long guided the legislative process for redistricting in Tennessee. . . . The General Assembly's actions have made me feel hopeless." Spriggs Decl. ¶ 21. Being deliberately targeted by the government in a way that stymies any realistic chance to have a say in how one is governed would (and indeed does) chill a person of ordinary firmness.

### 2. *Retaliation Through Redistricting Remains Unlawful.*

Redistricting does not occur in a First Amendment-free zone. The General Assembly's authority to draw and redraw congressional maps comes from the federal Constitution's Elections Clause. U.S. Const. art. I, § 4; *see Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 8–9 (2013). That authority is important but limited. It does not allow the General Assembly "to dictate electoral outcomes, to favor or disfavor a class of candidates, or to evade important constitutional restraints." *Cook v. Gralike*, 531 U.S. 510, 523 (2001) (citation omitted).

*Cook* is instructive. There, Missouri altered its ballot design to single out congressional candidates who refused to support a proposed constitutional amendment imposing term limits. 531 U.S. at 514–15. Although "the precise damage the labels may exact on candidates [was] disputed between the parties," the Court nonetheless struck down the law because the labeling scheme went beyond "regulating the procedural mechanisms of elections," and instead "place[d] [its] targets at a political disadvantage to unmarked candidates." *Id*. at 525–26. Legitimate Elections Clause regulations concern only the procedural steps *necessary* to hold an election. *Id*. at 523–24.

The same is true of the May 2026 Map. Regardless of "the precise damage [it] may exact on [Plaintiffs]," *Cook*, 531 U.S. at 525, the law was in no way necessary to conduct an election. Existing, equipopulous, lawful maps were already in place. The General Assembly did not draw a

20

new map to ensure that "'some sort of order, rather than chaos, [would] accompany the democratic process.'" *Id*. at 524 (quoting *Storer v. Brown*, 415 U.S. 724, 730 (1974)). It did so to retaliate against voters like Plaintiffs for speaking out, associating with and organizing their neighbors and communities, and voting and expressing political views in disfavored ways.

The partisan gerrymandering line of cases is entirely different. Those cases concerned *how* lines were drawn *in the context of an otherwise validly initiated map-drawing process*. In each of those cases, state legislators had some non-retaliatory reason that required the drawing of new congressional maps, including (1) the release of the Census (*e.g.*, *Gill v. Whitford*, 585 U.S. 48, 54–55 (2018)); (2) replacing a map that has been invalidated by a court (*e.g.*, *Rucho v. Common Cause*, 588 U.S. 684, 691 (2019)); or (3) replacing a court-drawn map with a legislature-drawn map (*e.g.*, *LULAC*, 548 U.S. at 412–13). Because the decision to draw a new map in cases like *Gill* or *LULAC* was itself valid, and in some cases required, the plaintiffs' challenges in those cases focused on *how* the lines were drawn, parsing out partisanship from other redistricting factors. Such claims necessarily implicate a question of "degree: How to 'provid[e] a standard for deciding how much partisan dominance is too much.'" *Rucho*, 588 U.S. at 704 (quoting *LULAC*, 548 U.S. at 420). Such standardless inquiries are "beyond the reach of the federal courts." *Id*. at 684.

But here, Plaintiffs do not bring a partisan gerrymandering claim or suggest "that groups with a certain level of political support should enjoy a commensurate level of political power and influence." *Rucho*, 588 U.S. at 704. And they do not seek a remedy "to rearrange the challenged districts to achieve that end." *Id*. at 705. Rather, this Court can resolve this claim by applying straightforward First Amendment retaliation principles. Just like with any other official government action, the Constitution forbids the government from redrawing electoral district lines in order "to punish or suppress speech." *Vullo*, 602 U.S. at 198. No complex metrics or subjective

assessments of "partisanship" are required to enjoin unconstitutional government action here and simply revert the map to the preexisting, legislatively-drawn status quo (namely, the 2022 map).

## II.     IMMEDIATE RELIEF IS REQUIRED TO AVOID IRREPARABLE HARM.

The imposition of an unconstitutional map designed to target Black Memphians will irreparably harm voters in multiple ways unless enjoined. Unconstitutional state action that impairs or impedes the right to vote is presumptively irreparable, because the ability to cast an effective vote in a lawful election, once denied, can never be regained. *See Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012); *Singleton v. Merrill*, 582 F. Supp. 3d 924, 1026–27 (N.D. Ala. 2022) (plaintiffs "suffer an irreparable harm" when they must vote in "elections based on a redistricting plan that violates federal law"), *aff'd sub nom. Allen v. Milligan*, 599 U.S. 1 (2023). Likewise, "[e]ven minimal infringement upon First Amendment values constitutes irreparable injury sufficient to justify injunctive relief." *Chabad of S. Ohio & Congregation Lubavitch v. Cincinnati*, 363 F.3d 427, 436 (6th Cir. 2004) (citation omitted); *see, e.g.*, Sherman Decl. ¶ 24; Moore Decl. ¶ 32; Spriggs Decl. ¶ 13; Turner Decl. ¶ 10. Actually running elections on the May 2026 Map and consummating Plaintiffs' constitutional injuries would plainly cause irreparable harm.

And immediate relief is critical here because the election season is already well underway. *See, e.g.*, Sherman Decl. ¶ 24. Congressional candidates have been campaigning under the 2022 map for Plaintiffs' and Memphis voters' votes for months.[2] Tenn. Code Ann. § 2-5-101(a)(2) (prior qualifying deadline was March 10). The sudden potential change has already begun to cause confusion. Sherman Decl. ¶ 24; Moore Decl. ¶ 18. Voter confusion is also likely to increase because the General Assembly removed the requirements that would ordinarily require notice

---

[2] See *Elections Calendar*, Tenn. Sec'y of State, https://sos.tn.gov/elections/calendar (last visited May 12, 2026).

directly to voters whose precincts or districts changed. *Compare* H.B. 7001, § 1 (amended Tenn Code Ann. § 2-16-203) *with* Tenn Code Ann. § 2-3-105. Without this protection, voters in Shelby County in particular—where the May 2026 Map makes the most changes, including new precinct splits—will be left unsure which candidates seek to represent them, where to vote, or whether their polling place and precinct number has changed.

Moreover, following the rushed changes, candidates are now required to commit to which district they are running in or whether they are withdrawing by this Friday, May 15, at noon. H.B. 7001, § 1 (amended Tenn. Code Ann. § 2-16-204). Allowing this Friday deadline to pass without relief will further exacerbate confusion and make it more difficult to impose an effective remedy later in the process. A TRO is thus needed to preserve "the relative positions of the parties until the Court can hold an adversarial hearing for a preliminary injunction". *Snipes v. Presbyterian Church (USA)*, No. 3:25-cv-00346, 2025 WL 1336325, at *1 (M.D. Tenn. May 6, 2025).

Sworn statements from election administrators filed in a prior case from a few years ago illustrate the urgent need for relief. In that case, election administrators testified that making changes to the redistricting plans even earlier in the calendar would cause chaos, making it impossible to "comply with the MOVE Act" (*i.e.*, a statute providing for overseas and military voting) and to "have everything timely and accurately ready for the August election and early voting." *See* Ex. 9, Declaration of Lucas Cameron-Vaughn ("Cameron-Vaughn Decl."), Ex. A (Beth Henry Robertson Decl. from *Moore v. Lee*) ¶¶ 7, 9, 21; *see generally* Cameron-Vaughn Decl., Ex. B (Linda Phillips Decl. from *Moore v. Lee*). Election administrators would in the end be left with barely *three weeks* at most to prepare, review, and send absentee ballots that comply with

23

federal law[3], *and* to implement the new congressional districting lines, when officials ordinarily have months for this process. Cameron-Vaughn Decl., Ex. B ¶ 16; *see Moore v. Lee*, 644 S.W.3d 59, 65 (Tenn. 2022) ("any extension of the candidate qualifying deadline risks compliance with the MOVE Act"). And these demands do not account for the other tasks election administrators must accomplish during that time. Cameron-Vaughn Decl., Ex. B ¶¶ 22–24; Cameron-Vaughn Decl., Ex. A ¶¶ 13–14; Cameron-Vaughn Decl., Ex. C (Chris Davis Decl. from *Moore v. Lee*) ¶¶ 21–24; Cameron-Vaughn Decl., Ex. D (Tammy Smith Decl. from *Moore v. Lee*) ¶¶ 18–20.

Moving forward with the General Assembly's last-minute changes in service of implementing its unlawful map will likely "disenfranchis[e] voters," including Plaintiffs and other Black Memphians, and "cause significant [voter] confusion." Cameron-Vaughn Decl., Ex. C ¶¶ 13–17, 25–26; Cameron-Vaughn Decl., Ex. D ¶¶ 9–10, 23; Cameron-Vaughn Decl., Ex. A ¶¶ 11, 12, 27. And with each passing day, reversion to a lawful map becomes more difficult. Immediate relief is thus necessary to protect voters and the integrity of the coming election. *See League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) ("[O]nce the election occurs, there can be no do-over and no redress").

## III.  THE EQUITIES AND THE PUBLIC INTEREST FAVOR RELIEF.

The balance of equities and the public interest—which merge when the government is the opposing party, *Nken v. Holder*, 556 U.S. 418, 435 (2009)—weigh in favor of injunctive relief. Temporary relief would not cause any harm to other parties, as it would simply maintain the status quo ante—*i.e.*, the state of affairs that existed prior to the challenged unlawful conduct—pending a final determination on the merits. *See Blaylock*, 547 F.2d at 965; *see also, e.g., Becker v. Granholm*, 272 F. Supp. 2d 643, 649 (E.D. Mich. 2003) (status quo is "the last peaceable

---

[3] UVOCAVA and the MOVE Act require election administrators to mail overseas and military ballots out no later than forty-five (45) days before an election.

24

uncontested status that existed before the dispute arose"").

Here, no one disputes that the congressional plan enacted in 2022 following the 2020 Census was lawful. *See, e.g.*, Verified Compl. ¶ 48 (noting Senate Speaker Randy McNally's statement, less than two weeks ago, that the 2022 map was "strong, fair and legal"). And the 2022 map has been serving as the basis for completed candidate qualifications, campaign planning, and election administration for an election cycle that is *currently underway*, and that is being disrupted by the feverish attempt to impose the discriminatory May 2026 Map. *See supra* at 9, 22–24. Using a congressional map that is unquestionably lawful and that will ensure that the coming elections will be smoothly administered is firmly in the public interest. *Cf. Obama for Am.*, 697 F.3d at 437 ("The public interest . . . favors permitting as many qualified voters to vote as possible.").

On the other side of the ledger, Defendants have "no interest in enforcing laws that are unconstitutional." *NetChoice, LLC v. Yost*, 716 F. Supp. 3d 539, 561 (S.D. Ohio 2024) (citation omitted); *accord G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights"). Even if Defendants could identify some valid interest in disrupting ongoing elections to replace a lawful congressional plan with one that is likely unlawful and discriminatory, there is certainly "no substantial harm" in temporarily maintaining the status quo ante and proceeding with elections using the 2022 map while this action is resolved on the merits. *Planned Parenthood Ass'n of Cincinnati, Inc. v. Cincinnati*, 822 F.2d 1390, 1400 (6th Cir. 1987).

## CONCLUSION

For the reasons set forth above, Plaintiffs' motion should be granted and a temporary restraining order enjoining use of the May 2026 Map should issue until the motion for a preliminary injunction can be heard by the three-judge panel. Once constituted, the three-judge Court should grant a preliminary injunction. A proposed order is appended.

25

Dated this 13th day of May, 2026

Respectfully submitted,

Ari J. Savitzky*
Theresa J. Lee*
Dayton Campbell-Harris*
Jonathan Topaz*
Sophia Lin Lakin*
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
asavitzky@aclu.org
tlee@aclu.org
dcampbellharris@aclu.org
jtopaz@aclu.org
slakin@aclu.org

*motion for admission *pro hac vice*
forthcoming

/s/ *Lucas Cameron-Vaughn*
Lucas Cameron-Vaughn (36284)
Zee Scout (042637)
ACLU FOUNDATION OF TENNESSEE
P.O. Box 120160
Nashville, TN 37212
(615) 320-7142
lucas@aclu-tn.org
zscout@aclu-tn.org

26