# Exhibit 1

Expert Report on the Tennessee's 9th Congressional District
Marvin King
May 12, 2026

Contents

1. Introduction                                        2
2. General Overview                                    3
3. CV                                                 14

Section 1.  Introduction

1. My name is Marvin King.

2. I am an Associate Professor of Political Science and African American Studies at The University of Mississippi. I teach classes on American Politics, African American Politics, the Politics of the American South, American Federalism, and Political Inequality. The issues of voting, redistricting, and vote dilution, as well as the role of race in politics in the American South in general, are frequent topics in several of the classes I teach. My CV is included at the end of this document.

3. My Ph.D. is from The University of North Texas. I have lived and worked in Mississippi since 2005.

4. I have been asked by plaintiff's counsel to write a report on Tennessee's 9th congressional district. This report relies on publicly available sources and literature commonly used in the academic discipline of political science.

5.  I am paid at a rate of $200/per hour for the work in this case. My compensation does not affect the conclusions that I reach in this report.

6. The conclusions in this report are provided with a high degree of professional certainty. I reserve the right to further modify, augment, or supplement my report, particularly if additional information becomes available to me.

2

Section 2.

**Tennessee's Racial Divisions - Race before Party**

This report addresses whether race was a substantial motivating factor in Tennessee's decision to dismantle the long-standing Memphis-centered congressional district. The anticipated response is that the plan was enacted for partisan advantage rather than racial reasons. That explanation is incomplete. In Tennessee, partisan division is downstream from racial division. White voters overwhelmingly support Republican candidates, Black voters overwhelmingly support Democratic candidates, and available political science research shows that race affects political behavior even when party is held constant. A mapmaker who fragments Black voters in Memphis is therefore not merely sorting Democrats from Republicans; in Tennessee's political context, that choice predictably reduces Black political power.

It is critical to establish the depth and length of Tennessee's racialized political past. It is likely the state will argue the newly enacted maps are purely partisan, and in no way cognizant of race. Given the state's long and highly racialized past, that is unlikely. Tennessee's racialized politics is based in both resistance and later, the law itself.

Tennessee seceded from the Union because as Tennessee Governor Isham Harris worried that staying in the Union would be "fatal to the institution of slavery forever."[1] In 1875, the General Assembly approved Chapter 130 of the Acts of Tennessee, permitting racial discrimination in public places including hotels, theaters, trains, and streetcars. Many historians give Tennessee credit for its "leadership" in Jim Crow owing to its 1881 adoption of railroad segregation law, often credited as being one of the earliest Jim Crow statutes.[2]

Voting is considered to be political self-help. Communities of interest cannot protect or advocate for themselves within the traditional political process without access to the ballot box. Given that, it is especially noteworthy that while the Fifteenth Amendment was ratified in 1870, Tennessee did not formally ratify it until 1997, 127 years later (and well after the Civil Rights Movement). This delay resonates symbolically

---

[1] Feller, D. (2023, April 21). *White Tennessee lawmakers speak out for insurrection in honoring Confederate history*. Tennessee Lookout. https://tennesseelookout.com/2023/04/21/white-tennessee-lawmakers-speak-out-for-insurrection-in-honoring-confederate-history/

[2] Tennessee State Library and Archives, 'Jim Crow Laws in Tennessee,' https://sharetngov.tnsosfiles.com/tsla/exhibits/aale/jimcrow.htm.

3

because it is indicative of Tennessee's long reluctance to embrace Black political equality.[3]

Throughout much of Southern political history, race, specifically anti-Black animus, has been at the forefront of contentious political debates.[4] Examples of this abound in Tennessee. After Reconstruction, as Jim Crow settled in, Tennessee adopted facially neutral voting rules that had the effect of weakening Black participation. The Lea Law of 1890 introduced the Australian ballot and other procedures that made voting more complex. The Dortch Law of 1893 imposed a cumulative poll tax, which turned poverty into political exclusion. These laws did not formally repeal the right to vote, but they reduced the value and accessibility of that right. The establishment of the one-party South led to suffrage restrictions enabling white elites to preserve political control while avoiding direct conflict with constitutional protections. This is a critical point. There was only one political party, yet the discrimination was omnipresent and permissive.[5] Partisanship had nothing to do with differential political outcomes, it was purely race-based. This legacy lives within Tennessee politics today.

The cracking of Tennessee's Congressional District 9 is a successor to these nineteenth-century methods. Instead of denying the formal right to vote, district lines are drawn to disperse minority voters across multiple districts where they are consistently outvoted. The means have changed from poll taxes and literacy tests to mathematical-based dilution, but the practical effect is similar: Black Tennesseans retain the ballot while losing the ability to convert votes into representation.

The fight against Black civil rights and school integration after Brown v. Board of Education, a Second Reconstruction, is also illustrative of the private animus of the state against its Black minority. White Citizens' Councils formed throughout the South as a coordinated nonpartisan response to desegregation and they were active in Tennessee.[6] The councils as organizations were dedicated to maintaining white supremacy through economic pressure, political retaliation, and social intimidation rather than relying solely

---

[3] Nashville Public Library, '150 Years Later: A Brief History of the 15th Amendment and Other Voting Laws,' https://library.nashville.gov/blog/2020/12/150-years-later-brief-history-15th-amendment-and-other-voting-laws.

[4] Ralph J. Bunche, *The Political Status of the Negro in the Age of FDR*, University of Chicago Press, 1973, 33.

[5] Kousser, J. Morgan. 1974. *The Shaping of Southern Politics: Suffrage Restriction and the Establishment of the One-Party South, 1880-1910*, Yale University Press, 104-110.

[6] Riley, Jimmy. *The Citizens' Councils: Their Origins and Natural History*. 1964. Southern Illinois University, M.A.

4

on overt mob violence.[7] The councils accomplished these goals by mobilizing opposition to desegregation and contributed to harassment and intimidation of Black students and their supporters.[8]

The persistence of explicitly racial politics is not merely historical. The Southern Poverty Law Center has reported on efforts by a whites-only organization to establish a rural Tennessee homeland. It is only reasonable to ask why this group feels so comfortable making Tennessee a home base for their segregationist operations.[9] This contemporary evidence does not suggest that such groups control Tennessee politics, but it does demonstrate that racial resentment and white separatist ideology remain part of the state's political and social environment.

Political divisions in Tennessee are best understood as structured by race first and party second. During the era of the one-party Democratic South, conflicts occurred within the Democratic Party over the preservation of racial hierarchy and the extent of Black political participation. Throughout the 1960s and 1970s, Tennessee's current partisan structure developed through a long process of racial realignment. Racial attitudes remained an important determinant of White partisan change in the South, even when ideology and social class were considered.[10]

**Tennessee's Ninth District Congressional District**

Today, Black residents comprise approximately 16.5 percent of Tennessee's population, but Shelby County contains approximately 43 to 44 percent of all Black Tennesseans. Stated differently, nearly one out of every two Black residents of Tennessee lives in the county that includes Memphis. Eliminating the Memphis-centered district therefore weakens not only Memphis representation, but the congressional influence of nearly half of the state's Black population. Furthermore, Memphis has long been kept together in a congressional district.

Black political power in Memphis was not accidental; it was built over generations of struggle against formal and informal racial exclusion. Black Memphians built a durable political infrastructure through churches, civic organizations, civil rights

---

[7] Martin Luther King, Jr. Research and Education Institute, 'White Citizens Councils,' https://kinginstitute.stanford.edu/white-citizens-councils-wcc.

[8] (n.d.). *Tennessee Legalizes Racial Discrimination in Public Spaces After Civil Rights Act Passes*. Equal Justice Initiative. https://calendar.eji.org/racial-injustice/mar/23.

[9] Southern Poverty Law Center, 'How a Whites-Only Group Plans to Turn Rural Tennessee into Its Homeland,' https://www.splcenter.org/resources/hatewatch/how-whites-only-group-plans-turn-rural-tennessee-its-homeland/.

[10] Knuckey, Jonathan. 2006. "Explaining Recent Changes in the Partisan Identifications of Southern Whites." *Political Research Quarterly* 59 1: 57-70.

5

groups, and voter mobilization.[11] Shelby County became the state's principal Black political base because Memphis contained Tennessee's largest concentration of Black residents and because Black voters there could act collectively across a compact geography.[12]

Since the 1974 election, the district (whether labeled the 8th or 9th congressional district) has served as Tennessee's principal congressional opportunity district for Black voters. Whether represented by Harold Ford Sr., Harold Ford Jr., or Steve Cohen, the district operated as the main federal electoral mechanism through which Memphis's Black electorate could exercise meaningful power.

**Racially Polarized Voting and The Sweet Spot for Minority Success in Majority-White Districts**

There is little ambiguity at the scale of racially polarized voting in Tennessee. Exhaustive district-level estimates of racial voting patterns shows that racial voting gaps remain substantial across the United States.[13] Applied to Tennessee, the study reinforces what the state's election returns already suggest: Black voters and White voters consistently support different candidates at markedly different rates.[14]

Still, data show that race is not simply a proxy for party. In the 2008 Tennessee Democratic presidential primary, for example, White Democratic voters overwhelmingly supported Hillary Clinton over Barack Obama, while Black Democratic voters overwhelmingly supported Obama.[15] Because all voters were participating in the same party primary, the racial divide cannot be explained solely by Republican versus Democratic partisanship. In the 2016 Tennessee Republican presidential primary, Ben Carson, the only major Black candidate in the field, received virtually no measurable support from White Republican voters. [16]

---

[11] Wright, Sharon D. 2000. *Race, Power, and Political Emergence in Memphis*. Routledge

[12] Gritter, Elizabeth. 1998. *River of Hope: Black Politics and the Memphis Freedom Movement, 1865-1954*. Lexington: University Press of Kentucky

[13] Kuriwaki, Shiro, et al. "The Geography of Racially Polarized Voting." 2024.

[14] Ibid.

[15] ABC News. Tennessee Democratic Primary Exit Poll, 2008.

[16] Roper Center for Public Opinion Research. Tennessee Republican Primary Exit Poll, 2016.

6

These examples are consistent with research finding that candidate race independently affects White voting behavior in the South.[17]

The challenged plan is especially problematic because it divided Tennessee's largest majority-Black city into three congressional districts, with Black populations of 27.87%, 26.57%, and 31.67% for congressional districts 5, 8, and 9 respectively. These numbers are not accidental due to Tennessee's extremely racially polarized electorate. Black voters vote cohesively for Democratic candidates, while White voters vote cohesively for Republican candidates. In that environment, placing Black voters just below a practical threshold for electoral influence can convert a district where Black voters can elect their preferred candidate into three districts where they cannot.

The consistency of the challenged plan's percentages is problematic. Each of the newly-enacted Memphis-based district falls in the same narrow 26 to 32 percent Black range. That uniformity suggests calibration: enough Black voters are included to divide Memphis and to avoid the appearance of total exclusion, but not enough to permit Black voters to elect or meaningfully influence outcomes in a racially polarized setting.

The newly enacted maps were created outside the normal democratic processes. The standard mapmaking process takes months of public, transparent deliberation. It is my professional opinion that the haste at which the Tennessee General Assembly presented and approved the new map indicates a clear desire to use the mapmaking process to maneuver the Black-preferred candidate representing the historic Memphis-based congressional district out of electoral contention.

Black candidates or Black-preferred candidates can sometimes win in districts that are not majority-minority, but those victories generally require a specific 'sweet spot.' Minority voters must comprise a sufficiently large share of the electorate, usually approaching or exceeding roughly 40 percent of the combined Black and other non-white population, and white crossover voting must be meaningful.[18]

Those conditions generally are not present in Tennessee. The state exhibits high levels of racially polarized voting, and white crossover support for Black-preferred candidates is limited. The rarity of Black electoral success in majority-white congressional districts underscores the point. In 2018, only a handful of majority-white districts—and none in Tennessee—elected Black members of Congress, and that

---

[17] McKee, Seth and Melanie Springer. 2015. "A Tale of "Two Souths": White Voting Behavior in Contemporary Southern Elections." *Social Science Quarterly* 96: 588-607

[18] Lublin, David, Lisa Handley, Thomas Brunell, and Bernard Grofman. 2020. "Minority Success in Non-Majority Minority Districts: Finding the "Sweet Spot." *Journal of Race, Ethnicity, and Politics* 5(2): 275-298.

7

development was noteworthy precisely because it was exceptional.[19] There are no comparable Tennessee examples of Black candidates consistently winning congressional elections from majority-white districts. District-level analysis of racially polarized voting confirms that racial voting gaps remain substantial and that district design can transform minority voters from an effective electoral bloc into a permanent minority.[20]

The challenged Tennessee districts fall below the demographic sweet spot and lack the white crossover voting needed to compensate for that shortfall. Under these conditions, Black voters remain visible but politically subordinated. That is precisely why the 26 to 32 percent range is so consequential.

Racially polarized voting can render minority communities politically ineffective even when they remain a substantial share of the electorate. When a geographically concentrated Black population is fragmented across multiple districts, candidates have fewer incentives to respond to Black communities, descriptive representation declines, and small changes in minority population percentages can decisively alter electoral outcomes.[21]

**Broader Evidence of Racialized State Action Toward Memphis**

The redistricting plan also fits a broader pattern of legislative action weakening the autonomy of Tennessee's largest majority-Black city. Civic organizations describe this as a longstanding pattern of anti-Memphis state preemption to override Memphis on local governance, criminal justice, public safety, and fiscal policy. The General Assembly has repeatedly threatened or punished Memphis when local officials adopted policies contrary to statewide preferences. After Memphis removed Confederate monuments, including a statue honoring Nathan Bedford Forrest, a Confederate general and early Ku Klux Klan leader, state lawmakers threatened to withhold funding from the city.[22] When Memphis sought local gun-violence prevention measures in response to high crime and public safety concerns, legislative leaders threatened punitive fiscal action rather than

---

[19] Lublin, David . "Eight White-majority Districts Elected Black Members of Congress This Year. That's a Breakthrough." *Washington Post*, 19 Nov. 2018. https://www.washingtonpost.com/news/monkey-cage/wp/2018/11/19/this-november-eight-mostly-white-districts-elected-black-members-of-congress-thats-a-breakthrough/

[20] Kuriwaki, Shiro, Stepehn Ansolabehere, Angelo Dagonel, Soichiro Yamauchi. 2024. "The Geography of Racially Polarized Voting: Calibrating Surveys at the District Level. *American Political Science Review* 118 (2): 922-939.

[21] Ibid.

[22] "Tennessee Lawmakers Punish Memphis for Removing Confederate Statues." *NBC*, 11 Apr. 2018, www.nbcnews.com/news/us-news/tennessee-lawmakers-punish-memphis-removing-confederate-statues-n866961.

8

allowing the courts to resolve the constitutional dispute.[23] Lawmakers also advanced legislation widely understood to target Shelby County District Attorney Steve Mulroy, creating a mechanism for state intervention in local prosecutorial discretion.[24]

The Tennessee House's treatment of the "Tennessee Three" is part of the same political context. After three Democratic lawmakers protested following the Covenant School shooting, the House expelled Representatives Justin Jones and Justin J. Pearson, both Black lawmakers representing majority-Black districts, while narrowly declining to expel Representative Gloria Johnson, who is White. The differential outcome reinforced concerns that Black political leaders and majority-Black constituencies are treated differently when challenging the state's dominant and racialized political majority.

Taken together, this demonstrates the state's repeated use of power to constrain Memphis, a city that is majority Black and historically central to Black political organization in Tennessee. Memphis's need for unified representation is strengthened by the city's shared history of racial exclusion. There is a lengthy political science literature documenting the lack of political responsiveness of white-dominated state legislatures to their majority-minority municipalities.[25] For instance, Tennessee maintains one of the nation's most restrictive felony disenfranchisement systems, with especially severe effects on Black citizens.[26]

District design affects more than descriptive representation. Minority opportunity districts shape substantive representation and policy responsiveness. The Voting Rights Act and the creation of minority opportunity districts improved the ability of minority communities to secure representatives responsive to their preferences. Conversely, weakening those districts reduces both the likelihood of electing candidates of choice and the policy responsiveness that follows.

---

[23] Stockard, Sam. "GOP Leaders Promise Punitive Tax Move If Memphis Passes Gun Restrictions; State Moves to Block Them." *Tennessee Lookout*, 27 Aug. 2024, tennesseelookout.com/2024/08/27/gop-leaders-promise-punitive-tax-move-if-memphis-passes-gun-restrictions-state-moves-to-block-them/.

[24] Burgess, Katherine. "The State Regularly Passes Legislation Targeting Memphis. This Year Is No Different." *MLK at 50*, 28 Feb. 2024, mlk50.com/2024/02/28/the-state-regularly-passes-legislation-targeting-memphis-this-year-is-no-different/.

[25] Schuit, Sophie, and Jon C. Rogowski. 2017. "Race, Representation, and the Voting Rights Act." *American Journal of Political Science* 61(3): 513–26

[26] Mancini, Matthew. "Tennessee Enacts New Policies to Further Disenfranchise Black Voters." *Georgetown Journal of Law & Critical Race Perspectives*, 1 Dec. 2023, www.law.georgetown.edu/mcrp-journal/blog/tennessee-enacts-new-policies-to-further-disenfranchise-black-voters/.

9

This directly relates to Tennessee's historic Ninth District as it did not merely symbolize Black political power; it provided a mechanism through which Tennessee's largest Black community could seek representation on housing, lending discrimination, criminal justice, education, infrastructure, environmental burdens, and economic development. Dividing that community among three majority-white districts predictably reduces both descriptive and substantive representation.

**Historical and Contemporary Racial Inequality in Memphis**

The need for a coordinated legislative response, state and federal alike, is the consequence of both historic and contemporary racial inequality in Memphis. For example, White flight in the 1960s and 1970s and the persistence of segregation academies is illustrative of the racial tensions Black residents have lived with. Court-ordered school desegregation accelerated white flight. White enrollment in Memphis City Schools fell from 69,809 in 1970 to 35,799 in 1973, while private school enrollment rose from 13,071 to 33,012.[27] Briarcrest Christian School was founded in 1973. Fayette Academy was founded on the same day Fayette County's desegregation plan was accepted. Black citizens who registered and voted were subjected to economic retaliation and forced into Fayette County's *Tent City*.[28] Recent Voting Rights Act litigation was required to remedy vote dilution there in Fayette County. The West Tennessee context is therefore not merely historical; it remains relevant to contemporary districting choices.

Suburbanization and school integration reshaped the city's racial geography, increasing the concentration of Black residents within Memphis while surrounding communities remained disproportionately white. This played an important role in the secession of several suburban municipalities from Shelby County Schools, weakening the fiscal capacity of the district serving Memphis.[29]

Housing and financial discrimination further explain why Black Memphians form a distinct community of interest. Historical redlining helped determine where Black residents could live, constrained wealth accumulation, and produced enduring neighborhood segregation. The compact Black population in Memphis was shaped by federal housing policy. The Home Owners' Loan Corporation graded Black

---

[27] Kravits, Mark R., and Carol A. Mutter. "Desegregation of Private Schools: Section 1981 as an Alternative to State Action." 63 *Georgetown Law Journal* 1321 (1975).

[28] University of Memphis. "Tent City Timeline." https://www.memphis.edu/tentcity/movement/timeline-overview.php

[29] Chalkbeat Tennessee. "Memphis-Shelby County Spotlighted in National Report on School District Secession," June 21, 2017.

10

neighborhoods as hazardous, discouraging investment and confining African Americans to specific areas.[30]

Contemporary lending discrimination, including the Department of Justice's 2024 settlement involving alleged redlining in the Memphis metropolitan area, shows that these patterns persist. In 2024, the Department of Justice alleged that Patriot Bank assigned all mortgage loan officers to branches and production offices in majority-white areas where walk-in mortgage services were available, while those services were not offered at either branch located in majority-Black and Hispanic neighborhoods. [31] In United States v. Trustmark National Bank, the Department of Justice similarly alleged discriminatory lending practices in the Memphis metropolitan area.[32]

Memphis has also experienced chronic underinvestment relative to its size and economic importance. Black communities in Memphis share common political, economic, and representational interests. Fragmenting them among three majority-White congressional districts weakens their ability to seek remedies through federal representation. Reports on capital investment and state-led economic development suggest that the city receives less support than its demographic and economic role would warrant, while investment that does reach Memphis has often flowed to whiter neighborhoods. Tennessee's Department of Economic and Community Development reports that 56 percent of all new job commitments announced in 2025 were located in rural counties, even though Tennessee is approximately 36 percent rural and 64 percent urban.[33]

**Modern Racial Appeals and Racial Priming in Tennessee Politics**

Racial polarization in Tennessee has repeatedly overwhelmed claims of racial moderation in statewide politics. Modern racial appeals often operate through coded messaging rather than explicit segregationist language. Racial priming is the use of negative messages, racial imagery, and subtle appeals that activate racial fears among white voters, often without the voters' direct awareness. Racial priming strategies can

---

[30] "Mapping Inequality: Redlining in New Deal America." University of Richmond. https://dsl.richmond.edu/panorama/redlining/map/TN/Memphis/areas#mapview=full&loc=13/35.1344/-90.0035

[31] Consumer Finance Monitor. "DOJ Settles with Patriot Bank for Redlining in Memphis," January 30, 2024. https://www.consumerfinancemonitor.com/2024/01/30/doj-settles-with-patriot-bank-for-redlining-in-memphis/

[32] U.S. Department of Justice. Consent Order, United States v. Trustmark National Bank (W.D. Tenn. 2021). https://www.justice.gov/crt/case/consent-order-united-states-v-trustmark-national-bank-wd-tenn

[33] Tennessee Department of Economic and Community Development. "Rural Advantages." https://tnecd.com/why-tennessee/rural-advantages/

11

trigger white anxieties about Black political power through references to crime, urban disorder, welfare, immigration, or threats to traditional values. Racial priming can have effects similar to the explicit racial appeals associated with Jim Crow, but it is less likely to be perceived as violating the norm of racial equality.[34] Examples of modern racialized politics in Tennessee include campaign messaging that invoked racial fears in a state senate contest, public neo-Nazi activity documented in Tennessee, and racially inflammatory campaign controversies in Nashville.[35] These examples reinforce that race continues to operate as a salient political force even when public rhetoric avoids openly racist language.

**Conclusion**

It is my opinion based on past and present evidence that Tennessee's partisan structure is rooted in racial realignment. Voting remains sharply polarized by race. Shelby County contains the state's largest and most compact concentration of Black voters, as well as approximately 43 to 44 percent of all Black Tennesseans. The Ninth District preserved that community's ability to translate demographic concentration into congressional influence for more than forty years after that district's restoration in 1983.

The General Assembly's hastily enacted map dismantled that structure by dividing Memphis into three districts, in the range of mid-20% Black to low-30% percent Black. The numerical effect is easy to demonstrate: one district in which Black voters can elect their preferred candidate can be transformed into three districts in which Black-preferred candidates lose.

In light of Tennessee's broader pattern of weakening Black political power, the fragmentation of Memphis's Black electorate cannot reasonably be understood as merely a partisan move. After all, Tennessee Republicans already control the state's congressional delegation 8-1. GOP dominance is so strong at the state legislative level that I make a bad joke to my class that Tennessee's entire Black caucus could fit inside my minivan. This can only be understood as a race-based dilution of Black voting strength, with statewide consequences for more than 40% of Tennessee's Black population.

Furthermore, cracking Memphis's Black residents cannot be the result of a nod to broader demographic shifts in Tennessee's electorate. Since 1960, Tennessee has been a

---

[34] Tali Mendelberg, The Race Card: Campaign Strategy, Implicit Messages, and the Norm of Equality, Princeton University Press, 2001; Tali Mendelberg, 'Racial Priming Revived,' Perspectives on Politics 6, no. 1 (2008): 109-123.

[35] Hale, Steven. "For Shame." *Nashville Scene*, 7 Nov. 2018, www.nashvillescene.com/news/pithinthewind/for-shame/article_581d8b17-42a7-5e85-ad64-f962bc35df56.html.

12

majority-urban state, and the proportion of Black residents has remained remarkably stable, from approximately 16.5 percent in 1960 to 16.4 percent today.[36] There has been no demographic transformation that would justify dismantling the Memphis-centered district. Yet, this would be consistent with the General Assembly's historic animus to Memphis. The Supreme Court dealt with Tennessee's refusal to reapportion legislative districts for more than sixty years in Baker v. Carr, 369 U.S. 186 (1962). The General Assembly preserved the power of predominantly rural and overwhelmingly white constituencies even as Memphis and other cities grew larger and more racially diverse, which is exactly what the General Assembly is doing all over again.

**Note**

Due to the truncated nature of the Tennessee General Assembly's map-drawing process, I reserve the right to further modify or augment my report, even though the material in this repost is presented with a high degree of accuracy and professional certainty.

Pursuant to 28 U.S.C. § 1746, I, Marvin King, declare under penalty of perjury that the foregoing is true and correct.

Date: <u>May 12, 2026</u>

<u>Marvin King, Ph.D.</u>

---

[36] U.S. Census Bureau. QuickFacts: Tennessee.

13

**Section 3. CV**

Marvin P. King, Jr.
Associate Professor | African American Studies & Political Science
325 Deupree
University, MS 38677 662-715-9423
marvin@olemiss.edu

## EDUCATION

University of North Texas – Denton, TX, Ph.D. Political Science
University of Texas at Austin, BA Government

## CURRENT RESEARCH PROJECTS

*Mississippi's Mess: Political Inequality, Stratification Economics, and Inadequate Economic Development.* Under contract with Lexington Books. Expected Publication – Fall 2026 (Currently being typeset)

*The Politics of Stratification Economics.* Under contract with Palgrave Macmillan. Expected Publication – Fall 2026 Currently being typeset)

*Financialized Higher Education and Its Effects on Low-Income Students*

*Stratification Federalism.* Book-length manuscript

## UNIVERSITY ADMINISTRATIVE EXPERIENCE

University of Mississippi, Senior Faculty Fellow, Residential College South (2013- 2023)

Direct and organize academic and other activities for a 466-bed co-ed residence hall.

Budgetary oversight, personnel supervision, alumni engagement, and interaction with various  UM units (e.g., Housing, Aramark, Outreach) in support of the mission to improve student engagement and retention.

Founding Organizer of TEDxUniversityofMississippi. Views of videos through year-7 top 5 million.
Organize a networking road trip for students to meet with University of Mississippi alumni.

14

Established a Chess Club, Garden Club, Cooking Club, Knitting Club, Movie Club, and Study Groups.

Established service requirement leading to more than 10,000 hours of community service.

Established Carolyn Ellis Staton Undergraduate Travel Fund.


## PUBLICATIONS

King, Marvin P. Jr. 2011. The Continued Relevance of the Congressional Black Caucus: A Study of Bill Preference." Politics & Policy 39: 421-439

Allen, Marcus and Marvin P. King, Jr. Winter 2010-2011. "The Electoral Geography of Black Electoral Success." American Review of Politics 31: 333-356

King, Marvin P. Jr. 2010. "The Misrepresentation of the Black Poor." Journal of Black Studies 40: 835-850.

King, Marvin P. Jr. 2009. "Reluctant Donors: The (Lack of) an Obama Effect on African American Campaign Donors." Souls 11: 389-406.

Forgette, Richard and Marvin P. King, Jr.  2009. "Political-Racial Cycles? Electoral Cycles in Racial Polarization and the 2006 Senate Elections." National Political Science Review 12: 111-122.

Forgette, Richard, Marvin P. King, Jr. and Bryan Dettrey. 2008. "Race, Hurricane Katrina, and Government Satisfaction: Examining the Role of Race in Assessing Blame." Publius 38: 671 - 691


### Book Chapters

McLean, Stephanie and Marvin P. King, Jr. 2011. "The American Path to Democracy," in Democratization in Theory and Practice, ed.  Mary Fran T. Malone. Continuum Books: New York

King, Marvin P. Jr. 2008. "African Americans and the Right to Vote: A Look at the Voting Rights Act Then and Now," in Voting in America, Vol. 1. Editor Morgan E. Felchner. Praeger: Westport, CT.


### Miscellaneous Publications

King, Marvin P. Jr. review of The Triumph of the Voting Rights Act in the South, by Charles Bullock and R. Keith Gaddie, American Politics Review 31: 377-379

Case 3:26-cv-00616    Document 20-1    Filed 05/13/26    Page 16 of 24 PageID #: 229

King, Marvin P. Jr., foreword to 2009. African Americans in Georgia: A Reflection of Politics and Policy in the New South, editor: Pearl K. Ford.

King, Marvin P. Jr. 2008. "Race and Politics," in The New Encyclopedia of Southern Culture. University of North Carolina Press, vol. 10

King, Marvin P. Jr. 2008. "The Republican Party," in The New Encyclopedia of Southern Culture. University of North Carolina Press, vol. 10


**Non-Academic Publications**

King, Marvin P. Jr. "In Defense of Higher Education." Jackson Clarion-Ledger, February 2009.

King, Marvin P. Jr. "Obama and Managing Expectations." Jackson Clarion-Ledger, January 2009.

King, Marvin P. Jr. "Lessons Democrats Should Heed." Jackson Clarion-Ledger, December 2008.

King, Marvin P. Jr. "The Incredibly Shrinking GOP." Jackson Clarion-Ledger, November 2008.

King, Marvin P. Jr. "Mississippi in the Eye of the (Presidential) Storm." Jackson Clarion-Ledger, September 2008.

King, Marvin P. Jr. "Minority Politics are American Politics." Daily Journal (Tupelo, MS), September 2008.

King, Marvin P. Jr. "Unemployment and Voting." Oxford Eagle, September 2008.


**Selected Conference Presentations**

"The Mixed Roots of Black Political Economy," Paper presented at the National Conference of Black Political Scientists, 2023

"The Mixed Roots of Black Political Economy," Paper presented at the Northeastern Political Science Association Annual Conference, 2022

"Politics, Economic Health, or Progressivity: What Matters Most in Higher Education Financing," Paper presented at the Southern Political Science Association, 2015

"Student Retention and State Legislative Solutions: Is it real or just rhetoric?" Paper presented at the Southern Political Science Association, 2014
.

"Barack Obama and African American Efficacy." Paper presented at the Annual Meeting of the Midwest Political Science Association. 2011

"The Geography of Black Electoral Success." Paper Presented at the National Conference of Black Political Scientists, 2010

"A Black Preference for Redistributive Economic Justice, or Economic Populism and the Continued Relevance of the Congressional Black Caucus." Paper presented at the Annual Meeting of the Midwest Political Science Association, 2009

"Reluctant Donors: The (Lack of) An Obama Effect on African American Campaign Donors." Paper Presented at the National Conference of Black Political Scientists, 2009

"Race, Hurricane Katrina, and Government Satisfaction: Examining the Role of Race in Assessing Blame." Paper presented at the Southern Political Science Association, 2008.

"Political-Racial Cycles? Electoral Cycles in Racial Polarization and the 2006 Senate Elections." Poster presented at the American Political Science Association, 2007.

"Black Ideology: Don't Forget Populism," Paper Presented at the National Conference of Black Political Scientists, 2007.

"Political Parties, Redistricting and African American Political Power," Paper presented at the Annual Meeting of the Southern Political Science Association, 2007.

"An Empirical Consideration of Racial Affect," Paper presented at the American Political Science Association, 2006 (with John Bruce).

 "The Black Church, Partisanship and Populism," Paper presented at the Annual Meeting of the Midwest Political Science Association, 2006.

"Political Power of the Black Middle Class and the Misrepresentation of the Black Poor," Paper presented at the National Conference of Black Political Scientists, 2006.

"Interest Groups, Black Legislators and Substantive Representation," Paper presented at the Citadel Symposium on Southern Politics, 2006.


**Graduate Thesis/Dissertation Committee Member**
1. Scott Blusckewicz (History – 2025)
2. Molly Wickenhauser (Psychology - 2023)
2. Sarah Scott (Psychology – 2016)
3. Maarten Zweirs, Southern Studies (2007)
4. Jonathan Hutchins, History (2008)
5. J. Colby Winzer (2008)
6. Alyson Kennedy, Political Science (2009)
7. Gray Young, Southern Studies (2009)
8. Matthew Bailey, History (2011)

17

9. J.D. Griffin, Political Science (2010)

**Sally McDonnell Barksdale Honors College Thesis Committee Chair**
1. Ella Segraves (expected 2027)
2. Ashlyn Ray (expected 2027)
3. Bella Leonard (expected 2026)
4. Grace Brian (2024)
5. Savannah Davis (2024)
6. Rabria Moore (2023)
7. James Drayton Purvis (2023)
8. Brenley Rinaudo (2023)
9. Shauna Lee Vaughn (2023)
10. Taylor Harris (2021)
11. Jacob Gleason (2019)
12. Catrina Curtis (2019)
13. Bess Nichols (2017)
14. Katelin Davis (2017)
15. Tim Abram (2014)
16. Evan Brewster (2014)
17. Daniel Roberts (2014)
18. Emily Morton (2011)
19. Kate Weston (2010)
20. Kyle Robbins (2010)

**Sally McDonnell Barksdale Honors College Reader**
1. Andrew Foxworth (2023)
2. Susan Shea (2015)
3. Phillip Waller (2015)
4. Jakira Davis (2015)
5. Christine Dickason (2014)
6. Kaitlyn Barton (2014)
7. Gabriella Barrientos (2014)
8. Madison Coburn (2014)
9. Hope Owens-Wilson (2014)
10. Charles Owen (2014)
11. David Trewolla (2010)
12. T. Benton York (2008)
13. Randall Watkins (2007)

## GRANTS

Center for Excellence and Teaching Grant, $5,000 (2026). This internal UM grant is to redesign an existing course.

Character of Leadership Initiative Grant, $5,000 (2025-2026). This internal UM grant is to develop a class (Political Rhetoric) utilizing the principles of fairness, civility, intellectual humility, and respect.

$10,000 Skoll Foundation Grant (2022). As a member of the TED Global Insights Initiative, I was able to apply for and was awarded funds to host a conference centered on Sustainable Economies.

$5,000 SMBHC Summer Stipend (2021). $5,000. I developed a class that studied and researched institutional commitments to diversity at the congressional and legislative level.

Applied for an NSF NRT grant (2014)

King, Marvin P. Jr. 2006. Principal Investigator. "How Do Majority-Minority Districts Affect African American Political Power." Granting Agency: Office of Research and Sponsored Projects, University of Mississippi. Award: $7,645

King, Marvin P. Jr. 2008. Principal Investigator. "An Investment Theory of Federalism." Granting Agency: College of Liberal Arts, University of Mississippi. Award: $7,200

## CLASSROOM EXPERIENCE

**University of Mississippi (2005 – Present)**

African American Studies 350: Evolution of Black Political Leadership
African American Studies 350: Black Political Institutions
African American Studies 390: The Presidency and Civil Rights
Liba 102: Political Leadership
Liba 102: Adulting
Political Science 101: Introduction to American Politics
Political Science 313: American Federalism
Political Science 318: Politics of the American South
Political Science 320: African-American Politics (In-Person)
Political Science 320: African-American Politics (Web)
Political Science 370: African American Legal Experience
Political Science 371: Politics of Protest
Political Science 398: Political Inequality
Political Science 398: Applied Politics (Study USA/Washington, DC)
Political Science 398: Labor Union Politics (Study USA/Washington, DC)
Political Science 398: Politics of Gay Rights (Study USA/Washington, DC)
Political Science 398: The Politics of Money (Study USA/Washington, DC)
Political Science 398: Political Media (Study USA/Washington, DC)
Political Science 398: Campaigns and Elections (Study USA/Washington, DC)
Political Science 398: Sports, Law, and Politics (Study USA/Washington, DC)
Political Science 609: Politics of the American South

19

**Texas Christian University (2004-5)**
     Introduction to American and Texas Government

**University of North Texas (2001–5)**
     Introduction to American & Texas Government & Politics: Institutions
     Introduction to American & Texas Government & Politics: Policy

## UNIVERSITY OF MISSISSIPPI SERVICE

**University Service**

1. Organized four-stop roadshow on inclusive economic development (2023) in partnership with Mississippi Secretary of State's Office and MS Alliance for Nonprofits and Philanthropy
2. Chair, Living Learning Task Force (2022-2023)
3. Mock Trial Judge (2022, 2025)
4. Business Model Competition Judge (2022)
5. Member, Outreach - Assistant Director College Programs, Search Committee (2022)
6. Member, Community Engaged Leader Minor Affiliated Faculty Committee (2021)
7. Member, Bonner Scholars Program Committee (2020-2021)
8. Member, Student Disability Services Committee (2019-2020)
9. Presenter, REBS, Student-Athlete Academic Preparedness Seminars (2014-2019)
10. Member, Multiple Faculty Search Committees, School of Applied Sciences
11. Member, Multiple Staff Search Committees, Division of Outreach and Development
12. Founding Organizer, TEDxUniversityofMississippi (2015-Present)
13. Member, SMB Honors College Admissions Committee (2014-2015 and 2017-2018)
14. TEDx Prison Initiative, Marshall County Correctional Facility (2017 – 2019)
15. Established TED-Ed program at Lafayette Middle School (2016 – 2018)
16. More than 160 radio, television and print interviews
17. More than 160 student recommendation letters since
18. Member, Honors Council (2013 – 2015)
19. Member, Undergraduate Council (2013 – Present)
20. Member, Extended Sensitivity & Respect Committee (2013- 2015)
21. Member, Incident Review Committee (2012-2013)
22. Member, Critical Race Studies Group (2011-2014)
23. Lecturer - Mississippi Outreach to Scholastic Talent Conference (2010, 2014)
24. Member, Traffic and Parking Committee (2007-2008)
25. Co-host of weekly Ole Miss produced talk show, Sports Doctors (2007-2008)
26. Member, Faculty Senate (2006-2008)
27. Member, Black History Month Committee (2005-2007)

**Department Service**

1. African American Studies Exit Interviews, Annually in May
2. Member, Undergraduate Studies Committee (2007-2008)
3. Member, Multiple Political Science Search Committees, Various Years
4. Committee Member, African American Studies Symposium, 2007

**Faculty Advisor**
1. Chess Club (2018 – 2020, 2022 – Present)
2. UM College Democrats (2013 – 2015, 2024 - Present)
3. UM Garden Club (2014 – 2023)
3. UM Racquetball Club (2014 – 2015)
4. UM Miss Pre-Law Society (2009-2010)
5. UM Campus Chapter of the NAACP (2006-2007)

**Speaker/Panelist**
1. Black History Month Panel, UM Democrats (2025)
2. New Albany Rotary Club (2023)
3. Guest Speaker – Yvette Butler's UM Law Class (2022)
4. Guest Speaker – Curtis Wilkie's UM SMBHC Class (2022)
5. Public Service Announcements, MPB/Mississippi Humanities Council (2021)
6. Workshop Leader, Mississippi Association of Supervisors – Minority Council (2021)
7. Panelist, UM Athletics, Why Vote? (2020)
8. Oxford to the Ballot Box, Keynote Speaker (2020)
9. Moderator, Square Books, Book Club with Stuart Stevens (2020)
10. Panelist, Mississippi Humanities Council, Ideas on Tap (2020)
11. Presenter, Division of Outreach, Study USA (2020)
12. Panelist, Overby Center Panel (2017)
13. Moderator, Just Mercy Panel (2017)
14. Phi Kappa Phi, Keynote Address (2016)
15. Multiple Community Events, Various Dates
16. Residence Hall Association (2009)
17. Trent Lott Leadership Conference (2007)
18. Multiple Black History Month Panels (2006-9)
19. Orientation, University of Mississippi Football Team (2006-7, 2009)

**Mentor**
Student Accountability/Changing Attitudes (2006)

**Professional Development**
Developed a series of online lectures for Soomo Publishing (2009)
College Board Reader and Table Leader: American Government and Politics (2002-20213)

**Memberships**

National Conference of Black Political Scientists

**Manuscript/Textbook Reviews**

*American Politics Review*, *Political Behavior*, *Political Science Quarterly, Politics and Policy*, Social Science Quarterly, textbooks for Thomson Higher Education Publishing, Houghton Mifflin, Routledge and Soomo.

**Selected Community Service**

NAACP LDF, American Civil Liberties Union, Harvard Redistricting Project (2022 – 2026)
Assist with various research projects related to federal redistricting trials and have served as expert witness in *Nairne v. Ardoin*, *Mississippi State Conference of the NAACP v. State Board of Election Commissioners*, *White v. Mississippi State Board of Elections*, and *Harris v. DeSoto County*.

Lafayette County Resolution Board, November 3, 2021
Worked Election Day. Our task was opening and verifying 6,500 absentee ballots.

Oxford Planning Commission, Commissioner (2017 – 2021)
Commissioner on a 7-member board responsible for considering ordinances, the land development code, and working with the Planning Department in the implementation of the orderly development of Oxford.

Run Oxford, Race and Timing Director (2018 – 2020)
Responsible for organizing The Great 38 Race Weekend in support of the Chucky Mullins Endowment. Responsible for the operations of Run Oxford Timing as this non-profit organized various running road races in north Mississippi.

Run Oxford, Founder and President (2014 – 2017)
Created a sustainable organization devoted to running. This club has 100+ dues paying members and generates $60,000 + annually.
Responsible for raising more than 2,000 donated books and $54,00 for local charities.

Oxford Park Commission, Board Member (2012 - 2017)
Served on a 5-member board in charge of Oxford's recreation sports leagues.
Oversaw $1.3 million budget.
Responsible for personnel decisions.
Created a Walk-to-Run program.

Oxford Taste Society, President (2006 – 2015)
Founded, organized, publicized, and maintained budget for a long-running social gathering of Oxford professionals.

22

Friends Board, Mississippi Public Broadcasting (2010-2011)
Assisted in raising funds and the profile of public radio and television in Mississippi.

23