| | |
|---|---|
| AMBER SHERMAN, RACHAEL SPRIGGS, KERMIT MOORE, BLACK CLERGY COLLABORATIVE OF MEMPHIS, MEMPHIS A. PHILIP RANDOLPH INSTITUTE, EQUITY ALLIANCE, <br><br> *Plaintiffs*, <br><br> *v.* <br><br> TRE HARGETT, in his official capacity as Secretary of State of Tennessee, MARK GOINS, in his official capacity as Coordinator of Elections for Tennessee, STATE ELECTION COMMISSION, and DONNA BARRETT, JUDY BLACKBURN, JIMMY ELDRIDGE, MIKE MCDONALD, SECONDRA MEADOWS, VANECIA BELSER KIMBROW, and KENT YOUNCE, in their official capacities as members of the State Election Commission, <br><br> *Defendants.* | Civil Action No 26 Civ. 616 <br><br> Judge Campbell |

**ADDENDUM AND CORRECTION TO EXPERT REPORT OF DR. JONATHAN R.**

**CERVAS**

1.     I submitted a report in the above captioned case on May 12, 2026. In that report, I analyzed data from 5,000 simulated maps. I mistakenly described that data as coming from plans drawn in a race-blind way. I discuss that misunderstanding below. To more properly address the question I was asked to evaluate, I generated a new set of 5,000 simulated maps using only race-race-blind traditional districting principles and the compactness constraints of the 2026 Plan and otherwise conducted the same analyses as provided in my May 12 report. This set shows that while race-blind redistricting in Tennessee is slightly less likely to generate majority-Black districts than

1

the race-conscious simulated map set, it is still virtually certain to yield a Black opportunity district. For comparison, while the race-conscious set of 5,000 plans necessarily yields a Black opportunity district 100% of the time, the race-blind set of 5,000 plans yield a Black opportunity district 99.9% of the time. With respect to the percentage of majority-Black districts, in the race-blind set, 90.9% of simulated maps contain a Black majority district by total population and 84.8% by BVAP, compared to 98.9% and 95.4% respectively in the race-conscious set. My corrected analysis does not change the conclusions I drew in my initial report.

2. I have experience evaluating competing redistricting algorithms, including ones created using the algorithm created by the Algorithm-Assisted Redistricting Methodology (ALARM) Project. Some are created with an attempt to comply with Section 2 of the Voting Rights Act, while others are race blind.

3. Under the "Redistricting requirements" of the ALARM Project's web-based data archive, it states: "In Tennessee, there are no rules for redistricting Congressional districts (NCSL)." I misunderstood this language to mean that they programmed this run of the algorithm to be race-blind.

4. On another page from the ALARM website, the algorithm authors say the following about how race is taken into consideration:

> VRA compliance requires substantial information, including a racially polarized voting analysis and knowledge of local history. For the purposes of this project, we *target the number of minority-opportunity districts as in the enacted plan*. We check approximate performance of these districts. Simulation results can change if different VRA constraints are imposed. (emphasis added).[1]

---

[1] The ALARM Project, *50 State Simulations FAQ*, https://alarm-redist.org/fifty-states/about/ (last visited May 17, 2026).

I now understand that the set of simulated maps I initially reviewed was not race-blind but instead designed to have at least one minority-opportunity district, like the 2022 enacted plan.

5. To conduct an analysis of a race-blind set of simulated maps, I re-ran the ALARM algorithm, replacing the constraints of the 2022 enacted plan with the 2026 Plan. The 2026 Plan contains zero minority-opportunity districts. Therefore, having input those constraints into the algorithm, the set of simulated maps will not be generated to target specifically any number of minority-opportunity districts. The resulting set of 5,000 simulated maps were generated using only race-blind traditional districting principles, such as preferences for avoiding splitting counties and other political subdivisions, and compact districts, and drew districts at least as compact as the 2026 Plan.

6. My analysis shows that the percentage of Black-majority districts in the race-blind set of simulated maps is similar but slightly less compared to the race-conscious set of maps; however, a race-blind redistricting process would still be virtually certain to yield at least one Black opportunity district.

7. Of the 5,000 race-blind maps, 90.9% contain a district where the Black population was a pure majority (84.8% were majority Black Voting Age Population [BVAP]). In 99.7% of the simulations, at least one district had a plurality (Blacks were the largest demographic group) of Black residents (99.3% contained a plurality BVAP). And every single one of those 5,000 maps has a district that is at least 38.2% Black (36.9% BVAP).

8. The 2026 Redistricting Plan contains neither a Black majority district, nor a Black plurality district, let alone a Black opportunity district. Instead, the district with the highest BVAP in the 2026 Plan is only 31.7% BVAP and the two other districts in the Memphis area are under

3

30% BVAP. Each of these districts has a white majority population despite Shelby County having a Black population of 53% and the City of Memphis having a Black population of 63%.

9. The simulation data also includes electoral data for several statewide contests: the 2016 presidential election, the 2020 presidential election, and the 2020 U.S. Senate election. Across all 15,000 district-election combinations generated by the simulations (plus three from the 2022 Enacted Plan), the white-preferred candidate defeats the Black-preferred candidate only 13 times (0.09%).

10. The result is that across all 5,000 simulated plans and the 2022 legislature-drawn plan, 99.9% of those maps contain at least one district in which Black voters have a very strong opportunity to elect their candidate of choice.

**Figure 1: Highest Proportion-Black District, 5,000 Simulations**

11. The analysis of this race-blind simulation confirm my conclusions from my May 12 report. Except in situations when race is being improperly used, Black residents in the Memphis

4

area are virtually guaranteed representation by a candidate of their choice. Under virtually any congressional plan drawn with traditional race-neutral districting criteria, Tennessee naturally produces at least one district in which Black voters have an opportunity to elect their candidates of choice.

*     *     *

I reserve the right to modify, update, or supplement my opinions in light of additional facts, testimony and/or materials that may become available.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 18, 2026
Morgantown, West Virginia

_____
Dr. Jonathan Cervas