# IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| AMBER SHERMAN, RACHAEL SPRIGGS, KERMIT MOORE, BLACK CLERGY COLLABORATIVE OF MEMPHIS, MEMPHIS A. PHILIP RANDOLPH INSTITUTE, EQUITY ALLIANCE | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | NO. 3:26-cv-00616 |
| v. | ) ) | JUDGE CAMPBELL MAGISTRATE JUDGE FRENSLEY |
| TRE HARGETT, in his official capacity as Secretary of State of Tennessee, MARK GOINS, in his official capacity as Coordinator of Elections for Tennessee; STATE ELECTION COMMISSION, and DONNA BARRETT, JUDY BLACKBURN, JIMMY ELDRIDGE, MIKE MCDONALD, SECONDRA MEADOWS, VANECIA BELSER KIMBROW, and KENT YOUNCE, all in their official capacities as members of the State Election Commission, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

On Thursday, May 7, 2026, the State of Tennessee enacted legislation that, among other things, redraws Tennessee's congressional map (the "2026 Congressional Map"), dividing Shelby County and the city of Memphis into three districts.[1] The following Monday, May 11, 2026, Plaintiffs filed a Verified Complaint challenging the constitutionality of the reapportionment on grounds that it is racially discriminatory and was enacted in retaliation against Plaintiffs for political speech and association. (*See* Doc. No. 1). On May 13, 2026, Plaintiffs filed a motion for a temporary restraining order and preliminary injunction in which they ask the Court to enjoin

---

[1] Tennessee House Bills 7001, 7002, 7003, and 7005, 2026 Tenn. Pub. Acts (2d Ex. Sess.)

Defendants from implementing and enforcing the Act until the district court panel of three judges can hear and decide Plaintiffs' application for preliminary injunction.[2] (Doc. No. 20). (Doc. No. 20).

## I. BACKGROUND[3]

On April 29, 2026, the U.S. Supreme Court decided *Louisiana v. Callais*, No. 24-109, 2026 WL 1153054 (U.S. Apr. 29, 2026). *Callais* involved a challenge to a Louisiana congressional district that was redrawn by the Louisiana legislature. The district challenged in *Callais* was drawn by the Louisiana legislature specifically in response to a finding of likely violation of Section 2 of the Voting Rights Act and the grant of a preliminary injunction on that basis. In *Callais*, the Supreme Court clarified the legal standard governing when race-based districting is justified by compliance with Section 2 and held that Louisiana's congressional map, which included majority-minority districts, impermissibly used race as a predominant factor. The Court also emphasized that a State may advance its "political goals" in redistricting. *Id.* at *13.

---

[2]      In the Verified Complaint, Plaintiffs request a three-judge Court be convened pursuant to 28 U.S.C. § 2284(a) because they are "challenging the constitutionality of the apportionment of congressional districts." (Compl., Doc. No. 1, ¶ 9). "Upon the filing of a request for three judges, the judge to whom the request is presented shall, unless he determines that three judges are not required, immediately notify the chief judge of the circuit, who shall designate two other judges, at least one of whom shall be a circuit judge." 28 U.S.C. § 2284(b)(1). The undersigned has separately notified the Honorable Jeffrey S. Sutton, Chief Judge of the United States Court of Appeals for the Sixth Circuit, of the request for a three-judge panel. (*See* Doc. No. 39).

Even when three judges are required under the statute, "[a] single judge … may grant a temporary restraining order on a specific finding, based on evidence submitted, that specified irreparable damage will result if the order is not granted, which order, unless previously revoked by the district judge, shall remain in force only until the hearing and determination by the district court of three judges of an application for a preliminary injunction." 28 U.S.C. § 2284(b)(3). Accordingly, the Court considers only Plaintiffs' motion for temporary restraining order. The application for preliminary injunction will be heard and decided by the panel.

[3]      Unless otherwise stated, the facts in this section are drawn from the Verified Complaint (Doc. No. 1), which is cited throughout as "¶ __."

2

The same day *Callais* decision was issued, Tennessee politicians urged the legislature to reconvene to reapportion the State's congressional districts to maximize the Republican party advantage. (¶¶ 48-50). Senator Marsha Blackburn urged the legislature to "reconvene to redistrict another Republican seat in Memphis," and Tennessee Senate Speaker Randy McNally remarked, "Tennessee now has the opportunity to send another Republican voice to Washington. We intend to seize it." (¶ 48). Within days, Tennessee Governor Bill Lee called a special session of the Tennessee legislature.[4] (¶ 50). The official proclamation calling the Extraordinary Session stated that "following the renewed nationwide action around congressional representation," and "we owe it to Tennesseans to ensure our congressional districts accurately reflect the will of Tennessee voters." (*Id.*).[5]

The Tennessee General Assembly convened for an Extraordinary Session on May 5, 6, 7, 2026, and, on May 7, 2026, enacted legislation that redraws most of the nine congressional districts in Tennessee. To do so, the Legislature also amended a 1972 law that required the General Assembly to redraw congressional lines after each decennial Census. Tenn Code § 2-16-102; *see* 1972 Tenn. Pub. Acts ch. 740, § 1. The amendment deleted the provision requiring that "[t]he

---

[4]     On May 1, 2026, Governor Bill Lee issued a proclamation calling the One Hundred Fourteenth General Assembly of the State of Tennessee to meet and convene in extraordinary session beginning May 5, 2026, to "consider and act upon legislation relative to: (1) the composition of Tennessee's congressional districts; (2) making statutory changes that are necessary to effectuate change to the composition of Tennessee's congressional districts and to facilitate 2026 congressional elections; (3) making appropriations sufficient to provide funding for any legislation that received final passage during the extraordinary session or other appropriations sufficient to facilitate 2026 congressional elections; and (4) making appropriations sufficient to pay the expenses of the extraordinary session, including the expenses of carrying out any actions taken pursuant to this proclamation." Proclamation by the Governor, State of Tennessee, May 1, 2026.

[5]     *See*      https://www.tn.gov/governor/news/2026/5/1/gov--lee-calls-special-legislative-session-to-review-congressional-map/.

districts may not be changed between apportionments." 2026 Tenn. Pub. Acts (2d Ex. Sess.), ch. 1, § 1 (effective May 7, 2026).

Since at least 1962 the Tennessee congressional map has included a compact district centered around Memphis. (¶ 30). Until the 2026 reapportionment, most of Memphis and Shelby County was in congressional District 9. The majority of the voting age population of Memphis and Shelby Count is Black.[6] (¶ 28). Over 40% of the Black population of the States of Tennessee lives in Shelby County. (*Id*.). Consistent with those demographics, Congressional District 9 was also majority Black (61.1% Black voting age population). (*Id*.). Congressional District 9 overwhelmingly favored Democratic Party congressional candidates; in recent years electing Democratic candidates over Republican candidates by a margin of 40 points or more.[7] All of Tennessee's other congressional districts are majority-White. (¶ 38). The only Black representatives elected to represent Tennessee in the U.S. House of Representatives were from the Memphis area.[8]

The May 7, 2026 reapportionment, which passed without support from any Black legislators, split the former majority-Black District 9 into three majority-White Districts, roughly

---

[6]     Memphis is a majority-Black city (61.3% Black voting age population) and is home to the largest concentration of Black citizens in the State (401,033 total persons). (¶ 28).[6] Shelby County, which contains Memphis, is a majority-Black County (51.4% Black voting age population). (*Id*.).

[7]     Democrat Stephen Cohen has been the congressional representative for the Memphis and Shelby County district since 2007. During the past six congressional elections for which data is readily available (since 2014) he received 70-80% of the vote.
*See https://ballotpedia.org/Tennessee%27s_9th_Congressional_District.*

[8]     Harold Ford Sr. served in the U.S. House of Representatives from 1975 until 1997. His son, Harold Ford Jr. served from 1997 to 2007. *See* Black-American Members by State and Territory, United States House of Representatives, available at
*https://history.house.gov/Exhibitions-and-Publications/BAIC/Historical-Data/Black-American-Representatives-and-Senators-by-State-and-Territory/*

4

dividing the Black voting-age population of Shelby county into thirds. (¶¶ 55, 87 (District 5 is 28% Black; District 8 is 27% Black; and District 9 is 32% Black); ¶ 94 (the Black voting-age population of Shelby county is 33.1% in District 5, 26.7% in District 8, and 40.3% in District 9)). The new districts are less compact. District 5 now extends from the southern border with Mississipi to the northern border with Kentucky and then east into middle Tennessee. District 9 runs from south Memphis east through 15 counties and ends in middle Tennessee to connect with the southern part of District 5 hundreds of miles from Memphis. (¶¶ 93, 95).

Plaintiffs are Black and African American voters who reside in Memphis, Tennessee: Amber Sherman, Rachael Spriggs, and Kermit Moore; and three organizations: Black Clergy Collaborative of Memphis ("BCCM"), Memphis A. Philip Randolph Institute ("APRI"), and Equity Alliance. (¶¶ 10-24). They challenge the Legislators' motives for reapportionment, arguing that the May 2026 Congressional Maps are racially discriminatory and that they were enacted in retaliation against Plaintiffs for political speech and association. Defendants are: Tre Harget, Secretary of State of Tennessee; Mark Goins, Coordinator of Elections for Tennessee; and the State Election Commission and its individual members in their official capacities.

Now before the Court is Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction. (Doc. No. 20). In support of the motion, Plaintiffs filed: Expert Reports of Dr. Marvin King (Ex. 1), Dr. Kasra Oskoii (Ex. 2), L. Arthi Krishnaswami (Ex. 3), and Dr. Jonathan Cervas (Ex. 4); the declaration of voter Amber Sherman (Ex. 5), the declaration of Rachael Spriggs, voter and Director of Power Building at the Equity Alliance Foundation (Ex. 6); the declaration of Kermit Moore, voter and President of the Memphis A. Philip Randolph Institute (Ex. 7); the declaration of Rev. Dr. Lawrence J. Turner, Board President of the Black Clergy

Collaborative of Memphis (Ex. 8); and declarations of state and county election officials from state court litigation over redistricting in 2022 (Ex. 9).

Defendants have not yet responded to the motion. However, this case is one of several cases challenging the constitutionality of the May 2026 reapportionment of congressional districts.[9] In *Hale v. Lee*, Case No. 3:26-cv-00603, the plaintiffs also sought to temporarily enjoin implementation of the 2026 Congressional Act, and Defendants Tre Hargett and Mark Goins, who are defendants in both cases, responded in opposition. To the extent relevant, the Court takes judicial notice of that response and the documents filed therewith.[10]

## II. LEGAL STANDARD

The same legal standard governs both the issuance of preliminary injunctions and temporary restraining orders. *Mich. State A. Philip Randolph Inst. v. Johnson*, 209 F. Supp. 3d 935, 942 (E.D. Mich. 2016) (citing *Sandison v. Mich. High Sch. Athletic Assoc.*, 64 F.3d 1026, 1030 (6th Cir. 1995)).

"To secure a preliminary injunction, a plaintiff must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *EOG Resources, Inc. v. Lucky Land Mgmt., LLC*, 134 F.4th 868, 874 (6th Cir. 2025) (citing *Winter v.*

---

[9]    The related cases are *Hale v. Lee*, Case No. 3:26-cv-00603, and *NAACP Tennessee v. Hargett*, Case No. 3:26-cv-00638. These case have been administratively consolidated for purposes of case management and so that they may be heard and decided before the same district judge and three-judge panel.

[10]    The Documents filed by the State Defendants in *Hale* include: a declaration by Andrew Dodd, Assistant Coordinator of Elections for the Division of Elections, Tennessee Department of State; a declaration from Will Burns, Chairman of the Davidson County Election Commission; and transcripts of proceedings before the Tennessee General Assembly on May 6, 2026. *See Hale*, Case No. 3:26-cv-00603, Doc. No. 40, Exhibits 1, 2-4).

6

*Nat. Rs. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). "Because a preliminary injunction is an 'extraordinary' equitable remedy that is 'never awarded as of right,' the plaintiff must make a 'clear showing' that these factors favor him." *Id*. (quoting *Starbucks Corp. v. McKinney*, 602 U.S. 339, 346-46 (2024)).

### III.  ANALYSIS

### A. Likelihood of Success

Plaintiffs assert two claims. Count 1 alleges intentional discrimination in violation of the Fourteenth and Fifteenth Amendments. (¶¶ 100-109). Count 2 alleges retaliation for protected expression and association in violation of the First Amendment. (¶¶ 110-125). Both claims challenge the Legislature's motivation in enacting the 2026 congressional map.

#### 1.  Count 1

In Count 1, Plaintiffs allege that the "completely gratuitous mid-decade redistricting and the egregious cracking of the predominantly Black city of Memphis and of the Black population in the Memphis area across three different congressional districts was done with an intent to discriminate based on race as a motivating factor in violation of the Fourteenth and Fifteenth Amendments to the U.S. Constitution" and that the purpose of the redistricting was to "disadvantag[e] voters of color in the majority-Black Memphis area and dilut[e] their voting strength … such that they can no longer elect a candidate of their choice to represent Memphis in Congress." (¶¶ 106-07).

Government action is unlawful whenever an "invidious discriminatory purpose was a motivating factor" in the decision to undertake it. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977); *Callais*, 2026 WL 1153054 at *10 ("[T]he Constitution almost never permits the Federal Government or a State to discriminate on the basis of race … Such

discrimination triggers strict scrutiny."). However, assessing a legislature's intent in enacting a law is not a straightforward endeavor; rather, it is "a complex task requiring a 'sensitive inquiry into such circumstantial and direct evidence as may be available.'" *Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471, 488 (1997) (quoting *Arlington Heights*, 429 U.S. at 266).

Plaintiffs argue that, notwithstanding the majority party's stated purpose to "redistrict another Republican seat in Memphis" and "send another Republican voice to Washington," the circumstantial evidence shows that the Legislature was motivated at least in part by race. Plaintiffs point to circumstantial evidence including: that the law was enacted mid-decade, during an election year, in an abbreviated special session that Plaintiffs describe as "rushed" and without sufficient opportunity for public comment or consideration of amendments; that the 2026 Congressional Map splits the formerly compact Memphis-based congressional district into thirds and combines those "fractured chunks" with White rural populations hundreds of miles away; allegations that individual members of the General Assembly who are White and in the majority have made repeated expressions of racial animus and racial stereotypes about Black Tennesseans; and that during the most recent legislative session the General Assembly made efforts, which Plaintiffs assert were based on anti-Black stereotypes, to strip Memphis of the ability to elect its own officials and set local policy. As further evidence that 2026 Congressional Map was motivated by racial discrimination, Plaintiffs point to the 2026 Congressional Map's sponsors alleged refusal to answer questions about the map, who drew it, what data was used, and demographics, and the provision of what Plaintiffs characterize as "bizarre, canned, robotic, and/or contradictory statements."

In evaluating the likelihood of success on the merit of Count I, the Court is particularly mindful of two principles. First, assessing a legislature's intent is "a complex task" that requires a "sensitive inquiry into such circumstantial and direct evidence as may be available." *See Reno v.*

*Bossier Par. Sch. Bd.*, 520 U.S. at 488 (quoting *Arlington Heights*, 429 U.S. at 266). Second, legislative action is entitled to a presumption of good faith. *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 6, 10-11 (2024) ("[I]n assessing a legislature's work, we start with a presumption that the legislature acted in good faith."). Plaintiffs may ultimately be able to prove that "an invidious discriminatory purpose was a motivating factor" in the decision to enact the 2026 Congressional Map, but at this juncture, the Court cannot say that their likelihood of success on this claim is substantial.

2. Count 2

In Count 2, Plaintiffs claim Defendants "initiated gratuitous mid-decade redistricting to retaliate against Black voters, including Plaintiffs, for their associating and organizing to build political power in Memphis and Shelby County and for their opposition to the White-dominated faction that controls all the levers of political power in Tennessee." (Doc. No. 20 at 14; Compl., ¶¶ 110-125). Plaintiffs acknowledge that the Supreme Court has recognized that "a legislature may pursue partisan ends when it engages in redistricting," and has also held that partisan gerrymandering disputes are largely non-justiciable. (Doc. No. 20 at 14 (citing *Alexander*, 602 U.S. at 6)); *see Rucho v. Common Cause*, 588 U.S. 684, 718 (2019) ("Excessive partisanship in districting leads to results that reasonably seem unjust. But the fact that such gerrymandering is 'incompatible with democratic principles,' does not mean that the solution lies with the federal judiciary. We conclude that partisan gerrymandering claims present political questions beyond the reach of the federal courts.") (internal citations omitted). Plaintiffs argue the retaliation claim falls outside these holdings because it concerns not how the lines themselves were drawn, but whether the mid-decade decision to redraw the map was legitimate. (Doc. No. 20 at 14).

9

To prevail on a First Amendment retaliation claim, a plaintiff must establish "(1) that [they] engaged in First Amendment protected activity; (2) that [defendants] undertook 'an adverse action' that would deter 'a person of ordinary firmness from continuing to engage in that conduct'; and (3) that there is a 'causal connection' between [the] protected activity and [the] adverse action." *MacIntosh v. Clous*, 69 F.4th 309, 315 (6th Cir. 2023).

The Court is not persuaded that Plaintiffs have shown a substantial likelihood of success on the merits of this claim for the following reasons. First, although the redistricting will unquestionably hamper Plaintiffs' efforts to elect their candidate of choice and may result in voter apathy, the question of whether the alleged retaliatory action of redistricting would deter a person of ordinary firmness from engaging in First Amendment speech and association is less than certain. In addition, as with the claim alleging racial discrimination, Plaintiffs attack the motivations of the legislature. Certain members of the legislature and others made no secret that their motives in redistricting were to advance the aims of the Republican Party. But concluding that politically motivated action directed at an opposing political party or its members constitutes First Amendment retaliation has potential ramifications that extend far beyond this case. The Court is unwilling to reach that conclusion at this juncture.

**B. Irreparable Harm**

Plaintiffs contend the May 6, 2026 legislation will cause voter disenfranchisement and significant voter confusion and argue that risk of voter confusion is heightened because the challenged legislation also removed the requirement to provide notice of the changes directly to affected voters. *See* H.B. 7001, § 1 (amended Tenn. Code Ann. § 2-16-203) (providing that notice is satisfied by publication on the county election commission's official website "if one exists"). Plaintiffs also point to statements from election administrators in 2022. At that time, election

10

officials stated that they would be unable to timely and accurately implement changes necessitated by redistricting on a less compressed timeline than that imposed by the Act and expressed concerns about "significant voter confusion." (*See* Cameron-Vaughn Decl., Doc. No. 20-9, Exs. A-D).

Although Defendants have not yet filed a response in this case, Tre Hargett and Mark Goins, who are also defendants in *Hale*, Case No. 3:26-cv-00603, responded the same argument in that case by filing a declaration from Andrew Dodd, Assistant Coordinator of Elections, and Will Burns, Chairman of the Davidson County Election Commission. (*See Hale v. Lee*, Case No. 3:26-cv-00616, Doc. Nos. 40-1, 40-3). In their declarations, Dodd and Burns stated that the 2026 redistricting is different than the court-imposed redistricting in 2022, in large part because the State has appropriated over $3 million to assist county election officials in meeting deadlines and performing their duties. Chairman Burns stated that, with the additional funds appropriated, he is confident the Davidson County Election Commission will be able to meet election deadlines. (*Id.*, Doc. No. 40-3, ¶ 7).

Although evidence that state and local election officials expect to be able to meet deadlines and perform their duties for the upcoming elections mitigates the likelihood of voter confusion from the redistricting, there is no question that disenfranchisement, were it to occur, constitutes irreparable harm.

## C. Balance of Equities and the Public Interest

When defendants are government officials, the balance-of-equities and public interest factors merge. *Wilson v. Williams*, 961 F.3d 829, 844 (6th Cir. 2020). Accordingly, the Court considers them together. Plaintiffs argue injunctive relief will preserve the status quo – *i.e.*, the congressional plan enacted in 2022 following the 2020 census – and that Defendants have "no interest in enforcing laws that are unconstitutional." (Doc. No. 20 at 24-25). Plaintiffs further argue

11

that using the 2022 congressional map will ensure that the elections will be "smoothly administered," which is in the public interest.

## D.  *Purcell* **Principle**

The *Purcell* principle instructs federal courts not to alter state election rules "on the eve of an election." *See NAACP v. Lee*, 105 F.4th 888, 890 (6th Cir. 2024) (citing *Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam)). In *Purcell*, a month before an election, a lower court issued an injunction against a law requiring voter identification. *Id*. The Supreme Court dissolved the injunction without any opinion about the likelihood of success "because of the need for 'clear guidance' to election officials and the risk of 'voter confusion' from the judiciary's last-minute election changes." *Id*. Neither the Supreme Court nor the Sixth Circuit has provided a categorical answer to what constitutes a last-minute election change, or in other words, "How close is too close?" *Id*. However, the Sixth Circuit has noted that the Supreme Court has stayed injunctions issued anywhere from a month to several months before an election, and appears to presume that an injunction within this timeframe would "fall within *Purcell*." *Id*. at 897. The Sixth Circuit has not, however, suggested that an injunction affecting an election rule is foreclosed by *Purcell* merely because it would fall within weeks or months of an election. Instead, the *Purcell* principle is considered within the balance of the equities. *Id*. at 896. Sometimes, "the equities underlying *Purcell* can justify a stay *by themselves*." *Id*. (citing *Crookston v. Johnson*, 841 F.3d 396, 399 (6th Cir. 2016)). To determine whether *Purcell* "alone" warrants a stay, the Sixth Circuit has found relevant considerations to be timing of the request for relief, risk of confusion, and relative burdens.

Here, Plaintiffs sought expedited relief almost immediately after the Act became law. Nothing about the timing of Plaintiffs' motion is a basis to deny relief. The potential for confusion, perhaps inevitable in this type of litigation, is a more pressing concern that is magnified given the

already compressed timeframe between the Act and the primary election. Mindful of this Court's role in the litigation of this matter and that the motion for preliminary injunction will ultimately be decided by a three-judge panel under 28 U.S.C. § 2284, the likelihood of confusion resulting from a stream of Court decisions which may or may not reach the same conclusions is too significant to disregard. This is particularly true where the likelihood of success on the merits is far from certain. *See Purcell*, 549 U.S. at 4-5 ("Court orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls.").

The relative burdens of an injunction cut both ways. From the perspective of the Plaintiffs, the burden on the State is minimal because an injunction would merely restore the pre-Act boundaries and deadlines and cease rather than perpetuate election upheaval. The change in congressional map also imposes burdens on voters who find themselves in a new district with new candidates, separated from voters with whom they had previously associated, and less likely to elect their candidates of choice during the upcoming election. These burdens apply equally to those who remain in District 9. The burden on the State is less than it would be if, for example, Plaintiffs sought to enjoin long-standing congressional maps. But the burden on the State, which has begun implementing the new map on a compressed timeline, is not inconsequential. Moreover, it is universally recognized that a State is burdened whenever a court enjoins one of its election laws. *See NAACP v. Lee*, 105 F.4th at 900 (collecting cases).

On balance, given the timing of the legislation vis-a-vis the election, Plaintiffs' immediate request for relief, and the relative burdens, it does not appear to the Court that this is a case where the *Purcell* principle *alone* warrants denial of an injunction. The Court does, however, give strong weight to the likelihood of voter confusion in the face of ongoing litigation close to an election

13

regardless of the outcome of that litigation. This consideration counsels strongly against the issuance of an injunction.

## IV.    CONCLUSION

Considering the relevant factors, the Court is not persuaded that a temporary restraining order should issue. Accordingly, the motion for temporary restraining order is **DENIED**.

It is so **ORDERED**.

WILLIAM L. CAMPBELL, JR.
CHIEF UNITED STATES DISTRICT JUDGE