## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

AMBER SHERMAN, RACHAEL SPRIGGS, KERMIT MOORE, BLACK CLERGY COLLABORATIVE OF MEMPHIS, MEMPHIS A. PHILIP RANDOLPH INSTITUTE, EQUITY ALLIANCE,

    *Plaintiffs,*

v.

TRE HARGETT, in his official capacity as Secretary of State of Tennessee, MARK GOINS, in his official capacity as Coordinator of Elections for Tennessee, STATE ELECTION COMMISSION, and DONNA BARRETT, JUDY BLACKBURN, JIMMY ELDRIDGE, MIKE MCDONALD, SECONDRA MEADOWS, VANECIA BELSER KIMBROW, and KENT YOUNCE, in their official capacities as members of the State Election Commission,

    *Defendants.*

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

No. 3:26-cv-00616
CHIEF JUDGE CAMPBELL
MAGISTRATE JUDGE FRENSLEY

THREE-JUDGE
COURT REQUESTED

## DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES...................................................................................................ii

INTRODUCTION ............................................................................................................ 1

    I.    Plaintiffs are not likely to succeed on the merits.......................................... 8

        A.    Plaintiffs do not have standing for a statewide challenge to districts............. 8

        B.    Plaintiffs are unlikely to succeed on the merits of Count I. ............................ 8

        C.    Plaintiffs are unlikely to succeed on the merits of Count II........................... 19

    II.    *Purcell* precludes Plaintiffs' extraordinary request for preliminary relief. ............ 22

    III.    Plaintiffs cannot satisfy the remaining preliminary injunction factors.................. 23

CONCLUSION ............................................................................................................. 26

# TABLE OF AUTHORITIES

**Cases**

*Abbott v. LULAC,*
146 S. Ct. 418 (2025)......................................................................... 14, 15, 19, 21, 27, 28, 31

*Abbott v. LULAC,*
2026 WL 1127246 (Apr. 27, 2026) .................................................................................. 14, 27

*Abbott v. Perez,*
585 U.S. 579 (2018) ............................................................................................................. 30

*Alexander v. South Carolina NAACP,*
602 U.S. 1 (2024)......................................................... 5, 10, 11, 12, 13, 14, 15, 16, 17, 18, 22, 32

*Anders v. Cuevas,*
984 F.3d 1166 (6th Cir. 2021) ........................................................................................... 26

*Ardoin v. Robinson,*
142 S. Ct. 2892 (2022).......................................................................................................... 28

*Benisek v. Lamone,*
138 S. Ct. 1942 (2018).......................................................................................................... 28

*Berman v. Parker,*
348 U.S. 26 (1954).............................................................................................................. 32

*Common Cause v. Rucho,*
279 F. Supp. 3d 587 (M.D.N.C.)....................................................................................... 24

*Elrod v. Burns,*
427 U.S. 347 (1976).............................................................................................................. 26

*Enchant Christmas Light Maze & Market Ltd. v. Glowco, LLC,*
958 F.3d 532 (6th Cir. 2020) .............................................................................. 8, 12, 15, 29

*EOG Res. v. Lucky Land Mgmt.,*
134 F.4th 868 (6th Cir. 2025).......................................................................................... 9, 29

ii

*Gill v. Whitford,*
585 U.S. 48 (2018)............................................................................................. 9

*Gomillion v. Lightfoot,*
364 U.S. 339 (1960).......................................................................................... 26

*Gonzales v. Nat'l Bd. of Med. Exam'rs,*
225 F.3d 620 (6th Cir. 2000) .......................................................................... 29

*Greater Birmingham Ministries v. Sec'y of State for State of Alabama,*
992 F.3d 1299 (11th Cir. 2021) ....................................................................... 20

*Hartman v. Moore,*
547 U.S. 250 (2006)........................................................................................... 26

*Helvering v. Nw. Steel Rolling Mills,*
311 U.S. 46 (1940)............................................................................................ 21

*Holder v. Hall,*
512 U.S. 874 (1994)............................................................................................. 4

*Jackson v. Tarrant County,*
158 F.4th 571 (5th Cir. 2025)........................................................................... 26

*L.W. v. Skrmetti,*
73 F.4th 408 (6th Cir. 2023)............................................................................. 30

*Lichtenstein v. Hargett,*
489 F. Supp. 3d 742 (M.D. Tenn. 2020) ........................................................ 30

*Louisiana v. Callais,*
146 S. Ct. 1131 (2026)...................................................................... 4, 18, 20, 23

*Lubin v. Panish,*
415 U.S. 709 (1974)........................................................................................... 26

*Lujan v. Defenders of Wildlife,*
504 U.S. 555 (1992)............................................................................................. 9

*McCleskey v. Kemp,*
481 U.S. 279 (1987)........................................................................................... 19

iii

*Memphis A. Philip Randolph Inst. v. Hargett,*
    978 F.3d 378 (6th Cir. 2020) ........................................................................................... 29

*Merrill v. Milligan,*
    142 S. Ct. 879 (2022) ......................................................................................... 27, 28, 31

*Miller v. Johnson,*
    515 U.S. 900 (1995) .................................................................................................. 11, 20

*Nat'l Rifle Ass'n of Am. v. Vullo,*
    602 U.S. 175 (2024) ........................................................................................................ 26

*Pers. Adm'r of Massachusetts v. Feeney,*
    442 U.S. 256 (1979) ........................................................................................................ 10

*Purcell v. Gonzalez,*
    549 U.S. 1 (2006) ............................................................................................................ 27

*Republican Nat'l Comm. v. Democratic Nat'l Comm.,*
    589 U.S. 423 (2020) ........................................................................................................ 27

*Reynolds v. Sims,*
    377 U.S. 533 (1964) ........................................................................................................ 28

*Robinson v. Callais,*
    144 S. Ct. 1171 (2024) .............................................................................................. 28, 31

*Rucho v. Common Cause,*
    588 U.S. 684 (2019) ................................................................. 2, 3, 24, 25, 26, 27, 29

*Shaw v. Reno,*
    509 U.S. 630 (1993) ................................................................................................. 3, 4, 20

*Students for Fair Admissions v. Harvard,*
    600 U.S. 181 (2023) .......................................................................................................... 3

*Sw. Voter Registration Educ. Project v. Shelley,*
    344 F.3d 914 (9th Cir. 2003) ......................................................................................... 28

*Tennessee NAACP v. Lee,*
    746 F. Supp. 3d 473 (M.D. Tenn. 2024) ................................ 10, 11, 13, 14, 18, 19, 20, 21, 22

iv

*Thompson v. DeWine,*
976 F.3d 610 (6th Cir. 2020) ....................................................................................... 30

*United States v. City of Birmingham, Mich.,*
727 F.2d 560 (6th Cir. 1984) ............................................................................. 18, 20, 21

*Veasey v. Perry,*
769 F.3d 890 (5th Cir. 2014) ...................................................................................... 31

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,*
429 U.S. 252 (1977) ............................................................................................ 13, 18, 21

*Virginian Ry. Co. v. Sys. Fed'n No. 40,*
300 U.S. 515 (1937) ...................................................................................................... 31

*Walters v. Nat'l Ass'n of Radiation Survivors,*
468 U.S. 1323 (1984) .................................................................................................... 32

*Williamson v. Lee Optical of Okla.,*
348 U.S. 483 (1955) ...................................................................................................... 32

*Wilson v. Williams,*
961 F.3d 829 (6th Cir. 2020) ...................................................................................... 30

*Wise v. Lipscomb,*
437 U.S. 535 (1978) ...................................................................................................... 31

*Wygant v. Lee,*
2025 WL 3537313 (Tenn. Dec. 10, 2025) ................................................................. 31

*Zielasko v. Ohio,*
873 F.2d 957 (6th Cir. 1989) ............................................................................... 25, 29

**Statutes**

2026 Tenn. Pub. Ch. 2, 2d Extra. Sess. §1 ................................................................. 6

2026 Tenn. Pub. Ch. 4, 2d Extra. Sess. §2 ................................................................. 6

**Constitutional Provisions**

U.S. Const. art. I, §4, cl. 1 ............................................................................................ 2

**Other Authorities**

*2026 Congressional Redistricting Revised District Boundaries*, Tennessee Secretary of State
(last updated May 18, 2026) ............................................................................................................. 7

vi

## INTRODUCTION

Earlier this month, Tennessee redistricted its nine congressional districts. The State's goal was open and obvious: to send nine Republicans to Washington to represent Tennessee in the U.S. House of Representatives. "Tennessee is a conservative state," and "our congressional representation in Washington should reflect that," Senator John Stevens said. This map "ensures" that it does.[1]

What just transpired in Tennessee is not unique. There has been mid-decade redistricting in California, Florida, Missouri, New York, North Carolina, Ohio, Texas, and the failed effort in Virginia. Tennessee redistricted knowing that control of Congress is up for grabs in the upcoming 2026 elections. That was the "intent"—to ensure "a Republican majority in the United States House of Representatives."[2] As the Senate Majority Leader put it, that "battle for control of Congress is about far more than politics."[3] It's a fight for policymaking, "preserving economic opportunity, protecting our communities, and defending the principles that make this country strong," "for secure borders, public safety, and responsible government."[4]

---

[1] Senate Judiciary Comm. Tr. 6:24-7:2 (May 6, 2026) (Sen. Stevens) (attached as Ex. 1).

[2] *Id.* at 70:7-11 (Sen. Stevens).

[3] Tennessee Political Parties Voice Opinions on Congressional Redistricting Map, WBBJ TV, https://www.wbbjtv.com/2026/05/07/general-assembly-strengthens-tennes-see-voices-dc/ (last visited May 19, 2026).

[4] *Id.*

1

Americans can debate the wisdom of Tennessee's mid-decade redistricting at their kitchen tables. Social scientists can debate it in the classroom. But federal courts cannot.

Politically minded redistricting is as old as the country itself. *See Rucho v. Common Cause*, 588 U.S. 684, 696-97 (2019) (describing efforts to fence out James Madison and other Federalists). The Framers settled on a political solution: Task "the Legislature" of every state with redistricting but give Congress a check on that power. U.S. Const. art. I, §4, cl. 1. As for the judicial branch, "[a]t no point was there a suggestion that the federal courts had a role to play," or that the "Framers had ever heard of courts doing such a thing." *Rucho*, 588 U.S. at 699. There are no "legal standards" to decide when redistricting becomes too politically unfair, only "political" questions. *Id.* at 707.

At best, Plaintiffs' challenge to Tennessee's 2026 congressional districts runs head-long into *Rucho.* Like Plaintiffs, the *Rucho* plaintiffs brought First Amendment retaliation claims. *Id.* at 692 (describing plaintiffs' claim that districts "violated their First Amendment rights by retaliating against supporters of Democratic candidates on the basis of their political beliefs"). The Supreme Court directed dismissal of that suit in unequivocal terms. *Id.* at 721. After *Rucho*, federal courts are no longer in the business of answering the unanswerable: "At what point does permissible partisanship become unconstitutional?" *Id.* at 707.

2

At worst—far worse—Plaintiffs' entire lawsuit rests on pernicious racial stereotypes that have been condemned by the Supreme Court again and again. *See Students for Fair Admissions v. Harvard*, 600 U.S. 181, 203 (2023) (collecting cases); *Shaw v. Reno*, 509 U.S. 630, 647 (1993) (*Shaw I*). For over 100 pages of briefing and expert declarations, Plaintiffs conflate the State's plainly stated political goal with a racial one. As Plaintiffs tell it, "the White-controlled General Assembly['s] actions" are "unlawful" and a "repeat" of "all-White governments in prior eras to shut Black voters out of power." Compl. ¶5; PI Mem. 2, 5, 8, 11, 14-15 ("White-controlled" or "White-dominated" legislature).

Plaintiffs would have this Court presume racial discrimination from a map drawn to favor Republicans. That theory "reinforces the perception that members of the same racial group—regardless of their age, education, economic status, or the community in which they live—think alike, share the same political interests, and will prefer the same candidates at the polls" indefinitely into the future. *Shaw I*, 509 U.S. at 647. The assumption that black voters are to be "drawn into 'black districts' and given 'black representatives' … should be repugnant to any nation that strives for the ideal of a color-blind Constitution." *Holder v. Hall*, 512 U.S. 874, 905-06 (1994) (Thomas, J., concurring in the judgment). And while for a time court decisions were "rapidly progressing toward a system that is indistinguishable in principle from a scheme under which members of different racial groups are divided into separate electoral registers and allocated a proportion of

3

political power on the basis of race," *id.* at 906, that era is over. *See Louisiana v. Callais*, 146 S. Ct. 1131 (2026).

## BACKGROUND

On April 29, 2026, the Supreme Court decided *Louisiana v. Callais*, 146 S. Ct. 1131 (2026). The Court held that Louisiana's existing redistricting plan was racially gerryman-dered and clarified that States need not put racial considerations before nonracial consid-erations when they draw congressional districts. Among those nonracial considerations, a State may advance its "political goals" in redistricting. *Id.* at 1157. Likewise, in *Alexander v. South Carolina NAACP*, 602 U.S. 1, 20-21 (2024), the Supreme Court confirmed that a State may prioritize nonracial considerations in redistricting without being faulted for racially gerrymandering.

With those clarifications, Tennessee convened a special session to redraw its nine congressional districts without the use of any racial data.[5] That was a conscious choice to "reduc[e] the risk of future legal challenges" and "protect[] the state from costly litiga-tion" after *Callais*.[6] The State instead took the opportunity to advance its political and

---

[5] House Cong. Redistricting Comm. Tr. 68:1-3 (May 6, 2026) (Speaker Sexton) (at-tached as Ex. 2) ("[T]he map that was generated was based on population and politics[.] [N]o racial data was used, and no incumbents were paired together."); *id.* at 80:15-18 (Speaker Sexton) (similar). Senate Judiciary Comm. Tr. 69:12-14 (Sen. Stevens); *see also id.* at 68:19-22 (Sen. Stevens) (similar).

[6] Senate Judiciary Comm. Tr. 69:12-14 (Sen. Stevens); *see also id.* at 68:19-22 (Sen. Ste-vens) (similar).

4

policy goals—to redraw districts to favor Republicans, send a "conservative" delegation to Washington, and keep Republicans as the U.S. House majority.[7]

The special session began on May 5, 2026, three months before Tennessee's primary elections on August 6, 2026. The Legislature repealed a statute prohibiting mid-decade redistricting, 2026 Tenn. Pub. Ch. 1, 2d Extra. Sess. §1, and replaced the 2022 congressional districts with a 2026 Plan containing nine Republican-leaning districts, 2026 Tenn. Pub. Ch. 3, 2d Extra. Sess. §1. *See* Barber Decl. 13, fig. 4 (comparing partisan lean of 2022 Plan and 2026 Plan) (attached as Ex. 3).

Figure 3



Barber Decl. 12, fig. 3

---

[7] Senate Judiciary Comm. Tr. 6:24-7:1 (May 6, 2026) (Sen. Stevens); *see also id.* at 60:14-66:13, 66:23-67:1 (Sen. Stevens) (noting redistricting by the Democratic Party in New York and California); *id.* at 66:23-67:1 (observing "who's going to control the House of Representatives" was up for grabs and stating "[w]e want Republicans to maintain control of the House of Representatives"); *id.* at 70:7-11, 71:8-11, 72:3-8 (Sen. Stevens) ("We are attempting to maximize the chances that the congressional delegation of Tennessee will maintain a Republican majority in the United States House of Representatives. That's our intent.").

5

Candidate qualification requirements and deadlines were also revised. 2026 Tenn. Pub. Ch. 2, 2d Extra. Sess. §1. Already-qualified candidates remain qualified and may run in the same numbered district or any other district. *Id.*; *see* Decl. of Andrew Dodd ¶4 (attached as Ex. 4). Candidate qualifying was also reopened until May 15 to allow new candidates to qualify. 2026 Tenn. Pub. Ch. 2, 2d Extra. Sess. §1; *see* Dodd Decl. ¶18. On that revised timeline, counties could begin preparing ballots as early as May 18, and multiple counties have prepared their ballots for review by Division of Elections. *See* Dodd Decl. ¶9.

To implement these changes, the State appropriated $3.1 million for state and local election officials. 2026 Tenn. Pub. Ch. 4, 2d Extra. Sess. §2. The additional funding will pay for overtime and additional staff, expedited services from vendors, and notices to voters and other miscellaneous items, including training, signage, and voter education. Dodd Decl. ¶13; *see, e.g.*, Decl. of Will Burns ¶¶3-9 (attached as Ex. 5) (noting use of funding for special redistricting team).

With that substantial funding, state and local election officials have already begun implementing the 2026 Plan and preparing for the 2026 primary elections. Dodd Decl. ¶¶13-16, 19. The Division of Elections made information about the 2026 districts available on its website right after its enactment. *Id.* ¶15. Candidates were immediately notified

6

about the revised qualifying deadlines and requirements. *Id.* ¶16. A "voter look-up" function went live on May 7, allowing voters to identify their congressional district by typing in their address. *Id*. ¶15.[8] Counties are also preparing to notify voters. *See* Burns Decl. ¶5. The Division has been in close coordination with local elections officials, beginning before the 2026 Plan passed. Dodd Decl. ¶¶14-15, 19. And counties have already worked considerable overtime to implement the 2026 Plan and reassign at least half of a million voters. *Id.* ¶19.

Chief Judge Campbell denied Plaintiffs' request for a temporary restraining order on May 26, 2026. *See* Dkt. 40.

## ARGUMENT

A "preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Enchant Christmas Light Maze & Market Ltd. v. Glowco, LLC*, 958 F.3d 532, 539 (6th Cir. 2020). To do so, a plaintiff must establish that (1) "he is likely to succeed on the merits," (2) he is likely to suffer irreparable harm in the absence of preliminary relief, (3) "the balance of equities tips in his favor," and (4) "an injunction is in the public interest." *Id.* at

---

[8] *2026 Congressional Redistricting Revised District Boundaries*, Tennessee Secretary of State (last updated May 18, 2026), https://sos.tn.gov/announcements/2026-congressional-redistricting.

7

535-36; *EOG Res. v. Lucky Land Mgmt.*, 134 F.4th 868, 885 (6th Cir. 2025) (holding that all four factors are "prerequisite[s]"). Plaintiffs have not cleared any one of those hurdles.

## I. Plaintiffs are not likely to succeed on the merits.

### A. Plaintiffs do not have standing for a statewide challenge to districts.

A plaintiff may challenge only "the boundaries of the particular district in which he resides." *Gill v. Whitford*, 585 U.S. 48, 66 (2018). Plaintiffs cannot obtain "statewide" relief. *Id.* at 66-68. Individual Plaintiffs allege they live in CD5 or in Shelby County, without further identifying their districts, while the Black Clergy Collaborative of Memphis alleges it has members living in CD5, CD8, and CD9. *See* Compl. ¶¶10-12, 14, 18, 24. It is Plaintiffs' burden to establish standing, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992), and their current allegations at most allege standing to challenge CD5, CD8, and CD9, *see Gill*, 585 U.S. at 66-68.

### B. Plaintiffs are unlikely to succeed on the merits of Count I.

Plaintiffs claim intentional racial discrimination for a map drawn without the use of racial data. *Supra* p.4 & n.5. They make the extraordinary claim that the redistricting process was simply the "[w]hite-dominated supermajority of the Tennessee General Assembly … shutting Black voters completely out of power in federal elections in Tennessee." Compl. ¶1. They blind themselves to the State's plainly stated political goals.

8

### 1. Plaintiffs cannot prove racial purpose.

Proving intentional discrimination requires proving the 2026 Plan was the product of racial purpose, not political purpose. *See Alexander*, 602 U.S. at 39 ("'purpose and effect'" of diluting the minority vote); *see also Tennessee NAACP v. Lee*, 746 F. Supp. 3d 473, 499, 506 (M.D. Tenn. 2024) (dismissing intentional discrimination claim challenging Nashville-area districts). "'Discriminatory purpose" requires showing that the State legislated "because of" race, "not merely in spite of" race. *Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979) (quotation marks omitted); *see also Lee*, 746 F. Supp. 3d at 502 ("merely by showing that the legislature knew that the revised map would have harmful effects on the racial group" is not enough). To make that showing, Plaintiffs must overcome the presumption of legislative good faith, rather than blithely presume that legislators acted "with racial animus." *Lee*, 746 F. Supp. 3d at 504; *see Alexander*, 602 U.S. at 11. Federal courts do not "hurl such accusations at the political branches" without compelling proof. *Alexander*, 602 U.S. at 11. The "sensitive nature of redistricting and the presumption of good faith … require[] courts to exercise extraordinary caution in adjudicating claims that a State has drawn district lines on the basis of race." *Miller v. Johnson*, 515 U.S. 900, 916 (1995).

Applied here, there is no direct evidence of racial purpose, only political purpose. Far from any "express acknowledgment that race played a role in the drawing of district

lines," *Alexander*, 602 U.S. at 8, legislators emphasized that they took the opportunity to *remove* racial data from their process. *Supra* p.4 & n.5.[9] Plaintiffs point to no contrary direct evidence that would even suggest racial purpose; the allegations in Plaintiffs' own verified complaint confirm the Legislature's *political* motivation. *See* Compl. ¶¶48, 50, 60, 63, 64. *But see Lee*, 746 F. Supp. 3d at 504 (dismissing complaint when nothing from the legislative record "indicate[d] that legislators voted on the maps for … racist reason[s]"). The State redrew districts to favor Republicans, attempting to maintain control in the U.S. House of Representatives. *Supra* p.1. That is political, not racial.

Indeed, the entire impetus for the special session was the Supreme Court's clarification that the State could advance that political- and policy-minded goal, rather than entangle itself in a web of racial data. *See Callais*, 141 S. Ct. at 1156-57. Plaintiffs agree that *Callais* clarified the legal ground rules and was the impetus. Compl. ¶¶46, 49. Only in an upside-down world could it be invidious racial discrimination for a State to redistrict *without* racial data after *Callais* clarified the State could do just that. With no direct evidence of racial discrimination, Plaintiffs cannot make the "clear showing" required for the "extraordinary and drastic remedy" of a preliminary injunction. *Glowco*, 958 F.3d at 539; *see Alexander*, 602 U.S. at 8 ("[W]e have *never* invalidated an electoral map in a case

---

[9] House Cong. Redistricting Comm. Tr. 68:1-3 (May 6, 2026) (Speaker Sexton) ("[N]o racial data was used."); *see also id.* at 69:1-2; 79:25-80:2 (Speaker Sexton) (similar).

in which the plaintiff failed to adduce any direct evidence." (emphasis added)).

All evidence points toward the Legislature's political purpose. *Supra* pp.1, 5 & n.7. So while Plaintiffs declare the 2026 Plan "is unexplainable on grounds other than race, evincing a laser focus on Black voters," PI Mem. 9, Plaintiffs offer *no evidence* to "disentangle race from politics" to prove race, not politics, "drove a district's lines," *Alexander*, 602 U.S. at 9 (quotation marks omitted). Plaintiffs must show racial purpose in this intentional discrimination case, *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977), just as they would in a racial gerrymandering case. To the extent there is a difference, the required showing of racial purpose is even "*more demanding*" for Plaintiffs' intentional discrimination claim. *Lee*, 746 F. Supp. 3d at 501 (emphasis added). Meaning here, just as in a racial gerrymandering case, if evidence shows "either politics or race could explain a district's contours," Plaintiffs lose. *Alexander*, 602 U.S. at 10. If there is even a "possibility" that politics, not race, explains the districts, that "possibility" is "dispositive." *Id*. at 20.

Practically speaking, Plaintiffs cannot declare the 2026 Plan "is unexplainable on grounds other than race," *contra* PI Mem. 9, without showing an "alternative map" could have achieved the State's "professed partisan goals" with a different "racial balance,"

11

*Alexander*, 602 U.S. at 10.[10] An alternative map is the evidentiary tool to "perform the critical task of distinguishing between racial and political motivations when race and partisanship are closely entwined." *Id*. at 34. Failure to produce an alternative map demands "an adverse inference." *Id*. Weeks ago, the Supreme Court summarily reversed the Texas three-judge court for failing to require an alternative map at the preliminary-injunction stage. *Abbott v. LULAC*, No. 25-845, ___ U.S. ___, 2026 WL 1127246 (2026); *see Abbott v. LULAC*, 146 S. Ct. 418, 419 (2025) (stay).

Here too, it would be clear error to preliminarily enjoin the use of the 2026 Plan when Plaintiffs have altogether neglected these "'demanding' standard[s]." *Alexander*, 602 U.S. at 17-18; *see Abbott*, 146 S. Ct. at 419. Not one of Plaintiffs' experts looked at the 2026 Plan through a political lens, let alone offered an alternative map. *Compare, e.g.*, Dkt.20-3, Krishnaswami Decl. at 7-12 (zeroing in on racial observations without any political analysis), *with* Barber Decl. at 11-16 (accounting for politics). As in *Alexander*, Plaintiffs have enlisted "experts who could have made these maps at little marginal costs." 602 U.S. at 35. But not one has offered an alternative map or any other analysis "that actually

---

[10] *Alexander* discussed alternative maps for racial gerrymandering claims. *See* 602 U.S. at 34-35. Explained above, both *Alexander*'s racial gerrymandering claim and Plaintiffs' intentional discrimination claim demand proof of racial purpose. *Lee*, 746 F. Supp. 3d at 501. If failing to proffer an alternative map disentangling racial purpose from political purpose in a racial gerrymandering case can be "dispositive," *Alexander*, 602 U.S. at 20, so too in this intentional discrimination case.

12

controlled for politics." *Id.*; *see* Barber Decl. at 29 (criticizing Cervas analysis of computer-simulated redistricting plans that did not account for "the central political feature of the 2026 Plan"). That absence of evidence demands a "dispositive or near-dispositive adverse inference" against Plaintiffs. *Abbott*, 146 S. Ct. at 419; *see Alexander*, 602 U.S. at 18. Plaintiffs' request for a "drastic remedy" doesn't get out of the starting gate. *Glowco*, 958 F.3d at 539.

Had they tried, Plaintiffs could not have met their demanding evidentiary burden. Detailed in the attached declaration by Dr. Michael Barber (Ex. 3), the 2026 Plan can be explained by the State's offered political goal. Given the required presumption of good faith, that is "dispositive." *Alexander*, 602 U.S. at 20. The 2026 Plan replaces the existing districts with all Republican-leaning districts. Barber Decl. at 12-13. It does so by taking the State's two most populous counties—Shelby and Davidson—and dividing those highly Democratic areas "across three congressional districts," "join[ing] with more Republican areas outside the county." *Id.* at 11, 14-15. That "parallel treatment" across those two counties "is consistent with a partisan explanation," not a racial one. *Id.* at 15. Both counties are divided three ways, [11] even though Shelby is majority-black and Davidson is

---

[11] Plaintiffs are also wrong that Shelby County has never been divided three ways between congressional districts. Their expert's own analysis shows there have been three-way divisions of Shelby County as recently as the 2002 districts, consistent with decades previous. Barber Decl. 27-28.

13

majority-white—meaning the map divides highly Democratic areas "regardless of whether those Democratic voters are located in a majority-Black county or not." *Id.* at 14-15 & fig. 5. That conclusion is confirmed by tens of thousands of race-blind simulations; when conditioned to "resemble the 2026 Plan's partisan performance, the Black Voting Age Population (or BVAP) distribution of the race-blind simulated districts is similar to the BVAP distribution of the 2026 Plan" in Shelby County. *Id.* at 21-22. Without any evidence, Plaintiffs have speciously conflated the 2026 Plan's political explanation with a racial one.

### 2. Plaintiffs' arguments about racial demographics are not evidence of racial purpose.

Plaintiffs contend (at 9-10) that it is too coincidental that the 2026 plan split CD9's BVAP into "near-perfect thirds."[12] That argument, based on crude observations of racial demographics alone, invites this Court to err by presuming legislative "*bad faith.*" *Alexander*, 602 U.S. at 21 (emphasis added). In *Alexander*, for instance, the district court erroneously presumed racial purpose after finding it too coincidental that the BVAP of the challenged district was 17% in 2011 and remained 17% BVAP when redrawn in 2021; the

---

[12] Not even Plaintiffs' expert's race-only analysis supports that claim of "near-perfect thirds." *See* Dkt. 20-2, Oskooii Decl. ¶¶59, 61 (describing 33.1%-26.7%-40.3% BVAP and 39.7%-20.5%-39.8% BVAP shares). And shown in Dr. Barber's attached declaration the 2026 Plan can be just as well understood to split Democratic voters roughly into thirds. Barber Decl. 15-16 & tbl. 2.

14

district court held that was sufficient evidence of a racial "target." *Id*. at 19-20. The Supreme Court reversed, finding those racial demographics to "prove[] very little." *Id*. at 20. Presuming racial purpose was "flatly inconsistent" with the presumption of good faith. *Id*.

Plaintiffs invite the same error here. They have enlisted experts with entire reports opining on the racial demographics of districts alone, without once considering whether those racial demographics are simply a lawful "side effect of the legislature's partisan goal." *Id.* at 20. Had they done so, they could not have ruled out politics as an equal—indeed, better—explanation for the 2026 Plan. *But see id.*; *see* Barber Decl. at 11-33.[13] That political explanation is "dispositive" in the State's favor. *Alexander*, 602 U.S. at 20.

### 3. *Arlington Heights* does not help Plaintiffs.

Even if the Court were to apply the *Arlington Heights* factors—despite Plaintiffs' total failure to offer any evidence of any racial purpose, *supra* I.B.1-2—there remains no basis for extraordinary preliminary relief. *See Arlington Heights*, 429 U.S. at 266.

---

[13] For similar reasons, Plaintiffs' expert's racially polarized voting analysis is irrelevant. *See* Dkt. 20-2 at 16-28 (Oskooii Report); Barber Decl. at 31-33. A racially polarized voting analysis remains an element of a §2 claim under the Voting Rights Act. *See Callais*, 146 S. Ct. at 1159-60. But for Plaintiffs' constitutional claims, any such racially polarized voting analysis simply shows that race and politics are correlated. *See* Barber Decl. at 24-26. From there, Plaintiffs must satisfy their burden of disentangling the two. *Supra*, I.B.1.

**a.** For "the historical background of the decision," *United States v. City of Birmingham, Mich.*, 727 F.2d 560, 565 (6th Cir. 1984), courts review "the 'sequence of events' leading up to the law's passage," *Lee*, 746 F. Supp. 3d at 503. The sequence of events here confirms the 2026 Plan's *political* purpose, not a racial one. Tennessee redistricted on the heels of that nationwide push by both Democrat- and Republican-controlled legislatures after *Callais* confirmed the State was permitted to prioritize politics. *Supra* pp.1, 3; *see Abbott*, 146 S. Ct. at 419 (observing "several States have in recent months redrawn their congressional districts in ways that are predicted to favor the State's dominant political party" in view of the 2026 midterms).[14]

Plaintiffs' contrary arguments are unavailing. Plaintiffs point to 1960s politics as evidence that the 2026 Plan is racially discriminatory (PI Mem. 8), which is not "reasonably contemporaneous with the challenged decision" and "has little probative value," *McCleskey v. Kemp*, 481 U.S. 279, 298 n.20 (1987). Similarly, Plaintiffs point to laws having "little to do with redistricting," *Lee*, 746 F. Supp. 3d at 505-06, including measures relating to "Memphis-Shelby County Schools" and others relating to the Shelby County District

---

[14] Proclamation by the Governor at 1 (May 1, 2026) (stating the session "follow[ed] the renewed nationwide action around congressional representation") (attached as Ex. 6); Senate Judiciary Comm. Tr. 60:14-67:1 (Sen. Stevens) (recounting mid-cycle redistricting by Democrats in other states, observing "who's going to control the House of Representatives" was up for grabs, and "[w]e want Republicans to maintain control of the House of Representatives").

16

Attorney, PI Mem. 8. These allegations have nothing to do with congressional districts. *But see Callais*, 146 S. Ct. at 1160. Such "statements and votes of a 'handful' of legislators on unrelated topics" cannot "plausibly suggest that the whole legislature passed the legislative maps to discriminate against racial minorities" during redistricting. *Lee*, 746 F. Supp. 3d at 506; *see also Greater Birmingham Ministries v. Sec'y of State for State of Alabama*, 992 F.3d 1299, 1324 (11th Cir. 2021) (similar).

Worst of all, Plaintiffs argue that the "White-dominated" Tennessee government is itself evidence of intentional discrimination. PI Mem. 8 (citing Compl. ¶35); *see* Compl. ¶¶1, 4, 33-35, 38-39, 40-42, 44, 48-49, 53, 55-58, 60, 64, 69, 70, 86, 88, 98-99, 108, 116 (alleging "White-dominated" more than 50 times). The suggestion that executive branch officials, legislators, and judges are in a racist "faction" merely because of their race is offensive and demeaning to Tennessee's public officials. *See Shaw I*, 509 U.S. at 657. The Court cannot credit Plaintiffs' casual accusations of racism based on the race of state officials alone. *See Miller*, 515 U.S. at 912.

**b.** Next is the "the legislative or administrative history of the decision" itself. *City of Birmingham*, 727 F.2d at 565; *Arlington Heights*, 492 U.S. at 267-68; *see also Lee*, 746 F. Supp. 3d at 503. Described above, the legislative record confirms the 2026 Plan's purpose was a political one, not racial; Plaintiffs identify nothing to the contrary. *Supra* I.B.1-2.

17

**c.** Last is any "departures from normal procedures and usual substantive norms." *City of Birmingham*, 727 F.2d at 565. Plaintiffs fault (at 8-9) the Legislature's repeal of the prior ban on mid-cycle redistricting. But there is nothing unique about repealing that statute to redistrict mid-cycle as other Republican- and Democrat-controlled States have done "[w]ith an eye on the upcoming 2026 midterm elections." *Abbott*, 146 S. Ct. at 419. The Legislature is not bound by that prior statute, as though it were a constitutional amendment. *See Helvering v. Nw. Steel Rolling Mills*, 311 U.S. 46, 51 (1940) (power to "repeal, modif[y], alter[], or amend[]" a "law" is "within the general legislative powers"). And while Plaintiffs fault (at 9) how the Legislature moved the 2026 legislation quickly through the special session, that does "not plausibly rule out of the possibility' that the legislators acted for political—not racist—reasons," *Lee*, 746 F. Supp. 3d at 504 (quoting *Alexander*, 602 U.S. at 24). Any faulted "brevity" does not overcome the presumption of good faith. *Id.* at 504-05 (quoting *Abbott*, 585 U.S. at 610-11). The shortened process was consistent with the Legislature's political aim to redistrict in time for the 2026 elections. *Supra* p.1.

Plaintiffs also fault the 2026 Plan specifically for alleged irregularities. They contend (at 10) that it is irregular to split Shelby County across three congressional districts. *See, e.g.*, Comp. ¶87. But Plaintiffs' own expert shows Shelby County has been historically split across three districts. *See* Barber Decl. at 27-28. A Democrat-controlled legislature

18

did the same thing in 2002. *Id*. More broadly, explained above, Plaintiffs cannot laud any supposed "quantitative analysis," *contra* PI Mem. 9-10, when that analysis does not even attempt to disentangle politics from race. *See, e.g.*, *Lee*, 746 F. Supp. 3d at 506 (finding obvious alternative political explanation for Nashville-area districts).

### 4. Plaintiffs have not carried their burden to establish discriminatory effect.

Plaintiffs also cannot show discriminatory "effect," which is a separate element of their claim. *Alexander*, 602 U.S. at 39. The Court need not reach this question of effects when Plaintiffs have not shown racial purpose. *See, e.g.*, *Lee*, 746 F. Supp. 3d at 501 (declining to reach effects when Plaintiffs failed to plead unlawful purpose). Should the Court reach the question of effects, Plaintiffs have not proved effects using the right "baseline" for measuring the 2026 Plan's effect on minority voters. *See Callais*, 146 S. Ct. at 1154-55 (clarifying the "effects" test in the §2 context). That "baseline" is "the chance enjoyed by nonminority voters to secure the election of their preferred candidates" while accounting for politics. *Id*. Plaintiffs nowhere account for politics. *Supra* I.B.1-2. For districts redrawn to be heavily Republican, making it difficult to elect Democrats, that would be a permissible *political* effect, not a racial one. *See Callais*, 146 S. Ct. at 1154-55, 1156-57.

### C. Plaintiffs are unlikely to succeed on the merits of Count II.

Plaintiffs claim the 2026 Plan is unconstitutional First Amendment retaliation and violates their right to associate. Compl. ¶¶110-25. They contend the 2026 Plan "punish[es]

19

citizens for exercising their First Amendment rights." PI Mem. 14. By their telling, "Black voters in Congressional District 9, including Plaintiffs, engaged in protected expression and association when they organized to build political power in Black communities in Memphis and Shelby County" and "encourag[ed] others to vote for candidates and policies not favored by the White-dominated supermajority in control of the Tennessee General Assembly." *Id.* at 15. And by their telling, the State "targeted Memphis" to "creat[e] three separate bizarrely shaped majority-White districts." *Id.* at 16. They say the resulting redistricting Plan is "adverse action" for First Amendment retaliation purposes. *Id.* at 17.

*Rucho* forecloses that First Amendment retaliation claim. In *Rucho*, plaintiffs claimed that the newly drawn districts violated the First Amendment "by intentionally burdening and retaliating against supporters of non-Republican candidates on the basis of their political beliefs and association." *Common Cause v. Rucho*, 279 F. Supp. 3d 587, 606 (M.D.N.C.), *vacated and remanded*, 588 U.S. 684 (2019). They asserted they "face[d] difficulty raising money, attracting candidates, and mobilizing voters to support the political causes and issues such Plaintiffs sought to advance." Rucho, 588 U.S. at 713 (citation omitted). Likewise in *Lamone v. Benisek*, consolidated with *Rucho*, plaintiffs argued districts "violated the First Amendment by diminishing their 'ability to elect their candidate of choice' because of their party affiliation and voting history[.]" *Id.* at 695. The Supreme Court rejected those theories in unequivocal terms: "The First Amendment test simply

20

describes the act of districting for partisan advantage. It provides no standard for determining when partisan activity goes too far." *Id*. at 714. The First Amendment retaliation claim "offer[ed] no 'clear' and 'manageable' way of distinguishing permissible from impermissible partisan motivation." *Id.* at 714-15. Courts are not equipped to answer questions about how much is too much political fairness. For instance, "[i]f a districting plan protected half of the incumbents but redistricted the rest into head to head races, would that be constitutional?" *Id.* at 708.

Try as they might (at 20-21), Plaintiffs cannot distinguish their First Amendment theories—challenging the redrawing of district lines for stated political reasons—from the theories rejected in *Rucho.* Plaintiffs contend (at 17-20) that the 2026 Plan's "reassign[ing]" them from District 9 to another district "depriv[ed] them of the right to vote for—and be represented by—their sitting congressional representative." That was the theory rejected in *Rucho. See* 588 U.S. at 713-14; *accord Zielasko v. Ohio*, 873 F.2d 957, 961 (6th Cir. 1989) ("no one is guaranteed the right to vote for a specific individual"). Likewise, Plaintiffs' theory that redrawn districts deprived them "the right to associate with like-minded citizens in their neighboring communities," PI Mem. at 18-19, is foreclosed. "[T]here are no restrictions on speech, association, or any other First Amendment activities in the districting plans at issue. The plaintiffs are free to engage in those activities no matter what the effect of a plan may be on their district." *Rucho*, 588 U.S. at 713–14.

21

And while Plaintiffs cite (at 16-17, 20-21) a smattering of First Amendment cases as part of their insistence that this is not a "partisan gerrymandering" case like *Rucho*, none is analogous.[15] The Supreme Court case that addresses Plaintiffs' claim is *Rucho*. And *Rucho* says that claim must be dismissed. 588 U.S. at 713-16.

**II.** *Purcell* **precludes Plaintiffs' extraordinary request for preliminary relief.**

Plaintiffs' requested relief would have the effect of stopping ongoing preparations mid-stream. *Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam), precludes any such order. Just as the Supreme Court stayed and summarily reversed a federal court that stopped ongoing preparations after mid-decade redistricting in Texas, it would be error to stop Tennessee's. *See Abbott*, 146 S. Ct. at 419; *Abbott*, 2026 WL 1127246. The Supreme Court "has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*,

---

[15] *See, e.g.*, *Elrod v. Burns*, 427 U.S. 347, 356 (1976) (plurality op.) (public employees arguing they were fired in retaliation for expressing their political beliefs); *Hartman v. Moore*, 547 U.S. 250, 256 (2006) (retaliatory prosecution after plaintiff lobbied for changes to Postal Service technology); *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 198 (2024) (retaliation for plaintiffs' Second Amendment beliefs); *Anders v. Cuevas*, 984 F.3d 1166, 1176 (6th Cir. 2021) (alleged retaliation after state internal affairs investigation); *Gomillion v. Lightfoot*, 364 U.S. 339 (1960) (examining districts that could be understood only by *race* alone); *see also Lubin v. Panish*, 415 U.S. 709, 716 (1974) (just because "a voter hopes to find on the ballot a candidate who comes near to reflecting his policy preferences," that does "not mean every voter can be assured that a candidate to his liking will be on the ballot"); *accord Jackson v. Tarrant County*, 158 F.4th 571, 593 (5th Cir. 2025) ("[W]e are aware of no cases applying Anderson-Burdick to redistricting decisions.").

589 U.S. 423, 424-25 (2020) (per curiam); *see Merrill v. Milligan*, 142 S. Ct. 879, 879 (2022) (Mem.) (Kavanaugh, J., concurring) ("[F]ederal appellate courts should stay injunctions when, as here, lower federal courts contravene th[e] [*Purcell*] principle."). As early as *Reynolds v. Sims*, the Supreme Court has emphasized federal courts must stay their hand. 377 U.S. 533, 585 (1964); *see Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003) (per curiam). Here too, implementation of the 2026 Plan is ongoing, and new candidates have already finished qualifying. Dodd Decl. ¶¶13-16, 18-20. *Purcell* would compel a stay of any order stopping those election preparations mid-stream. *See Abbott*, 146 S. Ct. at 419; *Merrill*, 142 S. Ct. at 879; *see also Ardoin v. Robinson*, 142 S. Ct. 2892 (2022); *Robinson v. Callais*, 144 S. Ct. 1171 (2024).

### III. Plaintiffs cannot satisfy the remaining preliminary injunction factors.

"[A] preliminary injunction does not follow as a matter of course" even if Plaintiffs could show they were likely to succeed on the merits. *Benisek v. Lamone*, 138 S. Ct. 1942, 1943 (2018) (per curiam). The remaining preliminary injunction factors preclude that extraordinary preliminary relief. *Lucky Land Mgmt.*, 134 F.4th at 885.

**A.** Plaintiffs cannot show they are "*likely* to suffer irreparable harm in the absence of preliminary relief." *Glowco*, 958 F.3d at 536 (emphasis added); *accord Memphis A. Philip Randolph Inst. v. Hargett*, 978 F.3d 378, 391 (6th Cir. 2020) (irreparable harm requires "both certain and immediate" injury, not "speculative or theoretical"). It is Plaintiffs, not the

23

State, who have called for a re-sorting of congressional districts for race-based reasons. *See, e.g.*, Compl. ¶6. As for Plaintiffs' claimed First Amendment harms, "no one is guaranteed to vote for a[ny] specific individual," *Zielasko*, 873 F.2d at 961, and district lines themselves do not stop Plaintiffs from supporting whatever candidates they choose, *Rucho*, 588 U.S. at 713-14; *see also Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000) ("[A] finding that there is simply no likelihood of success on the merits is usually fatal.").

**B.** Any balancing of the harms further compels the denial of Plaintiffs' requested relief. Because Defendants are government officials, the balance-of-equities and public-interest factors "merge." *Wilson v. Williams*, 961 F.3d 829, 844 (6th Cir. 2020). It is "in the public interest" to enforce the State's democratically enacted laws, *Thompson v. DeWine*, 976 F.3d 610, 619 (6th Cir. 2020), and "any time" such a law is enjoined, the State "suffers a form of irreparable injury," *Lichtenstein v. Hargett*, 489 F. Supp. 3d 742, 787 (M.D. Tenn. 2020) (cleaned up); *see L.W. v. Skrmetti*, 73 F.4th 408, 421 (6th Cir. 2023) (granting stay pending appeal) ("Tennessee will suffer irreparable harm from its inability to enforce the will of its legislature.").

That is doubly true in the election context. The "inability" to conduct elections under a "duly enacted" redistricting plan "clearly inflicts irreparable harm" on the State and

24

the members of the public it represents. *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018); *Veasey v. Perry*, 769 F.3d 890, 896 (5th Cir. 2014) ("[T]he State has a significant interest in ensuring the proper and consistent running of its election machinery, and this interest is severely hampered by [an] injunction."). The Supreme Court regularly stays injunctions against redistricting plans to preserve the status quo until appellate review concludes, *Abbott*, 146 S. Ct. at 419, even in circumstances where appellate review came out in Plaintiffs' favor, *see, e.g., Robinson*, 144 S. Ct. at 1171; *Merrill*, 142 S. Ct. at 879.

Redistricting "is a legislative task" that "courts should make every effort not to pre-empt." *Wise v. Lipscomb*, 437 U.S. 535, 539-40 (1978) (White, J.) (collecting cases); *accord Wygant v. Lee*, ___ S.W.3d ___, 2025 WL 3537313, at *25 (Tenn. Dec. 10, 2025). The 2026 Plan and the associated changes to the State's election laws, all enacted by the General Assembly, are themselves "a declaration of public interest." *Virginian Ry. Co. v. Sys. Fed'n No. 40*, 300 U.S. 515, 552 (1937); *see Berman v. Parker*, 348 U.S. 26, 32 (1954) ("when the legislature has spoken, the public interest has been declared in terms well-nigh conclusive"). That legislative action is entitled the presumption of good faith that Plaintiffs here have not overcome. *See, e.g., Alexander*, 602 U.S. at 6, 10-11; *cf. Williamson v. Lee Optical of Okla.*, 348 U.S. 483, 487-88 (1955); *Walters v. Nat'l Ass'n of Radiation Survivors*, 468 U.S. 1323, 1324 (1984) (Rehnquist, J., in chambers) (presumption is a factor "to be considered in favor of applicants in balancing hardships").

25

## CONCLUSION

For all these reasons, the Court should deny Plaintiffs' motion for preliminary injunction.

Dated: May 27, 2026

Respectfully submitted,

JONATHAN SKRMETTI
Attorney General and Reporter

/s/ *Zachary L. Barker*
ZACHARY L. BARKER (BRP #035933)
*Senior Assistant Attorney General*

ANDREW DENNING (BPR #042208)
*Assistant Attorney General*
Office of the Tennessee Attorney General
P.O. Box 20207
Nashville, Tennessee 37202-0207
Phone: (615) 532-7400
Zachary.barker@ag.tn.gov
Andrew.denning@ag.tn.gov
(615) 532-4098

TAYLOR A.R. MEEHAN*
BRYAN K. WEIR*
OLIVIA C. ROGERS*
Consovoy McCarthy PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
taylor@consovoymccarthy.com
bryan@consovoymccarthy.com
orogers@consovoymccarthy.com

* Admitted pro hac vice

*Counsel for Defendants*

27