# EXHIBIT 3

# Expert Report of Michael Barber, PhD

Dr. Michael Barber
Brigham Young University
724 Spencer W. Kimball Tower
Provo, UT 84604
barber@byu.edu

Case 3:26-cv-00616    Document 43-3    Filed 05/27/26    Page 2 of 42 PageID #: 672

# Contents

1 Introduction and Qualifications      3

2 Summary of Conclusions      4

3 Political Geography of Tennessee      6

4 2026 Congressional Map      11

5 Simulation Results      17

6 Race and Partisanship      24

7 Plaintiffs' Experts      26

   7.1 Dr. Cervas . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

   7.2 Dr. Oskooii . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

   7.3 Ms. Krishnaswami . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Case 3:26-cv-00616    Document 43-3    Filed 05/27/26    Page 3 of 42 PageID #: 673

# 1 Introduction and Qualifications

I have been asked by legal counsel for the Defendants to evaluate the 2026 Tennessee congressional map and respond to Plaintiffs and their experts.

I am a professor of political science at Brigham Young University and director of the Center for the Study of Elections and Democracy in Provo, Utah. I received my PhD in political science from Princeton University in 2014 with emphases in American politics and quantitative methods/statistical analyses. In my position as a professor of political science, I have conducted research on a variety of election- and voting-related topics in American politics and public opinion. Much of this research has been published in my discipline's top peer-reviewed journals. I have published more than 20 peer-reviewed articles.

I have worked as an expert witness in a number of redistricting cases in which I have been asked to analyze and evaluate various political and geographic-related data and maps, including in New York, Ohio, Pennsylvania, Louisiana, Alabama, North Carolina, and Georgia. I also served as the court-appointed Mapping Special Master in Michigan to draw remedial districts for the Michigan House of Representatives. I have previously provided expert reports in several other cases related to voting rights, redistricting, and other election-related issues for groups representing both Republican and Democratic interests. Cases in which I have testified at trial or by deposition are listed in my CV, which is attached to the end of this report.

The analysis and opinions I provide below are consistent with my education, training in statistical analysis, and knowledge of the relevant academic literature. These skills are well-suited for this type of analysis in political science and quantitative analysis more generally. My conclusions stated herein are based upon my review of the information available to me at this time and sources have been cited throughout. I am being compensated at a rate of $400.00 per hour. My compensation does not depend in any way on the outcome of the case or on the opinions or testimony that I provide. My opinions expressed herein are my own and do not represent the opinions of Brigham Young University or the Center for

the Study of Elections and Democracy. I reserve the right to update and revise this report as new information becomes available.

# 2 Summary of Conclusions

Based on the evidence and analysis presented below, I draw the following conclusions regarding the 2026 congressional map passed by the Tennessee General Assembly.

- Tennessee has nine congressional districts, and the 2026 Plan creates nine Republican-leaning districts. The least Republican-leaning district in the 2026 Plan is District 9, with an average Republican two-party vote share of approximately 57 percent across six recent statewide elections.

- Tennessee's political geography is defined by broad Republican strength across most of the state and concentrated Democratic strength in Davidson County and Shelby County. Davidson County contains Nashville, and Shelby County contains Memphis.

- The 2026 Plan achieves nine Republican-leaning districts by dividing Democratic voters in both Davidson County and Shelby County across three congressional districts and combining those portions with more Republican areas elsewhere in Tennessee. The parallel treatment of Davidson and Shelby Counties is consistent with a partisan strategy aimed at dividing Democratic voters where they are most geographically concentrated.

- Shelby County's population is too large to be contained wholly within a single congressional district, so any equal-population congressional plan must divide Shelby County across at least two districts. A three-way division of Shelby County is not historically unprecedented. Several historical congressional plans divided Shelby County across three districts.

4

- Computer-simulated redistricting plans (or simulations) can be used to draw conclusions about the 2026 Plan. If a computer is programmed to draw districts without any consideration of partisanship, those computer simulations do not produce districts with the same partisan lean as the 2026 Plan. None of 10,000 statewide simulated plans, programmed without any consideration of partisanship, creates nine Republican-leaning districts. These simulations almost always divide Shelby County across two districts rather than three.

- The statewide simulations show that the 2026 Plan departs from what one would ordinarily expect from traditional race- and party-blind districting criteria. That fact alone, however, does not determine whether race or party explains the enacted lines.

- Simulations focused on Shelby County address that question more directly. Once the 2026 Plan's broader western Tennessee structure is held fixed, when Shelby County is divided across Districts 5, 8, and 9, a race-blind algorithm frequently produces districts with racial compositions similar to the enacted districts when the simulated plans closely resemble the 2026 Plan's partisan performance.

- Race and political preference are strongly related in Tennessee's precinct-level election returns. Across recent statewide elections, the correlation between a precinct's Black voting-age population percentage and its average Democratic two-party vote share is approximately 0.82. This strong relationship means that a plan designed to divide Democratic voters in Shelby County can also have the effect of dividing Black voters Black voters.

- Plaintiffs' experts identify demographic effects of the 2026 Plan, especially for voters in Memphis and Shelby County. But their analyses do not adequately disentangle race from party. Dr. Cervas's second set of simulations establish an unconditional partisan- and race-neutral baseline, but they do not account for the State's apparent

5

partisan objective of creating nine Republican-leaning districts.[1] Dr. Oskooii's racial polarization and performance analyses show that Black voters overwhelmingly support Democratic candidates, but general election racial polarization does not separate race from partisanship where race and party are highly correlated. Ms. Krishnaswami's visual analysis illustrates the geographic effects of the plan, but does not consider whether party explains the district boundaries

- In my opinion, the evidence I have reviewed is more consistent with a plan designed to achieve a partisan objective by dividing Tennessee's largest concentrations of Democratic voters. Because Black voters in Shelby County are also heavily Democratic voters, that partisan strategy has racial effects. But the racial composition of enacted Districts 5, 8, and 9 is not sufficient, by itself, to show that race rather than party explains the enacted lines.

# 3 Political Geography of Tennessee

Before evaluating the 2026 congressional plan, it is important to describe the basic political geography of Tennessee. The location of population, the geographic concentration of voters, and the relationship between population density and partisan voting patterns all shape the range of possible districting plans.

Figure 1 shows the population density of Tennessee counties. The state's population is not evenly distributed. A large share of Tennessee's population is concentrated in and around its major urban counties, especially Davidson County, which contains Nashville, and Shelby County, which contains Memphis. Collectively, Davidson and Shelby Counties contain 1,645,628 people, which is approximately 24 percent of Tennessee's 2020 Census population.

Figure 2 shows the same counties by their average Democratic two-party vote share across six recent statewide elections. The elections included in this index are the 2024

---

[1]The first set of simulations presented by Dr. Cervas were not race neutral. His second, corrected, set were race netrual. However, neither considered partisanship.

presidential and U.S. Senate elections, the 2020 presidential and U.S. Senate elections, and the 2018 U.S. Senate and gubernatorial elections. I calculate the Democratic two-party vote share as the Democratic candidate's votes divided by the total votes cast for the Democratic and Republican candidates.

The geographic pattern is clear. Most Tennessee counties are Republican-leaning, while the state's Democratic voters are concentrated disproportionately in a small number of urban counties. Davidson and Shelby Counties are the two most prominent examples. They are among the state's largest population centers, and they are also two of the most Democratic counties in the state.

This political geography is important for evaluating the 2026 Plan. A mapmaker seeking to draw a congressional plan with nine Republican-leaning districts would have to address the fact that Democratic voters are heavily concentrated in Davidson and Shelby Counties. Because those Democratic voters are geographically concentrated, they can either be kept together in one or more Democratic-leaning districts or divided across multiple districts and joined with more Republican voters elsewhere in the state.

Table 1: Population and Political Geography of Davidson and Shelby Counties

| County | Major City | 2020 Population | Share of State Population | BVAP |
|---|---|---|---|---|
| Davidson | Nashville | 715,884 | 10.4% | 24.1% |
| Shelby | Memphis | 929,744 | 13.5% | 51.4% |

The comparison between Davidson and Shelby Counties is especially informative. Both counties have large Democratic concentrations but they differ in racial composition, where Davidson County is majority-white while Shelby County is majority-Black. One would expect a plan that is racially motivated to treat Davidson County (majority-white) differently than Shelby County (majority-Black). Conversely, one would expect a plan that is politically motivated to treat both counties similarly because, despite their different racial composition, both are highly Democratic. If a plan divides both counties in similar ways, that pattern is consistent with a statewide partisan strategy aimed at dividing Democratic voters where

they are most concentrated. The fact that such a strategy has racial consequences in Shelby County does not, by itself, establish that race rather than party explains the districting choices.

This distinction is particularly important in light of the Supreme Court's decisions in *Alexander v. South Carolina State Conference of the NAACP* and *Louisiana v. Callais.* My understanding of those decisions is that they direct experts to disentangle race from politics where race and party are closely correlated. The political geography shown in Figure 1 and 2 provides the background for that inquiry in Tennessee. The state contains broad Republican strength across most counties, but concentrated Democratic strength in heavily populated Davidson and Shelby Counties. The 2026 Plan should therefore be evaluated against this geographic and partisan baseline.

8



Figure 1

Population Density of Tennessee
County–level

9

Figure 2

**Political Geography of Tennessee**
County–level average Democratic two–party vote share across recent statewide elections



Democratic
vote share

70%
60%
50%
40%
30%
20%
10%

# 4    2026 Congressional Map

Figure 3 shows a map of the 2026 congressional districts, colored by their partisan lean. Each of the nine districts is colored red, indicating that it is Republican leaning. Using the six election index described above, the most Republican district is District 1 (77.6% Republican) in the eastern side of the state and the least Republican district is District 9 in the bottom of the state (57.0% Republican).

Figure 4 shows partisan lean of each district in the 2026 Plan compared to the partisan lean of the districts in the 2022 map. The largest difference is that under the 2022 map, District 9 was heavily Democratic, with a Republican lean of approximately 27%. In the 2026 map, District 9 is now Republican leaning, with a Republican partisan lean of approximately 57%. In the 2026 map, all 9 districts have a Republican lean of at least 57%.

Note that Figure 2 above showed that Davidson and Shelby counties are both strongly Democratic leaning. The Enacted Map takes those strongly Democratic areas and creates nine Republican-leaning districts by dividing the Democratic voters of these two counties and joining them with Republican voters in the more suburban and rural counties of the state. In both cases both counties are divided across three districts, splitting Democrats across the three districts. Figure 5 shows the way in which each of these two Democratic-leaning counties are divided and the partisan lean of the precincts in each county. There are groups of blue, Democratic precincts assigned to each of the three districts that span both Shelby and Davidson counties. The division of each county in this way is consistent with an effort to create nine Republican-leaning districts by dividing the state's two largest concentrations of Democratic voters and combining portions of those counties with more Republican areas.

11



**Partisan Lean of 2026 Tennessee Congressional Districts**
Average Republican two–party vote share across six recent statewide elections

Figure 3

District labels show district number and average Republican two–party vote share.

Republican vote share: 80%, 75%, 70%, 65%, 60%, 55%, 50%

Case 3:26-cv-00616     Document 43-3     Filed 05/27/26     Page 13 of 42 PageID #: 683

## Figure 4: Partisan Lean of 2022 and 2026 Congressional Plans

### (a) 2022 Plan

### (b) 2026 Plan



Points show average Republican vote shares across six recent statewide elections. Grey horizontal lines show range of outcomes.

## Figure 5: County Splits in 2026 Plan

(a) Shelby County　　　　　　　　　　(b) Davidson County



District boundaries are shown in red lines. Precincts are colored by partisan lean, blue indicates Democratic-leaning precincts and Red indicates Republican-leaning precincts.

This comparison is instructive because Davidson County does not have a majority-Black population. This parallel treatment is consistent with a partisan explanation for the plan's structure. Each is a large Democratic county, each is divided across three congressional districts, and each is joined with more Republican areas outside the county. The map divides Democratic voters where they are most geographically concentrated, regardless of whether those Democratic voters are located in a majority-Black county or not.

In dividing Shelby County across Districts 5, 8, and 9, Dr. Oskooii reports several measures of how Black voters in Shelby County and Memphis are distributed across the three districts. Plaintiffs emphasize that the shares of Memphis's BVAP assigned to Districts 5 and 9 are nearly identical. Standing alone, I do not regard the similarity of two racial percentages as sufficient evidence that race, rather than party, explains the district lines. The relevant empirical question is whether the same pattern is also consistent with a partisan objective. Because race and party are strongly correlated in Shelby County and Memphis, a plan that divides Democratic voters in Memphis will also have the effect of dividing Black voters. For that reason, any assessment of the racial distribution should be paired with a corresponding assessment of the partisan distribution to rule out partisan explanations before assuming racial intentions.

Table 2 shows that the division of Shelby County and Memphis is not only a division of BVAP. It is also a division of Democratic votes. Memphis's Democratic votes are distributed across Districts 5, 8, and 9 at 36.2 percent, 32.4 percent, and 31.4 percent, respectively.[2] Shelby County's Democratic votes are distributed across the same three districts at 25.6 percent, 43.1 percent, and 31.4 percent, respectively. These figures are consistent with the broader structure of the 2026 Plan: Democratic voters in Shelby County and Memphis are divided across three Republican-leaning districts.

---

[2]Given time constraints for these expedited proceedings, I have used the 2024 Presidential election for these comparisons.

Table 2: Shelby County and Memphis Contributions by District

| | District 5 | District 8 | District 9 |
|---|---|---|---|
| *BVAP* | | | |
| % of Shelby County's BVAP | 33.1% | 26.7% | 40.3% |
| BVAP of Shelby County Portion of District | 70.4% | 29.0% | 72.9% |
| Shelby County contribution to district total BVAP | 73.8% | 62.0% | 79.6% |
| % of Memphis' BVAP | 39.7% | 20.5% | 39.8% |
| BVAP of Memphis Portion of District | 71.7% | 35.4% | 80.2% |
| Memphis contribution to district total BVAP | 71.6% | 38.8% | 63.8% |
| *Total Population* | | | |
| % of Shelby County's Total Population | 23.8% | 47.3% | 28.9% |
| % of Memphis' Total Population | 33.5% | 35.1% | 31.4% |
| Shelby County contribution to district total population | 28.8% | 57.3% | 35.0% |
| Memphis contribution to district total population | 27.6% | 28.9% | 25.9% |
| *Democratic Votes* | | | |
| % of Shelby County's Democratic votes | 25.6% | 43.1% | 31.4% |
| % Democratic of Shelby County Portion of District | 84.2% | 48.4% | 79.2% |
| Shelby County contribution to district total Democratic votes | 43.5% | 68.9% | 50.7% |
| % of Memphis' Democratic votes | 36.2% | 32.4% | 31.4% |
| % Democratic of Memphis Portion of District | 86.9% | 60.0% | 88.7% |
| Memphis contribution to district total Democratic votes | 42.3% | 35.6% | 34.9% |

# 5 Simulation Results

Computer simulations provide a way to compare an enacted districting plan to many alternative plans that could have been drawn under a specified set of rules. A congressional plan is, at its most basic level, an assignment of geographic units to congressional districts. In this analysis, the geographic units are precincts. Each precinct has a population, a location on the map, election returns, and demographic information. A simulated plan assigns each precinct to one of Tennessee's nine congressional districts while satisfying the rules given to the algorithm.

The purpose of the simulation is not to identify the single best map. Rather, the purpose is to create a large set of comparison maps. These comparison maps provide a baseline for evaluating whether the enacted plan is typical or unusual relative to plans drawn under the same stated criteria. If the enacted plan looks very different from the simulated plans, that suggests the enacted plan is doing something not captured by the simulation criteria. If the enacted plan resembles the simulated plans, that suggests the enacted plan is consistent with those criteria.

I first conduct a statewide simulation analysis without any considerations of race or partisanship. Here I used precinct-level geography and precinct-level election and demographic data. The statewide simulation used the following parameters. The number of districts was set to nine, corresponding to Tennessee's nine congressional districts. The districts are required to be geographically contiguous, and the districts were required to be within one-half of one percent of the ideal district population of 767,871 people.[3] I also instructed the algorithm to draw districts that give weight to geographic compactness. The algorithm was also instructed to consider county boundaries by avoiding splitting counties if possible. This does not absolutely forbid county splits, since some county splits are nec-

---

[3]Which is approximately 4,000 people. It is common in redistricting simulations in academic publications as well as redistricting litigation to allow for a small degree of population deviation to allow the algorithm to function correctly. It is not intended as a statement about the maximum legally permissible population deviation for an enacted congressional plan. In a State-enacted redistricting plan, such as Tennessee's, the population deviation is 0%.

essary to draw equal-population congressional districts, but it encourages plans that avoid unnecessary county splits.

The statewide simulations were conducted using the Sequential Monte Carlo (SMC) method implemented in the computer statistical program R. In ordinary terms, the algorithm repeatedly builds complete districting plans by assigning neighboring precincts to districts while respecting the constraints described above. Each completed plan is one possible congressional map. I generated 10,000 such plans. Importantly the computer draws these districts without any knowledge of partisanship or race. This gives us an idea of what we would expect to see if 10,000 people were asked to produce a map from a relatively blank slate that followed traditional redistricting criteria, without considering partisanship or race.

Only after constructing the simulated districts does the computer then calculate the partisan composition of each district. To measure partisan performance, I used the election index based on six recent statewide elections described earlier in this report. I then ranked districts within each simulated plan from least Republican to most Republican. Ranking the districts in this way allows for a fair comparison across thousands of simulated plans, since the district numbers assigned by a computer simulation are arbitrary. The least Republican district in each simulated plan can be compared to the least Republican district in the 2026 Plan, the second-least Republican district can be compared to the second-least Republican district in the 2026 Plan, and so on.

The results of these simulations are presented below in Figure 6. The figure shows how the partisan performance of the 2026 Plan compares to the distribution of simulated plans that do not consider partisanship. Each black point represents one simulated district from one simulated plan. The districts are ranked from least Republican to most Republican within each simulated plan, so the first column shows the least Republican district in each plan, the second column shows the second least Republican district, and so on. The vertical position of each point shows that district's Republican two-party vote share. The gray squares show the median Republican vote share among the 10,000 simulated districts at

each rank. The orange diamonds show the corresponding districts in the enacted 2026 Plan. The dashed horizontal line marks 50 percent Republican vote share. Points above that line are Republican-leaning districts, while points below it are Democratic-leaning districts. The figure therefore allows a direct comparison between the 2026 plan and the range of outcomes produced by the simulation process that does not consider partisanship.

The main takeaway from Figure 6 is that these party-free simulations do not produce the partisan structure of the 2026 Plan. The simulated plans are contiguous, nearly equal in population, reasonably compact, and attentive to county boundaries. None of the 10,000 simulated plans creates nine Republican-leaning districts.[4] Each simulated plan contains at least one, and often two, Democratic-leaning districts. In Figure 6, those districts are represented by black dots below the 50% Republican vote-share line.

I also calculated the number of districts that include a portion of Shelby County in each simulated plan. Because Shelby County's population is larger than the ideal congressional district population, any equal-population congressional map must split Shelby County across at least two districts. In the statewide simulations, Shelby County is split across two districts in all but two of the 10,000 plans. In those two plans, Shelby County is split across three districts. These results support the inference that a nine-Republican-district plan is not produced by accident. The traditional race- and party-blind criteria used in the statewide simulation. They also show why the three-way division of Shelby County is essential to the partisan structure of the 2026 Plan. Shelby County was divided across three congressional districts in several post-equal-population congressional plans, including the 1966, 1968–1970, 1972–1974, 1982–1990, 1992–2000, and 2002–2010 plans. Not all three-way splits of Shelby County will yield 3 Republican-leaning districts in western Tennessee, but all maps with 3 Republican districts in western Tennessee will require splitting Shelby County three times.

---

[4]Even when increasing the number of maps, the simulation software cannot produce a sufficient number of statewide simulations that approximate the political lean of the 2026 Plan. Dr. Cervas also presents simulation results from the ALARM Project. I understand those simulations to provide a similar unconditional benchmark: they show what plans commonly emerge from traditional partisan- and race-neutral districting criteria. They do not, however, condition on a partisan objective such as creating nine Republican-leaning congressional districts.

Figure 6



Black points show simulated districts. Gray squares show the simulation median at each rank. Orange diamonds show enacted Districts. Districts are ranked within each plan from lowest Republican vote share to highest.

The central feature of Plaintiffs' claim is the division of Shelby County across three congressional districts which they suggest is race-based. It is therefore useful to ask a more targeted question: what happens if a computer algorithm divides Shelby County across three districts without using racial data, while holding fixed the non-Shelby County portions of 2026 enacted Districts 5, 8, and 9 and the six districts that do not touch Shelby County? In other words, if the computer is given the 2026 Plan's broader western Tennessee structure and asked to allocate Shelby County precincts among Districts 5, 8, and 9 in a way that produces contiguous and nearly equal-population districts, what kinds of district configurations

20

result?[5]

This conditional simulation is not a full statewide simulation. It deliberately conditions on the 2026 Plan's broader structure outside Shelby County. The statewide simulations answer whether traditional districting criteria, without race or party, would ordinarily divide Shelby County three ways. They generally would not. The conditional simulation asks a different question: can the Shelby County splits be explained by partisan considerations alone?

The algorithm divides Shelby County without using racial data or partisan election data. Race and party are used only after the simulated plans are drawn, in order to evaluate the resulting districts. When the algorithm is asked to divide Shelby County under this conditional setup, the partisan lean of the simulated districts clusters much more closely around the partisan lean of Districts 5, 8, and 9, as shown in Figure 7.

Even in the conditional Shelby County simulations, many simulated plans still produce at least one district that is less Republican-leaning than the least Republican district in the 2026 Plan. These appear in Figure 7 as black dots below the orange diamond in the first column, especially those below the 50% line. For the next analysis, I focus on the subset of simulated plans that approximate the 2026 Plan's partisan performance. Specifically, I retain plans in which the least Republican-leaning district is within two percentage points of the 2026 Plan's least Republican-leaning district. The least Republican-leaning district in the 2026 Plan is District 9, with a Republican partisan index of 56.95%. This leaves approximately 30,000 simulated plans. The question is whether, among this subset of race-blind simulated plans with similar partisan performance, the racial composition of the simulated districts resembles the racial composition of enacted Districts 5, 8, and 9, or is different.

Figure 8 shows that race-blind simulations with similar partisan characteristics as the 2026 Plan resemble the racial balance of the 2026 Plan. Among conditional simulated plans

---

[5]For this analysis I use the same parameters and constraints as in the statewide simulation, but increase the number of maps from 10,000 to 100,000 to allow for more variation and exploration of possible alternatives by the algorithm since the algorithm is only exploring options within a single county and not statewide.

Figure 7



### Distribution of Republican Vote Share by District Rank

Black points show simulated districts.
Grey squares show simulation medians at each rank.
Orange diamonds show 2026 enacted districts.

Black points show simulated districts. Gray squares show the simulation median at each rank. Orange diamonds show enacted Districts 5, 8, and 9. Districts are ranked within each plan from least Republican to most Republican.

that resemble the 2026 Plan's partisan performance, the BVAP distribution of the race-blind simulated districts is similar to the BVAP distribution of the 2026 Plan. This result is important because the algorithm did not use racial data to draw the districts. That means the racial balance is better understood only as an effect of the partisan considerations.[6]

These analyses support three conclusions. The statewide race- and party-blind simulations do not produce a nine-Republican-district plan, and they almost never split Shelby

---

[6]Of note, this is also true when comparing the BVAP of the enacted map to the full set of 100,000 simulations in Shelby County, regardless of if the simulation result is within 2 percentage points of the district's partisan lean.

22

Figure 8



Black points show simulated districts. Gray squares show the simulation median at each rank. Orange diamonds show enacted Districts 5, 8, and 9. Districts are ranked within each plan from lowest BVAP to highest BVAP.

County across three districts. This supports the conclusion that a nine-Republican-district structure requires the three-way division of Shelby County. Second, once Shelby County is divided across three districts and joined to the non-Shelby portions of enacted Districts 5, 8, and 9, race-blind simulated plans can produce districts that resemble the 2026 Plan's partisan structure, although not all such plans do so. Third, among the race-blind conditional simulations that do resemble the 2026 Plan's partisan performance, the simulated districts also have a racial profile similar to the 2026 Plan. In my view, this shows that the racial composition of enacted Districts 5, 8, and 9 is consistent with a race-blind effort to achieve

23

the 2026 Plan's partisan structure.

These simulation results are directly relevant to the inquiry described in *Alexander* and *Callais*. The statewide simulations show that the 2026 Plan departs from what one would ordinarily expect from race- and party-blind traditional districting criteria. But that fact alone does not disentangle race from politics. These conditional Shelby County simulations show that, once the 2026 Plan's partisan structure is approximated, a race-blind algorithm often produces districts with racial compositions similar to the 2026 Plan. In my view, this means that the racial profile of the 2026 Plan is not sufficient, by itself, to show that race rather than party explains the lines. The evidence is more consistent with a plan designed to achieve a partisan objective by dividing a heavily Democratic county, with racial consequences following from the strong relationship between race and party in Shelby County.

# 6  Race and Partisanship

The final issue I address is the relationship between race and partisanship in Tennessee's congressional redistricting. Plaintiffs and their experts place substantial weight on the racial composition of Shelby County and Memphis, as well as on estimates of racially polarized voting. I do not dispute that race and party are strongly related in Tennessee's election returns. Indeed, that relationship is evident in the precinct-level data shown in Figure 9. That is why it is important for any expert analysis to disentangle race and politics.

Figure 9 plots each precinct's Black voting-age population percentage against its average Democratic two-party vote share across recent statewide elections. The relationship is very strong. The correlation between BVAP percentage and Democratic vote share is approximately 0.82. Precincts with low BVAP percentages generally vote heavily Republican, while precincts with high BVAP percentages generally vote heavily Democratic.

This strong relationship between race and party creates a significant inference problem that Plaintiffs' experts overlook. When race and party are highly correlated, a district plan

designed to reduce Democratic electoral performance will have the effect of also moving Black voters, particularly in a place like Shelby County, where Black voters constitute a large share of the Democratic coalition. That fact does not, by itself, show that race rather than party explains the district lines. To reach that conclusion, an analysis must show that race explains the adopted configuration above and beyond partisanship. The analysis must evaluate whether racial composition explains the lines only after accounting for political goals.

Plaintiffs' racially polarized voting evidence does not change that conclusion. Dr. Oskooii estimates that Black voters in District 9 under the 2022 map, and in Districts 5, 8, and 9 under the 2026 map, support Democratic candidates at high rates, while White voters support Republican candidates at high rates. I have no reason to dispute that such general election patterns exist. But those estimates show the same broad fact shown in Figure 9: race and partisan vote choice are highly correlated in Tennessee. General election RPV analyses in which the candidates are Democrats and Republicans do not, by themselves, determine whether a plan was drawn to divide Black voters as Black voters or Democratic voters as Democratic voters. The 2026 Plan's treatment of Davidson County is important in this respect. Davidson County is strongly Democratic, but it is not majority Black. The 2026 Plan divides Davidson County across three districts in much the same strategic partisan manner that it divides Shelby County. This parallel treatment is consistent with a statewide partisan objective to create nine Republican-leaning congressional districts by dividing the two largest Democratic concentrations in the state and combining portions of those counties with more Republican areas. It is not necessary to rely on Shelby County's racial composition alone to explain the basic structure of the plan.

Figure 9



Relationship between Precinct Black Population and Democratic Vote Shares
Correlation = 0.82

## 7    Plaintiffs' Experts

Plaintiffs rely on several expert reports to support the conclusion that the 2026 Plan was motivated by race rather than partisanship. I have reviewed those reports and address them below. I do not dispute that the 2026 Plan substantially changes the configuration of District 9, divides Shelby County and Memphis across three congressional districts, and reduces the Black voting-age population percentage in each of the districts that now contain portions of Memphis. Nor do I dispute that Black voters in Memphis and Shelby County overwhelmingly support Democratic candidates. The central question, however, is whether the expert evidence offered by Plaintiffs shows that race, rather than party, explains the

26

enacted district lines. In my opinion, Plaintiffs' expert reports identify demographic and political consequences of the 2026 Plan, but they do not adequately separate racial effects from partisan effects.

## 7.1 Dr. Cervas

Dr. Cervas analyzes historical Tennessee congressional maps. Dr. Cervas states that, "[p]rior to the 2026 Plan, no congressional redistricting plan since the Memphis area became part of the State of Tennessee has divided Shelby County into more than two districts" (Cervas Report, para 4). He later makes a similar statement, "no redistricting plan has ever split Shelby County or the City of Memphis into more than two districts" (para 23). These statements are incorrect. As the figures below show, Shelby County was divided among three congressional districts in several prior congressional plans considered by Dr. Cervas.[7] The 1966 map divided Shelby County among Districts 7, 8, and 9; the 1968–1970 map again divided Shelby County among Districts 7, 8, and 9; the 1972–1974 and 1976–1980 maps divided Shelby County among Districts 6, 7, and 8; the 1982–1990 map divided Shelby County among Districts 7, 8, and 9; the 1992–2000 map divided Shelby County among Districts 7, 8, and 9; and the 2002–2010 map also divided Shelby County among Districts 7, 8, and 9. I do not include the 1922–1964 map in this comparison because, by the 1960s, that plan was badly malapportioned, and the modern equal-population requirement for congressional districts had not yet been imposed. The more relevant comparison is therefore the post-equal-population period, when congressional districts were required to satisfy substantially equal population. In that period, Shelby County was repeatedly divided across three congressional districts. The 2012–2020 and 2022–2024 plans divided Shelby County across only two districts, but those plans are also unique because they are the first to not include a district entirely within Shelby County. In sum, the historical plans do not support Dr. Cervas's claim. The historical record shows that three-way divisions of Shelby

---

[7]These figures use the same data as Dr. Cervas for Figure 1 of his report but zoom in on Shelby County.

County are not unprecedented.

Figure 10: Historical Division of Shelby County



Dr. Cervas also includes a set of simulated congressional plans from the ALARM Project and a second set that he ran using the data and code from the ALARM project. Neither set of simulations accounts for or attempts to match the 2026 Plan's political considerations. He concludes that adherence to traditional race-neutral districting criteria would essentially guarantee the creation of at least one district in which Black voters have an op-

28

portunity to elect their preferred candidates.[8] He further reports that 90.9 percent of the simulated plans contain at least one district in which Black residents constitute a majority of the voting age population and that 99.9 percent of the simulations create a district where Black voters' preferred candidate would be very likely to win.[9]

I do not dispute that Dr. Cervas's simulations establish an unconditional race- and party-neutral baseline. His results are consistent with my own statewide simulations that also do not consider race or partisanship. When congressional plans in Tennessee are drawn using traditional criteria, without considering race or party, they generally preserve a Memphis- or Shelby-centered district in which Democratic voters have substantial electoral power. That result is not surprising. Shelby County and Memphis contain a large and geographically concentrated Democratic population.

The limitation of Dr. Cervas's analysis is that it does not answer the race-versus-party question presented by this case. His simulations evaluate what plans commonly emerge from traditional race- and party-neutral criteria. They do not, however, accomplish the central political feature of the 2026 Plan: the creation of nine Republican-leaning congressional districts. The 2026 Plan may be an outlier relative to traditional race-neutral criteria and still be explainable by a race-neutral partisan objective. Dr. Cervas's simulations therefore show that the 2026 Plan departs from a partisan-neutral baseline, but they do not show that race, rather than party, explains that departure.

This distinction is important because the political geography of Tennessee makes a nine-Republican-district plan extremely difficult to draw without dividing the state's two largest Democratic areas, Davidson County and Shelby County. Davidson County is strongly Democratic but not majority Black. Shelby County is strongly Democratic and is majority Black. A partisan mapmaker seeking to create nine Republican-leaning districts would have reason to divide both counties. Dr. Cervas's analysis does not evaluate that comparison and does not test whether the enacted treatment of Shelby County resembles what would occur

---

[8]Second Cervas Report, para 7
[9]Second Cervas Report, para 7, 10.

under a race-blind effort to achieve the 2026 Plan's partisan structure.

## 7.2  Dr. Oskooii

Dr. Oskooii provides several analyses: district-level demographic comparisons, compactness and subdivision split comparisons, the distribution of Memphis and Shelby County BVAP across districts, racially polarized voting estimates, electoral performance analysis, and an analysis of the 2022 Democratic gubernatorial primary.[10] I do not dispute the basic descriptive facts, but I do dispute that they show race explains the 2026 Plan. The 2026 Plan eliminates the Democratic-leaning District 9 that existed under the 2022 map, divides the population previously concentrated in District 9 across Districts 5, 8, and 9, and creates three districts in which Black voters constitute between approximately 26 and 31.1 percent of the voting-age population.[11]

Dr. Oskooii also reports that the 2026 Plan is less compact and splits more counties, municipalities, and VTDs than the 2022 Plan.[12] Those facts may show a departure from certain traditional districting criteria. But departures from traditional criteria are also consistent with partisan gerrymandering. A partisan map designed to divide Democratic voters in Davidson and Shelby Counties would likely perform worse on compactness and subdivision-split measures. The compactness and split analyses therefore do not show that the departures were racial rather than partisan in nature.

The problem is that these facts, standing alone, do not distinguish racial intent from partisan intent. Dr. Oskooii emphasizes that Districts 5 and 9 receive nearly identical shares of Memphis's BVAP, with only a 252-person difference between them.[13] That similarity may be visually or rhetorically striking, but it is not sufficient evidence that race rather than party explains the district lines. Memphis's Democratic voters are also divided quite evenly across the three districts. Given the very strong relationship between BVAP and Democratic

[10]Oskooii Declaration, para 12–24.
[11]Oskooii Declaration, para 27–30.
[12]Oskooii Declaration, para 31–55.
[13]Oskooii Declaration, para 61.

voting in Memphis, a plan that divides Democratic voters will also divide Black voters.

Dr. Oskooii's racially polarized voting analysis has a similar limitation. He estimates that Black voters overwhelmingly support Democratic candidates and that White voters overwhelmingly support Republican candidates in recent statewide general elections.[14] I do not dispute that result. Indeed, my own precinct-level analysis shows a strong relationship between BVAP and Democratic vote share. But general elections between Democrats and Republicans are not well suited to separating race from party when race and party are highly correlated. In that setting, estimated racial polarization is also estimated partisan polarization. The analysis shows that Black voters and White voters tend to support different parties. It does not show that the 2026 Plan was drawn because of race rather than because of Democratic voting behavior.

The electoral performance analysis suffers from the same problem. Dr. Oskooii concludes that Black-preferred candidates would generally lose in Districts 5, 8, and 9 under the 2026 Plan.[15] But those districts are now Republican-leaning districts. Since Black-preferred candidates are Democratic candidates in Tennessee, their losses follow directly from the partisan composition of the districts. The performance analysis therefore confirms that the 2026 Plan reduces Democratic electoral opportunity in Shelby County and Memphis. It does not establish that the plan's lines are better explained by race than by party.

Dr. Oskooii's analysis of the 2022 Democratic gubernatorial primary is potentially more relevant because that contest was a biracial Democratic primary rather than a Democratic-versus-Republican general election.[16] Still, I would give that analysis limited weight for purposes of evaluating the 2026 congressional plan.

First, Figure 16 of Dr. Oskooii's report shows Black and White Democratic primary voters' preferences in the 2022 District 9 that was almost entirely within Shelby County. That figure shows that White Democratic voters did not cast a majority of their ballots for

---

[14]Oskooii Declaration, para 62–76.
[15]Oskooii Declaration, para 97–102.
[16]Oskooii Declaration, para 103–104.

any candidate, which suggests a lack of cohesion among this group of Democratic primary voters in Shelby County. Second, Figure 16 shows that White Democrats did cast a majority of their ballots for the two Black candidates on the ballot, as did Black Democratic voters. This shows a lack of racial polarization between White and Black Democratic voters in Shelby County.

Figures 18 and 19 broaden the area under consideration from Shelby County to the 38 counties that Districts 5, 8, and 9 cover in western Tennessee. Here there is stronger support for Martin among White Democrats than when looking at Shelby County alone. This suggests that White Democrats in Shelby County may have different preferences than White Democrats in the rest of Western Tennessee. More importantly, a Democratic primary does not explain the central structure of a congressional plan whose most obvious political consequence is the creation of nine districts that will likely elect Republicans in the general election.

A biracial Democratic primary may help evaluate whether Black voters can elect their preferred Democrat within a Democratic district, but the 2026 map is designed to create nine Republican-leaning districts. That makes the primary less probative of the main race-versus-party question. That type of evidence could be important in a case where the question is whether an existing Democratic district gives Black voters an opportunity to elect their preferred Democrat. But the 2026 Plan presents a different issue. The apparent objective of the plan is to create nine Republican-leaning congressional districts, not to maintain a Democratic district while changing which Democrat can win it.

For that reason, the 2022 Democratic gubernatorial primary does not answer the question whether race, rather than party, explains the district lines. As I understand it, a plaintiff must account for the State's legitimate political objectives, including partisan objectives. An analysis showing that some Black Democratic primary voters preferred J.B. Smiley while some White Democratic primary voters gave greater support to Jason Martin may show intra-party racial polarization. It does not show that the enacted congressional

plan was drawn because of race rather than because of the partisan objective of creating nine Republican-leaning districts.

In sum, Dr. Oskooii's analyses establish that the 2026 Plan has substantial consequences for Democratic voters in Memphis and Shelby County. They also establish that Black voters in the relevant areas overwhelmingly support Democratic candidates. But those two facts are not enough to disentangle race from party. His report does not provide an analysis showing that racial composition explains the enacted lines after accounting for the partisan objective of creating nine Republican-leaning districts.

## 7.3  Ms. Krishnaswami

Ms. Krishnaswami provides a visual analysis of the 2026 Plan's effect on Memphis, Shelby County, District 9, and the Black voting-age population of the affected districts and neighborhoods. Her report includes maps showing the prior District 9, the division of Memphis and Shelby County across Districts 5, 8, and 9, and the relationship between the new district boundaries and Memphis neighborhoods.[17] These visuals are useful for understanding the geography of the 2026 Plan. They show that Memphis is divided, that portions of the city are assigned to three different congressional districts, and that those districts extend into other parts of western and central Tennessee. That is useful for illustration, but it does not provide a method for determining whether race or party better explains the boundaries. As I analyze above, partisanship just as well explains the district boundaries.

Her report also focuses on the racial and neighborhood impact of the district lines without comparing that impact to the distribution of Democratic voters. The same neighborhoods that contain large Black populations in Memphis are also heavily Democratic. A district boundary that divides Black neighborhoods is also dividing Democratic voters. Without a corresponding analysis of partisan geography, the visual evidence cannot distinguish racial targeting from partisan targeting.

---

[17]Krishnaswami Report, Figures 1–6.

33

I reserve the right to modify, update, or supplement my opinions in light of additional facts, testimony and/or materials that may become available. Pursuant to 28 U.S.C. § 1746, the above is true and correct to the best of my knowledge.

Michael Barber

May 18, 2026

# Michael Jay Barber

CONTACT
INFORMATION

Brigham Young University
Department of Political Science
724 KMBL
Provo, UT 84602

barber@byu.edu
http://michaeljaybarber.com
Ph: (801) 422-7492

ACADEMIC
APPOINTMENTS

**Brigham Young University**, Provo, UT

August 2025 - present    Professor, Department of Political Science
August 2020 - July 2025    Associate Professor, Department of Political Science
Jan 2023 - present    Director, Center for the Study of Elections and Democracy
2014 - July 2020    Assistant Professor, Department of Political Science
2014 - Jan 2023    Faculty Scholar, Center for the Study of Elections and Democracy

EDUCATION

**Princeton University Department of Politics**, Princeton, NJ

Ph.D., Politics, July 2014

- Advisors: Brandice Canes-Wrone, Nolan McCarty, and Kosuke Imai

- Dissertation: "Buying Representation: the Incentives, Ideology, and Influence of Campaign Contributions on American Politics"

- 2015 Carl Albert Award for Best Dissertation, Legislative Studies Section, American Political Science Association (APSA)

M.A., Politics, December 2011

**Brigham Young University**, Provo, UT

B.A., International Relations - Political Economy Focus, April, 2008

- *Cum Laude*

RESEARCH
INTERESTS

American politics, congressional polarization, political ideology, campaign finance, survey research

PUBLICATIONS

29. **"Donations and Dollars: Characterizing the Policy Views of Donors and the Affluent"**
   with Brandice Canes-Wrone, Greg Huber, and Josh Clinton, forthcoming, *Journal of Politics*

28. **"Illiberalism among American State Legislative Candidates"**
   with Hans Hassell and Michael Miller, *Nature Humanities and Social Science Communications*

27. **"Which Republican Constituencies Support Restrictive Abortion Laws? Comparisons among donors, wealthy, and mass publics**, with Brandice Canes-Wrone, Joshua Clinton, and Greg Huber Forthcoming at *Public Opinion Quarterly*

26. **"The Crucial Role of Race in 21st Century U.S. Political Realignment**, with Jeremy Pope, *Public Opinion Quarterly* (2024): 1-10.

25. **"Misclassification and Bias in Predictions of Individual Ethnicity from Administrative Records"**, with Lisa Argyle, *American Political Science Review* (2023): 1-9.

24. **"Partisanship and Trolleyology"**, with Ryan Davis
*Research & Politics*

23. **"Does Issue Importance Attenuate Partisan Cue-Taking"**, with Jeremy Pope, *Political Science Research and Methods* (2024): 1-9.

22. **"A Revolution of Rights in American Founding Documents"**, with Scott Abramson and Jeremy Pope
*Journal of Political Institutions and Political Economy*

21. **"Groups, Behaviors, and Issues as Cues of Partisan Attachments in the Public"**, with Jeremy Pope
*American Politics Research*

20. **"Ideological Disagreement and Pre-emption in Municipal Policymaking"**, with Adam Dynes, *American Journal of Political Science*, no. 1 (2023): 119-136.

19. **"400 million voting records show profound racial and geographic disparities in voter turnout in the United States"**, with John Holbein
*PloS One*, 2022, Vol. 17, no. 6: e0268134

18. **"Comparing Campaign Finance and Vote Based Measures of Ideology"**
*Journal of Politics*, 2022. Vol. 84, no. 1 (2022): 613-619.

17. **"The Participatory and Partisan Impacts of Mandatory Vote-by-Mail"**, with John Holbein
*Science Advances*, 2020. Vol. 6, no. 35, DOI: 10.1126/sciadv.abc7685

16. **"Issue Politicization and Interest Group Campaign Contribution Strategies"**, with Mandi Eatough
*Journal of Politics*, 2020. Vol. 82: No. 3, pp. 1008-1025

15. **"Campaign Contributions and Donors' Policy Agreement with Presidential Candidates"**, with Brandice Canes-Wrone and Sharece Thrower
*Presidential Studies Quarterly*, 2019, 49 (4) 770–797

14. **"Conservatism in the Era of Trump"**, with Jeremy Pope
*Perspectives on Politics*, 2019, 17 (3) 719–736

13. **"Legislative Constraints on Executive Unilateralism in Separation of Powers Systems"**, with Alex Bolton and Sharece Thrower
*Legislative Studies Quarterly*, 2019, 44 (3) 515–548
Awarded the Jewell-Loewenberg Award for best article in the area of subnational politics published in *Legislative Studies Quarterly* in 2019

12. **"Electoral Competitiveness and Legislative Productivity"**, with Soren Schmidt
*American Politics Research*, 2019, 47 (4) 683–708

11. **"Does Party Trump Ideology? Disentangling Party and Ideology in America"**, with Jeremy Pope
*American Political Science Review*, 2019, 113 (1) 38–54

10. **"The Evolution of National Constitutions"**, with Scott Abramson
*Quarterly Journal of Political Science*, 2019, 14 (1) 89–114

9. **"Who is Ideological? Measuring Ideological Responses to Policy Questions in the American Public"**, with Jeremy Pope
*The Forum: A Journal of Applied Research in Contemporary Politics*, 2018, 16 (1) 97–122

8. **"Status Quo Bias in Ballot Wording"**, with David Gordon, Ryan Hill, and Joe Price
   *The Journal of Experimental Political Science*, 2017, 4 (2) 151–160.

7. **"Ideologically Sophisticated Donors: Which Candidates Do Individual Contributors Finance?"**, with Brandice Canes-Wrone and Sharece Thrower
   *American Journal of Political Science*, 2017, 61 (2) 271–288.

6. **"Gender Inequalities in Campaign Finance: A Regression Discontinuity Design"**, with Daniel Butler and Jessica Preece
   *Quarterly Journal of Political Science*, 2016, Vol. 11, No. 2: 219–248.

5. **"Representing the Preferences of Donors, Partisans, and Voters in the U.S. Senate"**
   *Public Opinion Quarterly*, 2016, 80: 225–249.

4. **"Donation Motivations: Testing Theories of Access and Ideology"**
   *Political Research Quarterly*, 2016, 69 (1) 148–160.

3. **"Ideological Donors, Contribution Limits, and the Polarization of State Legislatures"**
   *Journal of Politics*, 2016, 78 (1) 296–310.

2. **"Online Polls and Registration Based Sampling: A New Method for Pre-Election Polling"** with Quin Monson, Kelly Patterson and Chris Mann.
   *Political Analysis* 2014, 22 (3) 321–335.

1. **"Causes and Consequences of Political Polarization"** In *Negotiating Agreement in Politics*. Jane Mansbridge and Cathie Jo Martin, eds., Washington, DC: American Political Science Association: 19–53. with Nolan McCarty. 2013.

   - Reprinted in *Solutions to Political Polarization in America*, Cambridge University Press. Nate Persily, eds. 2015
   - Reprinted in *Political Negotiation: A Handbook*, Brookings Institution Press. Jane Mansbridge and Cathie Jo Martin, eds. 2015

| | |
|---|---|
| AVAILABLE WORKING PAPERS/ONGOING PROJECTS | **"Donations and Dollars: Characterizing the Policy Views of Donors and the Affluent"** with Brandice Canes-Wrone, Gregory Huber, and Joshua Clinton (Revise and Resubmit at *Journal of Politics*) <br><br> **"Preferences for Representational Styles in the American Public"** with Ryan Davis and Adam Dynes *(under review)* <br><br> **"Illiberalism among American State Legislative Candidates'** with Hans Hassell and Michael Miller *(under review)* |
| INVITED PRESENTATIONS | "Are Mormons Breaking Up with Republicanism? The Unique Political Behavior of Mormons in the 2016 Presidential Election" <br><br> • Ivy League LDS Student Association Conference - Princeton University, November 2018, Princeton, NJ <br><br> "Issue Politicization and Access-Oriented Giving: A Theory of PAC Contribution Behavior" <br><br> • Vanderbilt University, May 2017, Nashville, TN |

3

"Lost in Issue Space? Measuring Levels of Ideology in the American Public"

- Yale University, April 2016, New Haven, CT

"The Incentives, Ideology, and Influence of Campaign Donors in American Politics"

- University of Oklahoma, April 2016, Norman, OK

"Lost in Issue Space? Measuring Levels of Ideology in the American Public"

- University of Wisconsin - Madison, February 2016, Madison, WI

"Polarization and Campaign Contributors: Motivations, Ideology, and Policy"

- Hewlett Foundation Conference on Lobbying and Campaign Finance, October 2014, Palo Alto, CA

"Ideological Donors, Contribution Limits, and the Polarization of State Legislatures"

- Bipartisan Policy Center Meeting on Party Polarization and Campaign Finance, September 2014, Washington, DC

"Representing the Preferences of Donors, Partisans, and Voters in the U.S. Senate"

- Yale Center for the Study of American Politics Conference, May 2014, New Haven, CT

| | |
|---|---|
| CONFERENCE PRESENTATIONS | Money in Politics APSA Pre-Conference: |

- Founder (2020) and organizing committee (2020, 2021, 2022, 2023)

Washington D.C. Political Economy Conference (PECO):

- 2017 discussant

American Political Science Association (APSA) Annual Meeting:

- 2014 participant and discussant, 2015 participant, 2016 participant, 2017 participant, 2018 participant

Midwest Political Science Association (MPSA) Annual Meeting:

- 2015 participant and discussant, 2016 participant and discussant, 2018 participant

Southern Political Science Association (SPSA) Annual Meeting:

- 2015 participant and discussant, 2016 participant and discussant, 2017 participant

| | |
|---|---|
| TEACHING EXPERIENCE | Poli 301: Data Visualization |

- Summer 2022, Fall 2022, Winter 2023, Winter 2024

Poli 315: Congress and the Legislative Process

- Fall 2014, Winter 2015, Fall 2015, Winter 2016, Summer 2017, Fall 2018, Spring 2019, Fall 2022

Poli 328: Quantitative Analysis

- Winter 2017, Fall 2017, Fall 2019, Winter 2020, Fall 2020, Winter 2021, Fall 2023

Poli 410: Undergraduate Research Seminar in American Politics

- Fall 2014, Winter 2015, Fall 2015, Winter 2016,Summer 2017, Fall 2018, Winter 2024

AWARDS AND GRANTS

2024 BYU Early Career Scholarship Award

2021 BYU FHSS Research Grant, $6,500

2020 BYU FHSS Young Scholar Award

2019 BYU Mentored Environment Grant (MEG), Ideology in America Project, $35,000

2017 BYU Political Science Teacher of the Year Award

2017 BYU Mentored Environment Grant (MEG), Funding American Democracy Project, $20,000

2016 BYU Political Science Department, Political Ideology and President Trump (with Jeremy Pope), $7,500

2016 BYU Office of Research and Creative Activities (ORCA) Student Mentored Grant x 3

- Hayden Galloway, Jennica Peterson, Rebecca Shuel

2015 BYU Office of Research and Creative Activities (ORCA) Student Mentored Grant x 3

- Michael-Sean Covey, Hayden Galloway, Sean Stephenson

2015 BYU Student Experiential Learning Grant, American Founding Comparative Constitutions Project (with Jeremy Pope), $9,000

2015 BYU FHSS Research Grant, $5,000

2014 BYU Political Science Department, 2014 Washington DC Mayoral Pre-Election Poll (with Quin Monson and Kelly Patterson), $3,000

2014 BYU FHSS Award, 2014 Washington DC Mayoral Pre-Election Poll (with Quin Monson and Kelly Patterson), $3,000

2014 BYU Center for the Study of Elections and Democracy, 2014 Washington DC Mayoral Pre-Election Poll (with Quin Monson and Kelly Patterson), $2,000

2012 Princeton Center for the Study of Democratic Politics Dissertation Improvement Grant, $5,000

2011 Princeton Mamdouha S. Bobst Center for Peace and Justice Dissertation Research Grant, $5,000

2011 Princeton Political Economy Research Grant, $1,500

OTHER SCHOLARLY ACTIVITIES

Expert Witness in Nancy Carola Jacobson, et al., Plaintiffs, vs. Laurel M. Lee, et al., De-

fendants. Case No. 4:18-cv-00262 MW-CAS (U.S. District Court for the Northern District of Florida)

Expert Witness in Common Cause, et al., Plaintiffs, vs. Lewis, et al., Defendants. Case No. 18-CVS-14001 (Wake County, North Carolina)

Expert Witness in Kelvin Jones, et al., Plaintiffs, v. Ron DeSantis, et al., Defendants, Consolidated Case No. 4:19-cv-300 (U.S. District Court for the Northern District of Florida)

Expert Witness in Community Success Initiative, et al., Plaintiffs, v. Timothy K. Moore, et al., Defendants, Case No. 19-cv-15941 (Wake County, North Carolina)

Expert Witness in Richard Rose et al., Plaintiffs, v. Brad Raffensperger, Defendant, Civil Action No. 1:20-cv-02921-SDG (U.S. District Court for the Northern District of Georgia)

Expert Witness in Georgia Coalition for the People's Agenda, Inc., et. al., Plaintiffs, v. Brad Raffensberger, Defendant. Civil Action No. 1:18-cv-04727-ELR (U.S. District Court for the Northern District of Georgia)

Expert Witness in Alabama, et al., Plaintiffs, v. United States Department of Commerce; Gina Raimondo, et al., Defendants. Case No. CASE No. 3:21-cv-00211-RAH-ECM-KCN (U.S. District Court for the Middle District of Alabama Eastern Division)

Expert Witness in League of Women Voters of Ohio, et al., Relators, v. Ohio Redistricting Commission, et al., Respondents. Case No. 2021-1193 (Supreme Court of Ohio)

Expert Witness in Regina Adams, et al., Relators, v. Governor Mike DeWine, et al., Respondents. Case No. 2021-1428 (Supreme Court of Ohio)

Expert Witness in Rebecca Harper, et al., Plaintiffs, v. Representative Destin Hall, et al., Defendants (Consolidated Case). Case No. 21 CVS 500085 (Wake County, North Carolina)

Expert Witness in Carter, et al., Petitioners, v. Degraffenreid et al., Respondents (Consolidated Case). Case No. 464 M.D. 2021 (Commonwealth Court of Pennsylvania)

Expert Witness in Harkenrider, et al., Petitioners, v. Hochel et al., Respondents. Case No. E2022-0116CV (State of New York Supreme Court: County of Steuben)

Expert Witness in Our City Action Buffalo, Inc., et al., v. Common Council of the City of Buffalo (State of New York Supreme Court: County of Erie)

Expert Witness in Citizens Project, et al., v. City of Colorado Springs, et al. Case No. 22-cv-1365-CNS-MDB (U.S. District Court for the District of Colorado)

Expert report filed in League of Women Voters of Ohio v. Ohio Redistricting Comm., 172 Ohio St.3d 597, 2023-Ohio-4271 (Supreme Court of Ohio)

Expert Witness in Dr. Dorothy Nairne, et al., Plaintiffs, v. R. Yle Ardoin, Defendant, Case No. 3:22-cv-00178 (U.S. District Court for the Middle District of Louisiana)

Court Appointed Mapping Special Master in Donald Agee, et al., Plaintiffs, v. Jocelyn Benson, in her official capacity as the Secretary of State of Michigan, et al., Defendants., No. 1:22-cv-272 Three-Judge Court (U.S. District Court for the Western District of Michigan)

6

Expert report filed in remedial phase in Alpha Phi Alpha, et al., Plaintiffs, v. Brad Raffensperger, in his official capacity as the Secretary of State of Georgia, et al., Defendants., Case No. 1:21-cv-5337 (U.S. District Court for the Northern District of Georgia)

Expert Witness in McClure, et al. and Addoh-Kondi, et al., Plaintiffs, v. Jefferson County Commission, et al., Defendant, Case No. Case No.: 2:23-cv-00503-MHH (U.S. District Court for the Northern District of Alabama)

Expert Witness in Williams, et al. and North Carolina NAACP v. Berger, in his official capacity as President Pro Tempore of the North Carolina Senate, et al. Case Nos: 1:23-CV-1057, 1:23-CV-1104 (U.S. District Court for the Middle District of North Carolina)

Expert Witness in League of Women Voters of Utah, et al., v. Utah State Legislature, et al., Civil Action No. 220901712 (Third Judicial District Court in and for Salt Lake County, Utah)

ADDITIONAL TRAINING

EITM 2012 at Princeton University - Participant and Graduate Student Coordinator

COMPUTER SKILLS

Statistical Programs: R, Stata, SPSS, parallel computing

Updated January 23, 2026

7