**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**

| | | |
|---|---|---|
| AMBER SHERMAN, *et al.*, | ) | |
|  *Plaintiffs,* | ) ) | No. 3:26-cv-00616 |
| v. | ) | THREE-JUDGE COURT |
| TRE HARGETT, in his official capacity as Secretary of State of Tennessee, *et al.*, | ) ) ) ) | |
|  *Defendants.* | ) | |

**DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' COMPLAINT**
**AND SUPPORTING MEMORANDUM OF LAW**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES......................................................................................................ii

INTRODUCTION ................................................................................................................ 1

BACKGROUND.................................................................................................................. 3

LEGAL STANDARD ......................................................................................................... 4

ARGUMENT...................................................................................................................... 5

    I.    Plaintiffs Lack Standing to Challenge Tennessee's Districts Statewide.................. 6

    II.    The Complaint Does Not State a Claim for Intentional Discrimination. ................. 6

        A.    Plaintiffs fail to plausibly allege discriminatory purpose. ............................... 7

            1. The complaint itself alleges the 2026 Plan was politically motivated. .......... 8

            2. Plaintiffs do not plausibly allege a racial motive............................................ 9

              a. Plaintiffs' allegations about the 2026 Plan's resulting racial demographics are not allegations of a racial motive..........................................................10

              b. Plaintiffs offer no direct evidence of discriminatory intent...................... 12

              c. Plaintiffs' allegations of circumstantial evidence, following the *Arlington Heights* factors, are not plausible allegations of discriminatory intent. .. 15

        B.    Plaintiffs fail to plausibly allege discriminatory effect. .................................. 20

    III.    Plaintiffs' First Amendment Retaliation Claim Is Not Justiciable, Nor Plausible.21

        A.    Plaintiffs' First Amendment claim is not justiciable. ..................................... 21

        B.    Even if it was justiciable, Plaintiffs' alleged First Amendment violation is implausible........................................................................................................ 24

CONCLUSION ................................................................................................................. 24

Case 3:26-cv-00616    Document 56    Filed 06/26/26    Page 2 of 31 PageID #: 808

# TABLE OF AUTHORITIES

**Cases**

*Abbott v. LULAC,*
146 S. Ct. 418 (2025)...................................................................................................... 18

*Abbott v. Perez,*
585 U.S. 579 (2018)............................................................................................... 9, 15, 19

*ABCDE Operating v. City of Detroit,*
2011 WL 3607072 (E.D. Mich. Aug. 16, 2011) ........................................................ 5

*Alexander v. S.C. State Conf. of the NAACP,*
602 U.S. 1 (2024)...........................................................................................3, 9, 11-13, 23

*Allen v. Milligan,*
599 U.S. 1 (2023).............................................................................................................. 19

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009)....................................................................................... 1, 4, 11, 14, 24

*Bassett v. Nat'l Collegiate Athletic Ass'n,*
528 F.3d 426 (6th Cir. 2008) .......................................................................................... 5

*Bell Atlantic Corp. v. Twombly,*
550 U.S. 544 (2007)............................................................................................................ 4

*Brnovich v. Democratic Nat'l Comm.,*
594 U.S. 647 (2021)..................................................................................................... 13-14

*Common Cause v. Rucho,*
279 F. Supp. 3d 587 (M.D.N.C. 2018).......................................................................... 22

*Cook v. Gralike,*
531 U.S. 510 (2001)......................................................................................................... 23

*GBM v. Sec'y of State of Ala.,*
992 F.3d 1299 (11th Cir. 2021) .................................................................................... 18

*Gill v. Whitford,*
585 U.S. 48 (2018)........................................................................................................... 6

*Holder v. Hall,*
512 U.S. 874 (1994)...............................................................................................2

*Hunter v. Underwood,*
471 U.S. 222 (1985)...........................................................................................9, 12

*In re Omnicare, Inc. Sec. Litig.,*
769 F.3d 455 (6th Cir. 2014) ...............................................................................5

*League of Women Voters of Fla. v. Fla. Sec'y of State,*
66 F.4th 905 (11th Cir. 2023) .........................................................................11, 18

*Louisiana v. Callais,*
146 S. Ct. 1131 (2026).......................................................3, 7, 11-13, 20, 21

*Lujan v. Defenders of Wildlife,*
504 U.S. 555 (1992).............................................................................................6

*McCleskey v. Kemp,*
481 U.S. 279 (1987).............................................................................................15

*Northville Downs v. Granholm,*
622 F.3d 579 (6th Cir. 2010) ...............................................................................5

*Pers. Adm'r of Massachusetts v. Feeney,*
442 U.S. 256 (1979)..........................................................................................7, 10

*Rucho v. Common Cause,*
588 U.S. 684 (2019).......................................................................................2, 22-24

*Shaw v. Reno,*
509 U.S. 630 (1993)..........................................................................................17, 21

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard College,*
600 U.S. 181 (2023)...........................................................................................17

*Tenn. Conf. of the NAACP v. Lee,*
746 F. Supp. 3d 473 (M.D. Tenn. 2024).....................................1, 4, 7-15, 17-20, 24

*United States v. Hays,*
515 U.S. 737 (1995)..........................................................................................6, 11

iii

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,*
   429 U.S. 252 (1977)................................................................................... 10, 12, 18

*White v. Regester,*
   412 U.S. 755 (1973)..................................................................................... 7, 16, 20

*Zielasko v. Ohio,*
   873 F.2d 957 (6th Cir. 1989) ................................................................................ 23

**Constitutional Provisions**

U.S. Const. art. I, §2......................................................................................... 23

U.S. Const. art. I, §4, cl. 1 ............................................................................. 2, 23

**Secondary Sources**

Sen. Judiciary Comm. Video,
   https://tnga.granicus.com/player/clip/33465?view_id=841&redirect=true...................... 5

Tenn. 114th Gen. Assembly, HB 7003, https://wapp.capitol.tn.gov/
   apps/BillInfo/Default?BillNumber=HB7003&ga=114 ......................................................... 5

# INTRODUCTION

Last month, Tennessee redistricted its nine congressional districts to send an "'all-Republican delegation'" to Congress and "'maximize the Republican potential to maintain the majority in the United States House of Representatives.'" Dkt. 1, Compl. ¶¶63-64. On Plaintiffs' retelling, that stated political goal was all pretext for racially discriminatory redistricting by a "White-dominated political faction" that "holds total power" in Tennessee. *Id.* ¶35.

Plaintiffs have not plausibly alleged that the 2026 Plan was the product of unconstitutional racial discrimination. Plaintiffs' repeated refrain about "White-dominated" lawmakers, Compl. ¶¶1, 4, 33-35, 38-39, 40-42, 44, 48-49, 53, 55-58, 60, 64, 69, 70, 86, 88, 98-99, 108, 116, falls well "short of the line between possibility and plausibility," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Such unfounded allegations of racial animus cannot "plausibly rebut the more straightforward 'explanation': naked partisanship." *Tenn. Conf. of the NAACP v. Lee*, 746 F. Supp. 3d 473, 504 (M.D. Tenn. 2024) (three-judge court) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 567 (2007)). Plaintiffs' claim of "purposeful, invidious discrimination" is not plausible given the "obvious alternative explanation" that the 2026 Plan is a product of "purely partisan" goals—indeed, partisan goals Plaintiffs' own complaint concedes. *Id.* at 506 (quoting *Iqbal*, 556 U.S. at 682).

Nor have Plaintiffs alleged a viable First Amendment claim. Plaintiffs insist that the 2026 Plan's Republican advantage amounts to unconstitutional retaliation by "diminishing" Plaintiffs' efforts to "organize and associate with others to exercise political power and to elect candidates of their choice to Congress." Compl. ¶117. That theory runs headlong into *Rucho v. Common Cause*, 588 U.S. 684 (2019). Plaintiffs remain "free to engage in those activities no matter what the effect of a plan may be on their district." *Id.* at 713-14. Just as plaintiffs' First Amendment retaliation theory failed in *Rucho*, *id.* at 692, it fails here too. There is no justiciable test for how much politics is too much when Legislatures redistrict. *Id.* at 715. And Plaintiffs' suggestion that the Legislature had no power to redistrict at all—that it was "utterly gratuitous," Compl. ¶124—ignores that the Constitution vests redistricting power in "the Legislature," with full awareness that legislatures have pursued political ends when redistricting since the founding. U.S. Const. art. I, §4, cl. 1; *see Rucho*, 588 U.S. at 696.

The State's politically minded goal was just that—political. Tennesseans can debate the wisdom of the State's partisan redraw. But there is no conflating, as Plaintiffs do, redistricting intended to benefit Republicans with redistricting intended to harm black voters. That racialized retelling is "repugnant to any nation that strives for the ideal of a color-blind Constitution." *Holder v. Hall*, 512 U.S. 874, 905-06 (1994) (Thomas, J., concurring in the judgment). Plaintiffs' complaint must be dismissed.

2

## BACKGROUND

Two years ago, the Supreme Court confirmed that a State may prioritize nonracial considerations like partisan advantage in redistricting without being faulted for racial gerrymandering. *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 20-21 (2024). Two months ago, the Court clarified that States may advance their "political goals" in redistricting without being faulted for vote dilution under §2 of the Voting Rights Act. *Louisiana v. Callais*, 146 S. Ct. 1131, 1155-57 (2026).

With those clarifications, Tennessee convened a special session to redraw its nine congressional districts in May ahead of the 2026 congressional primary elections in August. *See* Dkt. 1, Compl. ¶50. As Plaintiffs' complaint alleges, the State's political goal was open and obvious: "'Tennessee is a conservative state,'" the "'congressional representation in Washington should reflect that,'" and the newly drawn "'map ensures" that it does. *Id.* ¶60. U.S. Senator Marsha Blackburn "urge[d]" the legislature "to redistrict another Republican seat in Memphis." *Id.* ¶48. Tennessee Senator Randy McNally agreed—it was time "to send another Republican voice to Washington." *Id.* Tennessee Representative Jason Zachary said the map would "send an all-Republican delegation" to Congress. *Id.* ¶64. The intent, in the words of Senator John Stevens, was "to maximize the Republican potential to maintain the majority in the United States House of Representatives." *Id.* ¶63.

Plaintiffs filed their complaint on May 11. They allege Tennessee's 2026 Plan amounts to unconstitutional racial discrimination, *id.* ¶¶100-09, and violates their First Amendment right against retaliation for protected expression, *id.* ¶¶110-25.

**LEGAL STANDARD**

Rule 12 tests the legal sufficiency of the complaint. To survive a motion to dismiss, a complaint must contain enough "[f]actual allegations" to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Plaintiffs must allege "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. Where there is an "obvious alternative explanation" for the government's action, Plaintiffs do not clear that bar. *Id.* at 682 (quoting *Twombly*, 550 U.S. at 567). Applied in a redistricting case such as this one, Plaintiffs' allegations must "plausibly rebut the more straightforward 'explanation'" for districts—"naked partisanship." *Lee*, 746 F. Supp. 3d at 504 (dismissing intentional discrimination claim for Nashville-area districts).

At the motion-to-dismiss stage, the presumption of good faith applies. That is because the presumption is "part of the *constitutional* test that invariably applies at the 'various stages of litigation.'" *Id.* at 494. Even at the pleading stage, courts must "'draw the inference that cuts in the legislature's favor when confronted with [a complaint's allegations] that could plausibly support multiple conclusions.'" *Id.* (alteration in original).

Also at the motion-to-dismiss stage, the Court may take judicial notice of the entire legislative record for the 2026 Plan. *See, e.g.*, *Northville Downs v. Granholm*, 622 F.3d 579,

4

586 (6th Cir. 2010).[1] Considering the whole of the legislative record is especially warranted where, as here, Plaintiffs have "incorporated the legislative record into the pleadings." *ABCDE Operating v. City of Detroit*, 2011 WL 3607072, at *2 (E.D. Mich. Aug. 16, 2011). *See, e.g.,* Compl. ¶¶48, 50, 60, 63-64. Where "a plaintiff references or quotes certain documents, or if public records refute a plaintiff's claim, a defendant may attach those documents to its motion to dismiss, and a court can then consider them in resolving the Rule 12(b)(6) motion without converting the motion to dismiss into a Rule 56 motion for summary judgment." *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 466 (6th Cir. 2014). "Fairness and efficiency require this practice," lest "complaints that quoted only selected and misleading portions of such documents could not be dismissed under Rule 12(b)(6) even though they would be doomed to failure.'" *Id.*; *see also, e.g.*, *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008).

## ARGUMENT

Plaintiffs' complaint should be dismissed in its entirety. As a threshold matter, Plaintiffs lack standing for the statewide relief they seek. As for Plaintiffs' two constitutional claims, they fail as a matter of law. Plaintiffs' intentional vote dilution claim (Count I) conflates the State's avowed partisan goal with invidious racial discrimination. The

---

[1] All redistricting committee and floor proceedings are publicly available online. *See* Tenn. 114th Gen. Assembly, HB 7003, https://wapp.capitol.tn.gov/apps/BillInfo/Default?BillNumber=HB7003&ga=114; *see also* Sen. Judiciary Comm. Video, https://tnga.granicus.com/player/clip/33465?view_id=841&redirect=true.

complaint fails to plausibly allege any direct or circumstantial evidence of discriminatory purpose. And the complaint fails to plausibly allege discriminatory effect—a required element of their claim. Plaintiffs' First Amendment claim (Count II) is not justiciable. Even if it were, Plaintiffs offer only bald conclusions of retaliatory motive insufficient to state a claim for relief.

## I. Plaintiffs Lack Standing to Challenge Tennessee's Districts Statewide.

A plaintiff may challenge only "the boundaries of the particular district in which he resides." *Gill v. Whitford*, 585 U.S. 48, 66 (2018); *see also United States v. Hays*, 515 U.S. 737, 744-45 (1995). He may not obtain "statewide" relief. *Gill*, 585 U.S. at 66-68. Here, the individual Plaintiffs allege they live in CD5 or in Shelby County, without further identifying their districts, while the Black Clergy Collaborative of Memphis and APRI allege they have members living in CD5, CD8, and CD9, or "in Memphis and Shelby County." *See* Compl. ¶¶10-12, 14, 18, 24. Those allegations, at most, allege standing to challenge three of the State's nine districts. Plaintiffs have not carried their burden to establish standing to challenge the *entire* "May 2026 Map" as unconstitutional. Compl. p.57 ¶¶1-2; *see Gill*, 585 U.S. at 73; *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (establishing standing is Plaintiffs' burden).

## II. The Complaint Does Not State a Claim for Intentional Discrimination.

To state a claim for unconstitutional vote dilution, Plaintiffs must plausibly allege they can "prove two elements: a discriminatory *purpose* and a discriminatory *effect*." *Lee*,

6

746 F. Supp. 3d at 499. "Discriminatory purpose" requires plausible allegations that the State acted "because of" race, not merely with an "awareness" of racial "consequences." *Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979) (quotation marks omitted); *Lee*, 746 F. Supp. 3d at 502. Discriminatory effect requires plausible allegations that districts are not "equally open" or provide "less opportunity" for minority voters. *White v. Regester*, 412 U.S. 755, 766 (1973). That inquiry must account for "the State's combination of permissible criteria"—including politics. *Callais*, 146 S. Ct. at 1155-56. Plaintiffs fail to plausibly allege either element here, instead pleading only a *political* purpose with a predictable *political* effect on Democrats.

### A. Plaintiffs fail to plausibly allege discriminatory purpose.

Plaintiffs' complaint concedes Tennessee redistricted with the stated intent to advantage Republicans. *See, e.g.*, Compl. ¶¶48, 60-64. And while Plaintiffs insist that express political goal was just pretext for racial animus, their complaint contains no plausible factual allegations that "the legislature drew the maps for a specific purpose (or with a specific intent): 'to minimize or cancel out the voting potential of' voters of a certain race or ethnicity." *Lee*, 746 F. Supp. 3d at 501. In this way, Plaintiffs' complaint fails to state a claim just as plaintiffs' complaint failed to state a claim to challenge Nashville-area congressional districts in *Lee*, 746 F. Supp. 3d at 504-06. Districts "are readily explainable on [political] grounds apart from race due to the correlation between the two." *Id.* at 504

7

(alteration in original; quotation marks omitted). And because Plaintiffs nowhere "plausibly rebut" that "partisanship," not race, was the motivation, Plaintiffs' complaint must be dismissed. *Id.* at 504-06.

### 1. The complaint itself alleges the 2026 Plan was politically motivated.

Plaintiffs do not dispute that the stated motivation for the 2026 Plan was partisanship. They allege Senator Blackburn called for the special session "'to redistrict another Republican seat in Memphis.'" Compl. ¶48. And they allege that state legislators shared that goal: "'to send another Republican voice to Washington,'" *id.*, to ensure a "'conservative'" delegation," *id.* ¶60, and "'an all-Republican delegation,'" *id.* ¶64. Plaintiffs further allege how legislators acknowledged the national political landscape motivated the mid-decade redistricting: "'The consideration for drawing these maps was to maximize the Republican potential to maintain the majority in the United States House of Representatives.'" *Id.*¶63; *see also id.* ¶50 (quoting Governor's proclamation, which emphasized "renewed nationwide action around congressional representation").

Those allegations make dismissal even more straightforward than the dismissal in *Lee.* In *Lee*, the three-judge court observed that legislators "did *not* publicly announce a partisan gerrymander during the redistricting." 746 F. Supp. 3d at 498 (emphasis added). And still, the court dismissed plaintiffs' intentional discrimination claim for failing to "plausibly rebut" that "naked partisanship" motivated the challenged districts. *Id.* at 504. Plaintiffs' intentional discrimination claim here is all the less viable given that Plaintiffs

8

themselves admit the Legislature's expressly stated *political* goal. *See, e.g.*, Compl. ¶¶48, 50, 60, 63-64. If the presumption of legislative good faith means anything,[2] it is that the truth of the Legislature's stated political goal "'must be presumed.'" *Alexander*, 602 U.S. at 36. Plaintiffs come nowhere close to overcoming that presumption of good faith with plausible allegations that this stated political goal was mere pretext for racial animus. *See infra*, Part II.A.2.

### 2. Plaintiffs do not plausibly allege a racial motive.

Plaintiffs' factual allegations come nowhere close to plausibly alleging that the Legislature harbored a "substantial or motivating" racial purpose. *Hunter v. Underwood*, 471 U.S. 222, 225 (1985). Their allegations fall short in the following three respects. *First*, the complaint's extensive discussion of the resulting racial demographics of the 2026 Plan is not evidence of an *ex ante* racial motivation. *Second*, while claiming to have "strong … direct evidence" of discriminatory intent, Compl. ¶105, Plaintiffs muster nothing more than conclusory assertions of racial animus and bad-faith interpretations of individual legislators' comments, *id*. ¶¶52, 60, 63-70, 86. *Third*, the alleged "circumstantial evidence," *id*. ¶105, is nothing more than allegations faulting lawmakers for their "White" race, *e.g.*, *id*. ¶¶4, 35, allegations about "a mix of laws, bills, or statements that have little to do with

---

[2] That presumption of good faith applies in this vote-dilution case, no less than any other redistricting case. *See Abbott v. Perez*, 585 U.S. 579, 603-05 (2018); *Lee*, 746 F. Supp. 3d at 504. Thus, even at the pleading stage, the Court must "draw the inference that cuts in the legislature's favor" when evidence "could plausibly support multiple conclusions." *Lee*, 746 F. Supp. 3d at 494.

redistricting," *Lee*, 746 F. Supp. 3d at 505-06, and allegations that are just as well explained by the Legislature's stated political goal.

### a. Plaintiffs' allegations about the 2026 Plan's resulting racial demographics are not allegations of a racial motive.

Plaintiffs fault the 2026 Plan for "divid[ing] the predominantly Black population of Memphis and Shelby County in three ways, and then combin[ing] each of the fractured portions of Black Memphis with large numbers of rural White voters hundreds of miles away, rendering the Black Memphians a minority in each of the three districts." Compl. ¶95; *see id.* ¶87 (describing the 2026 Plan as "crack[ing] the Black population in the City of Memphis across Congressional Districts 5, 8, and 9," resulting in "three separate majority-White districts with very similar percentages of Black voting age population"). Their complaint visualizes the *racial* demographics of new and old districts. *Id.* ¶¶89-90, 95. But never does the complaint "plausibly rebut" that the resulting demographics are explainable by the Legislature's conceded political motivation. *But see Lee*, 746 F. Supp. 3d at 504.

Such allegations about the resulting racial demographics of the 2026 Plan do not plausibly allege racial purpose. Laws might have an "overwhelmin[g]" effect on one group, *Feeney*, 442 U.S. at 259, but that "impact alone is not determinative," *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977). Take a "capital-punishment law [that] disparately affects minority defendants," or a hiring preference for veterans that overwhelmingly favors men. *Lee*, 746 F. Supp. 3d at 502. Plaintiffs must allege the

10

legislature acted "'*because of*' this racial effect" or *because of* a desire "to harm women[]," not merely that legislators were aware of these disparate effects. *Id.* If, more likely, the legislature enacted such laws because of a desire "to deter crime" or "to help veterans," plaintiffs have not proved invidious purpose. *Id.*

Relevant here, redistricting to advance a political goal will have racial effects when "race and partisan preference are highly correlated." *Alexander*, 602 U.S. at 6; *Callais*, 146 S. Ct. at 1158; *see, e.g.*, *Alexander*, 602 U.S. at 20 ("there is strong evidence that the district's BVAP of 17% was simply a side effect of the legislature's partisan goal"). Plaintiffs admit that race and party are highly correlated in Tennessee. *See* Compl. ¶¶35-36.[3] It would thus be error to conflate Tennessee's politically motivated redistricting with racially motivated redistricting simply because politically motivated redistricting might have racial effects. *See, e.g.*, *Lee*, 746 F. Supp. 3d at 504 ("[T]he Complaint must do more than plausibly allege that Tennessee's legislators knew that their Republican friendly map would harm voters

---

[3] Plaintiffs quote a Democratic senator's lengthy remarks that Republican legislators cynically used the high correlation between race and politics "as legal cover to eliminate Black political representation" and effect "the permanent silencing of Shelby County's Black community." Compl. ¶84; *see also id.* ¶85 (similar). Such "bare assertions" are insufficient, *Iqbal*, 556 U.S. at 681, particularly considering that the "good faith of [the] state legislature must be presumed," *Miller*, 515 U.S. at 915; *see also League of Women Voters of Fla. v. Fla. Sec'y of State*, 66 F.4th 905, 940 (11th Cir. 2023) ("[T]he concerns expressed by political opponents [about disparate impact on black voters] during the legislative process are not reliable evidence of legislative intent.").

who preferred Democratic candidates—including the higher percentage of minority voters who preferred those candidates."); *accord Alexander*, 602 U.S. at 10-11; *Callais*, 146 S. Ct. at 1157-58, 1163.

Where, as here, Plaintiffs concede the Legislature's stated motivation was partisanship, Plaintiffs must "plausibly rebut" that "naked partisanship" explains the resulting racial demographics of the 2026 Plan. *Lee*, 746 F. Supp. 3d at 504. Anything less would forget "that the presumption of legislative good faith extends to vote-dilution claims alleging that legislators acted with racial animus," including at the pleading stage. *Id.; see also Alexander*, 602 U.S. at 11 (identifying the presumption of good faith as the justification for requiring plaintiffs to disentangle race and politics).

### b. Plaintiffs offer no direct evidence of discriminatory intent.

Nor do Plaintiffs plausibly allege there was direct evidence of discriminatory intent in the making of the 2026 Plan. *Contra* Compl. ¶105. While Plaintiffs make conclusory allegations like "the General Assembly's White supermajority" enacted the law "in their zeal to gut majority-Black Congressional District 9," *e.g.*, *id*. ¶52, such conclusory allegations of racial animus are "not entitled to the presumption of truth," *Lee*, 746 F. Supp. 3d at 506.

Direct evidence is something tantamount to legislators' express "zeal for white supremacy r[unning] rampant" throughout the lawmaking process, *Hunter*, 471 U.S.

12

at 229, or a redistricting plan that is "unexplainable on grounds other than race," *Arlington Heights*, 429 U.S. at 266; *accord Lee*, 746 F. Supp. 3d at 504 (distinguishing *Hunter* from circumstantial evidence in *Lee*). Plaintiffs, moreover, must plausibly allege that "the legislature *as an institution*, as opposed to certain individual[s]," was "motivated by race." *Callais*, 146 S. Ct. at 1156 (emphasis added); *see, e.g.*, *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 689 (2021) (rejecting "cat's paw" theory of discrimination for legislative bodies, where a single legislator's statement could be imputed to the body as a whole); *accord Lee*, 746 F. Supp. 3d at 502 (describing "'hazards' of trying to divine the 'intent' of a collective body made up of many legislators with many motivations").

Plaintiffs allege nothing of the sort. Their own complaint offers the "obvious alternative explanation." *Lee*, 746 F. Supp. 3d at 506 (quoting *Iqbal*, 556 U.S. at 682). The legislators redistricted "'to send another Republican voice to Washington.'" Compl. ¶48; *see supra,* Part II.A.1. Plaintiffs' allegations that this partisan goal had a racial "side effect," *Alexander*, 602 U.S. at 20, come up short. *Supra*, Part II.A.1. Plaintiffs must plausibly allege the Legislature, as a whole, redistricted *because* of that racial side effect, not merely that they were *aware* of it. *See Lee*, 746 F. Supp. 3d at 504; *see, e.g.*, Compl. ¶56 (faulting legislators for failing to engage in a colloquy about potential racial side effects).

Plaintiffs' remaining allegations faulting individual legislator's statements fare no better. For example, Plaintiffs allege that "White Senator John Stevens from the White-dominated supermajority faction" said Tennessee's new map reflects Tennessee's status

as "'a conservative state,'" and that the Senator declined to "elaborate on what 'conservative' meant." Compl. ¶60. That allegation about the Senator's desire for a "conservative" congressional delegation does not remotely suggest that the Senator (let alone the entire Legislature) possessed a "discriminatory state of mind." *Iqbal*, 556 U.S. at 683. The same problems plague Plaintiffs' allegations that cast legislators' responses to various questions and comments in the worst light as evidence of invidious discrimination. *E.g.*, Compl. ¶¶63-69, 86 ("The White politicians from the White-dominated faction … had no retort."). Nor does a single legislator's suggestion that three Memphis-area districts would "add resources" to improve safety "highlight the White supermajority's racial motives." *Contra id.* ¶70. Even if a single legislator's single statement could establish a whole legislature's racial animus, *contra Brnovich*, 594 U.S. at 689, when legislators say they enacted a law to improve safety, the presumption of good faith compels taking the legislators at their word. *See Lee*, 746 F. Supp. 3d at 504 ("federal courts should act cautiously before we hurl such accusations [of discrimination] at the political branches" (quotation marks omitted)); *see also id.* at 502 ("If the legislature enacted the law to deter crime, the law would pass muster.").[4]

---

[4] Plaintiffs observe that legislators relied on census data and declined to identify what political data was used in the redistricting process. Compl. ¶¶64-65. Wisely, Plaintiffs stop short of alleging legislators' reliance on the Census to redistrict, as legislatures everywhere do, evinces discriminatory intent.

14

**c. Plaintiffs' allegations of circumstantial evidence, following the *Arlington Heights* factors, are not plausible allegations of discriminatory intent.**

Plaintiffs' remaining allegations fall short of plausible allegations of discrimination, little different than the similar allegations dismissed in *Lee*, 746 F. Supp. 3d at 504-06. As *Lee* illustrates, the "presumption of legislative good faith" extends to the Court's evaluation of alleged "circumstantial factors" too. *Id.* at 504.

***Historical Background.*** Plaintiffs assert that Tennessee barred black voters from political participation "[p]rior to 1965." Compl. ¶33. The alleged "past discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful." *Abbott v. Perez*, 585 U.S. 579, 603 (2018) (cleaned up). The allegations are of "little probative value" because they are not "reasonably contemporaneous with the challenged decision." *McCleskey v. Kemp*, 481 U.S. 279, 298 n.20 (1987).

From there, Plaintiffs assert that "a White-dominated political faction" harbors the same racial animus today. Compl. ¶35. They equate the present-day "White-controlled General Assembly's actions" to the "all-White governments in prior eras." *Id.* ¶5. *Ad nauseum*, Plaintiffs presume racial animus from lawmakers' "White race."[5] As Plaintiffs see

---

[5] *See also* Compl. ¶1 ("White-dominated supermajority"), ¶2 ("all-White legislators"), ¶3 ("White legislators"), ¶5 (equating "White-controlled General Assembly's actions" to "all-White governments in prior eras"), ¶¶33-34 (describing "White-dominated Democratic Party" and "White-dominated Republican Party"), ¶38 ("White-dominated faction"), ¶¶39-41 ("White-dominated supermajority"), ¶44 (same), ¶45 ("White supermajority"), ¶47 ("White officials in power"), ¶¶48-49 ("White-dominated"), ¶52 ("White su-

15

it, "[t]he White supermajority in the General Assembly appointed White politicians from their White-dominated faction to the offices of Secretary of State and Treasurer. Tennessee's governor is also a White politician from this White-dominated faction and he, in turn, appointed another White politician from their faction as Attorney General, as well as the five White justices of Tennessee Supreme Court." *Id.* ¶35. That "White-dominated faction [] controls all the levers of political power in Tennessee." *Id.* ¶4. QED. Defendants are unaware of any judicial decision willing to presume racial animus because lawmakers are "White."[6] With those allegations, Plaintiffs perpetuate the very "offensive and demeaning" racial stereotyping that the Equal Protection Clause was ratified to root out.

permajority"), ¶53 ("White-dominated supermajority"), ¶55 (same), ¶56 ("White-controlled Committee"), ¶¶57-58 ("White-dominated supermajority"), ¶60 ("White Senator John Stevens from the White-dominated supermajority"), ¶64 ("White Representative Jason Zachary of the White-dominated supermajority"), ¶65 ("White sponsors"), ¶66 ("White officials"), ¶67 ("White proponents"), ¶69 ("White-dominated supermajority"), ¶70 ("White Representative Lowell Russell … highlight the White supermajority's racial motives"), ¶71 ("White supermajority"), ¶73 ("White supermajority" and "White Chairman"), ¶¶74-76 "White supermajority"), ¶77 ("White Chair"), ¶78 ("White supermajority"), ¶80 ("White supermajority"), ¶84 ("White politicians"), ¶86 ("White politicians from the White-dominated faction"), ¶88 ("White legislators from the General Assembly's White-dominated supermajority"), ¶97 ("White supermajority's political violence against Black Memphians"), ¶¶98-99 ("White-dominated political faction"), ¶¶107-08 ("White supermajority"), ¶116 ("White-dominated supermajority").

[6] In *White v. Regester*, the Supreme Court referred *once* to a "white-dominated organization" that effectively controlled "Democratic Party candidate slating" to the exclusion of minority Democratic candidates in two Texas counties. 412 U.S. at 766-67. That observation was directly relevant to the claim of *intra-party* racial discrimination affecting multimember districts in *White*. *See id.* at 756, 765-70. There is no likening *White*'s single reference to Plaintiffs' complaint, making more than 50 references to a "White-dominated" Tennessee General Assembly, "White-dominated" committees, and "White" lawmakers. *Supra*, n.5.

16

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 600 U.S. 181, 220 (2023). The Court should reject in strongest terms Plaintiffs' "odious" use of lawmakers' race as proof of lawmakers' racial animus. *Shaw v. Reno*, 509 U.S. 630, 643 (1993) (*Shaw I*).

No other allegations warrant Plaintiffs' conclusory assertion that a present-day "White-dominated supermajority" harbors racial animus. Just as in *Lee*, Plaintiffs "point to a mix of laws, bills, or statements that have little to do with redistricting." *Id.* at 505; *see generally* Compl. ¶¶40-45. For example, they cite comments that individual members made several years ago. Compl. ¶¶40-41. And they fault "White politicians" for advancing legislation removing "critical-race theory from schools," for terminating the Tennessee Human Rights Commission, for expelling two black members but not a white member, for stripping funding earmarked for Memphis, for "nullify[ing] policing reforms," for a "takeover of Memphis-Shelby County Schools," for an "audit of the Shelby County District Attorney's Office," and for other resolutions passed and not passed. Compl. ¶¶41-44. The court in *Lee* confronted much of the same and similar "statements and votes of a 'handful' of legislators." 746 F. Supp. 3d at 506; *compare id.* at 505-06, *with* Compl. ¶40(g) (alleged statement about "lynching"), ¶41(b) (law removing "critical-race theory from schools"), ¶42(e) (comments about "dashiki" dress), ¶¶42-43 (expulsion of two black representatives). Those materially similar allegations were not enough to survive a motion to dismiss in *Lee,* and they are not enough here: "[T]hose statements the on unrelated topics do not plausibly suggest that the whole legislature passed the [] map[] to

17

discriminate against racial minorities." 746 F. Supp. 3d at 504-06. To say otherwise forgets the presumption of good faith. *Id.* at 504. When lawmakers enact laws to improve education outcomes or reform a district attorney's office, courts presume lawmakers enacted those laws in good faith for those nonracial reasons, not for secretly harbored racial animus. *Id.* None of Plaintiffs' "historical background" allegations comes close to "reveal[ing] a series of official actions taken for invidious purposes." *Arlington Heights*, 429 U.S. at 267. *See, e.g.*, *League of Women Voters of Fla. v. Fla. Sec'y of State*, 66 F.4th 905, 922-24 (11th Cir. 2023) (confronting similar evidence and rejecting it as proof of racial animus); *GBM v. Sec'y of State of Ala.*, 992 F.3d 1299, 1325 (11th Cir. 2021). And Plaintiffs' bald assertions that "White politicians from the White-dominated supermajority" have "repeatedly attacked the predominantly Black City of Memphis" (Compl. ¶44) are not "entitled to the presumption of truth." *Lee*, 746 F. Supp. 3d at 506.

***Sequence of Events.*** Applying the *Arlington Heights* framework, the "'sequence of events' leading up to the law's passage" can be relevant if it "suggests something invidious." *Lee*, 746 U.S. at 503. But here, the "sequence of events" alleged in Plaintiffs' complaint is consistent with two *lawful* reasons for Tennessee's mid-decade redistricting. First, Tennessee's mid-decade redistricting followed several other States' efforts to "redraw[] their congressional districts in ways that are predicted to favor the State's dominant political party." *Abbott v. LULAC*, 146 S. Ct. 418, 419 (2025). Plaintiffs admit Tennessee legislators likewise sought "'to maximize the Republican potential to maintain the

18

majority'" in Congress by redistricting mid-decade. Compl. ¶63. And while Plaintiffs describe the process as "rushed," *id*. ¶76, that is consistent with the Governor's call to redistrict before the mid-term elections, *see id.* ¶50 (incorporating by reference Governor's proclamation). Second, Tennessee redistricted only after *Callais*. Plaintiffs allege that timing is evidence of racial purpose. Compl. ¶¶47-49. It instead shows an "entirely reasonable and certainly legitimate" desire to avoid "expensive and time consuming" litigation. *Abbott*, 585 U.S. at 608. Before *Callais*, uncertainty abounded about whether States could advance political goals in redistricting without being faulted for an unintended violation of §2 of the Voting Rights Act. *See, e.g.*, *Allen v. Milligan*, 599 U.S. 1 (2023) (affirming preliminary injunction of Alabama's 2021 congressional districts for failing to create a second majority-minority district). Plaintiffs' allegations about the sequence of events do not "plausibly rebut" these lawful explanations. *Lee*, 746 F. Supp. 3d at 504.

*Departures from Normal Procedures.* For similar reasons, Plaintiffs cannot plausibly allege racial animus with allegations that the redistricting process "departed sharply" from normal procedures, emphasizing the "extreme haste" and supposed "disorder" wrought by "the all-White supermajority faction" enacting a "new congressional map within a span of forty-eight hours." Compl. ¶¶3, 81. The "'brevity of the legislative process' in creating maps does not 'overcome the presumption of legislative good faith'—at least when the legislature had a good reason for the shortened process." *Lee*, 746 F. Supp.

3d at 504-05 (quoting *Abbott*, 585 U.S. at 610-11). Plaintiffs admit it: "to maximize" Republicans' chances of keeping a majority in Congress, Compl. ¶63, by "'send[ing] another Republican voice to Washington'" in 2026, *id*. ¶48.

### B. Plaintiffs fail to plausibly allege discriminatory effect.

Plaintiffs have not plausibly alleged the separate element of their intentional discrimination claim: discriminatory effect. *See Lee*, 746 F. Supp. 3d at 499. Plaintiffs allege the 2026 Plan will preclude them from electing the Democratic candidates they prefer. *E.g.*, Compl. ¶¶87-97. But the Supreme Court just clarified in *Callais* that more is required. Just as a §2 plaintiff must allege districts are not "equally open" and provide "less opportunity" for minority voters to prove a discriminatory effect for purposes of the Voting Rights Act, *Callais*, 146 S. Ct. at 1154-60, Plaintiffs likewise must plausibly allege districts are not "equally open" and provide "less opportunity" to prove discriminatory effect for their constitutional claim, *White*, 412 U.S. at 766. The §2 standard is lifted "almost verbatim" from *White*'s standard for proving unconstitutional vote dilution. *Callais*, 146 S. Ct. at 1144-45. As clarified by *Callais*, plausibly alleging that districts provide "less opportunity" to minority voters requires plausibly accounting for the State's "permissible criteria," which "include[] partisan advantage." *Callais*, 146 S. Ct. at 1154-55, 1157.

But here, far from accounting for Tennessee's partisan goal, Plaintiffs dismiss it as mere pretext. *Supra*, Part II.A.1. Plaintiffs allege they prefer Democratic candidates, Compl. ¶¶10-21, but nowhere do they allege that Tennessee's new map offers them "less

20

opportunity" to elect Democrats than "nonminority" voters, *Callais*, 146 S. Ct. at 1154-55. The complaint states nothing more than the obvious: the 2026 Plan affects Democrats as a whole. But that partisan goal, and its effect, are "constitutionally permissible." *Id.* at 1156-57.

## III. Plaintiffs' First Amendment Retaliation Claim Is Not Justiciable, Nor Plausible.

### A. Plaintiffs' First Amendment claim is not justiciable.

Plaintiffs contend that the Legislature "initiated the redistricting process *solely* to punish Black voters for their past political expression, association, and petitioning activity" in violation of the First Amendment. Compl. ¶120. The Court should reject that theory as foreclosed by *Rucho*.[7]

Plaintiffs' novel First Amendment theory fails just as the First Amendment theory failed in *Rucho.* There, plaintiffs asserted the State's newly drawn districts "intentionally burden[ed] and retaliat[ed] against supporters of non-Republican candidates on the basis of their political beliefs and association." *Common Cause v. Rucho*, 279 F. Supp. 3d 587, 606 (M.D.N.C. 2018), *vacated and remanded*, 585 U.S. 1012 (2018). They claimed to "face[] difficulty raising money, attracting candidates, and mobilizing voters to support the political

---

[7] Indeed, it is worse than *Rucho.* Plaintiffs presume all "Black voters" are punished by the 2026 Plan's Republican advantage. Compl. ¶120. That perpetuates the stereotype that that "members of the same racial group—regardless of their age, education, economic status, or the community in which they live—think alike, share the same political interests, and will prefer the same candidates at the polls" indefinitely into the future. *Shaw I*, 509 U.S. at 647.

21

causes and issues such Plaintiffs sought to advance." *Rucho*, 588 U.S. at 713 (quotation marks omitted); *see also id.* at 695 (recounting allegations that redistricting "violated the First Amendment by diminishing their 'ability to elect their candidate of choice' because of their party affiliation and voting history"). *Rucho* rebuffed those allegations: "[T]here are no restrictions on speech, association, or any other First Amendment activities in the districting plans at issue," and "plaintiffs are free to engage in those activities no matter what the effect of a plan may be on their district." 588 U.S. at 713-14. And there is no justiciable "standard for determining when partisan activity goes too far." *Id*. at 714.

Plaintiffs allege the same sorts of associational harms here. They complain that the 2026 redistricting disrupts their ability to "vote for—and be represented by—their sitting congressional representative," harms their "right to associate with like-minded citizens," and "ma[kes] it significantly harder … to act collectively to elect candidates who represent their shared interests." Compl. ¶¶122-24. But these are the inevitable consequences of "districting for partisan advantage," such that under Plaintiffs' theory, "any level of partisanship in districting would constitute an infringement of their First Amendment rights." *Rucho*, 588 U.S. at 714. While Plaintiffs might prefer "their sitting congressional representative," Compl. ¶122, "no one is guaranteed the right to vote for a specific individual," *Zielasko v. Ohio*, 873 F.2d 957, 961 (6th Cir. 1989). And nothing about Tennessee's new map impedes Plaintiffs' ability to "associate with like-minded citizens." Compl. ¶123. Just as in *Rucho*, Plaintiffs here remain "free to engage in those activities no matter

22

what the effect of a plan may be on their district." 588 U.S. at 713-14. Plaintiffs' contrary assertion that "partisanship in districting should be regarded as simple discrimination … on the basis of political viewpoint" is not justiciable. *Rucho*, 588 U.S. at 714.

Plaintiffs cannot save their claim by limiting it to one about "gratuitous mid-decade redistricting." Compl. ¶106. *Rucho* applies to all "claims that a map is unconstitutional because it was drawn to achieve a partisan end." *Alexander*, 602 U.S. at 6. Directly contrary to Plaintiffs' suggestion that mid-decade redistricting is "'not authorized by the Elections Clause,'" Compl. ¶113 (quoting *Cook v. Gralike*, 531 U.S. 510, 526 (2001)), or had "no valid" basis, *id.* ¶120, that Clause assigns redistricting authority to "the Legislature" expressly, U.S. Const. art. I, §4, cl. 1—whether just after the Census or mid-decade.[8]

Nor can Plaintiffs save their claim by distancing their theory from the line-drawing itself. Plaintiffs' own allegations describe "crack[ing]" Memphis and Shelby County, Compl. ¶¶87-97, and creating an all-Republican delegation, *id.* ¶¶60-64. Plaintiffs' theory will no less devolve into one about the "ideal number of seats for each party," which are "'unguided and ill suited to the development of judicial standards.'" *Rucho*, 588 U.S. at

---

[8] *Cook* addressed the content of ballots, not redistricting. *See* 531 U.S. at 513-15. After *Cook*, *Rucho* rejected that the Elections Clause "'provides a judicially enforceable *limit* on the political considerations that the States and Congress may take into account when districting.'" 588 U.S. at 717 (emphasis added).

23

708. Plaintiffs' claim is no less a request that the Court hold Tennessee's "'political gerry-mandering has gone too far.'" *Id*. at 701. And that is precisely the sort of "political ques-tion[]" that lies "beyond the reach of the federal courts." *Id.* at 718.

**B.      Even if it was justiciable, Plaintiffs' alleged First Amendment violation is implausible.**

Even if Plaintiffs' First Amendment challenge was sufficiently distinct from *Rucho* to be justiciable, *but see supra*, Part III.A, Plaintiffs have not stated a plausible claim that the Legislature "initiated the redistricting process *solely* to punish Black voters for their past political expression, association, and petitioning activity." Compl. ¶120. As with their racial-discrimination claim, Plaintiffs admit the Legislature initiated the redistrict-ing process to accomplish a *political* goal to benefit Republicans, not to retaliate against non-Republicans. *Supra*, Part II.A.1. Plaintiffs' contrary and conclusory allegation that the State redistricted "solely to punish Black voters," Compl. ¶120, is "not entitled to the pre-sumption of truth," *Lee*, 746 F. Supp. 3d at 506. Like their racial-discrimination claim, Plaintiffs do not state a plausible First Amendment claim by presuming bad faith and ignoring entirely the "obvious alternative explanation" for the Tennessee's mid-decade redistricting: politics, not race. *Iqbal*, 556 U.S. at 682 (quotation marks omitted).

## CONCLUSION

For all these reasons, the Court should dismiss Plaintiffs' Complaint.

24

Dated: June 26, 2026

Respectfully submitted,

JONATHAN SKRMETTI
Attorney General and Reporter

/s/ *Zachary L. Barker*
ZACHARY L. BARKER (BRP #035933)
*Senior Assistant Attorney General*

ANDREW DENNING (BPR #042208)
*Assistant Attorney General*
Office of the Tennessee Attorney General
P.O. Box 20207
Nashville, Tennessee 37202-0207
Phone: (615) 532-7400
Zachary.barker@ag.tn.gov
Andrew.denning@ag.tn.gov
(615) 532-4098

TAYLOR A.R. MEEHAN (admitted PHV)
BRYAN K. WEIR (PHV forthcoming)
THOMAS A. WILSON (PHV forthcoming)
SOREN GEIGER (admitted PHV)
Consovoy McCarthy PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
taylor@consovoymccarthy.com
bryan@consovoymccarthy.com
orogers@consovoymccarthy.com

*Counsel for Defendants*

25

**CERTIFICATE OF SERVICE**

I certify that the foregoing motion to dismiss was filed electronically on June 26, 2026. A true and correct copy of that filing was forwarded via the Court's CM/ECF system and/or U.S. Mail postage prepaid upon the following:

Lucas Cameron-Vaughn
ACLU Foundation of Tennessee
P.O. Box 120160
Nashville, TN 37212
(615) 320-7142
Email: lucas@aclu-tn.org

/s/ *Zachary L. Barker*
ZACHARY L. BARKER
Senior Assistant Attorney General
