Case No. 3:26-cv-00616

**IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| AMBER SHERMAN, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | <u>ORDER AND OPINION</u> |
| v. | ) | |
| | ) | |
| TRE HARGETT, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**BEFORE: STIVERS, District Judge, NALBANDIAN, Circuit Judge, and CAMPBELL, Chief District Judge.**

**PER CURIAM.** Last May, Tennessee drew a new congressional map that split Memphis and Shelby County into three separate congressional districts. Tennessee says it made this decision to achieve an advantage for Republicans in all nine of its congressional districts. But a group of Black Memphians say that race was also a significant motivator. So they sued, arguing that Tennessee drew the new map to dilute the votes of Black people. They now move for a preliminary injunction, hoping to stop the new map from taking effect. But because they aren't likely to succeed on the merits, and because the other preliminary injunction factors disfavor relief, we DENY their motion.

**I.**

In May 2026, Tennessee convened a special session to redraw its nine congressional districts. It sought to draw districts based on population and politics—that is, without using racial data—to reduce the risk of future legal challenges. R.43-1, Senate Judiciary Comm. Tr. Excerpts,

1

68:19-22, 69:12-14. Its goal was to redraw districts to favor Republicans and keep Republicans in the U.S. House majority. *E.g.*, *id.* at 70:7-11, 71:8-11, 72:3-8. As a result of that session, Tennessee repealed a statute prohibiting mid-decade redistricting and enacted legislation (the "Act") that redrew the state's congressional map and revised election deadlines, candidate qualifications, and voter-notice requirements. Tenn. House Bills 7001, 7002, 7003, and 7005, 2026 Tenn. Pub. Acts (2d Ex. Sess.).

The Act took immediate effect—so it applies to Tennessee's primary election (to be held in August), and to its general election (to be held in November). Previously, Shelby County fell within a single congressional district: District 9. That district—which was Tennessee's only majority-Black district—overwhelmingly favored congressional candidates from the Democratic Party. R.1, Compl., PageID 11; R.43-3, Barber Decl., PageID 678, 687. But the new map divides Shelby County and Memphis into three districts, which are less compact and which connect Black Memphians with rural White voters. R.1, Compl., PageID 48.

Plaintiffs are Black registered voters in Tennessee and organizations serving Tennessee's Black community. They seek a preliminary injunction against Tennessee's May 2026 map. On their view, Tennessee discriminated against Black Memphians by cracking District 9 and diluting Black voting power, and retaliated against Black voters for exercising their First Amendment rights. R.20, Mot. for TRO & Prelim. Inj. We disagree, for the reasons set forth below.

**II.**

When a state's legislative maps are challenged, the Circuit's Chief Judge assembles a three-judge district court to decide the claims. *See* 28 U.S.C. § 2284. Here, Chief Judge Sutton convened this court to evaluate Plaintiffs' allegations that Tennessee's new map violates the Constitution.

2

**A.**

A preliminary injunction "is an extraordinary equitable remedy" that serves "to preserve the relative positions of the parties until a trial on the merits can be held." *Starbucks Corp. v. McKinney*, 602 U.S. 339, 345–46 (2024) (citation modified). To obtain a preliminary injunction, the Plaintiffs "must establish that [they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Showing a likelihood of success on the merits isn't enough. Plaintiffs "must also show that some irreparable harm will take place without the court's immediate intervention." *Churchill Downs Tech. Initiatives Co. v. Mich. Gaming Control Bd.*, 162 F.4th 631, 637 (6th Cir. 2025) (citation modified).

**1.**

First, Plaintiffs argue that Tennessee violated the Constitution by using race to redraw the state's legislative boundaries in a way that splits Black Memphians into three separate districts.[1]

---

[1] In its motion to dismiss—which we don't resolve today—Tennessee argues that Plaintiffs "lack standing to challenge Tennessee's districts statewide." R.56, Mot. to Dismiss, PageID 817 (citation modified). We'll briefly address this argument because it implicates our jurisdiction. Tennessee cites *Gill v. Whitford*, 585 U.S. 48, 66 (2018), for the principle that vote-dilution plaintiffs may challenge only the boundaries of the districts in which they reside. *Id.* And it takes issue with Plaintiffs' allegations here as implicating at most three districts. *Id.*

But we don't see a jurisdictional defect here. In *Gill*, the plaintiffs articulated a novel statewide injury: Regardless of whether they resided in a packed or cracked district, they were "harmed by the manipulation of district boundaries" because "Democrats statewide do not have the same opportunity provided to Republicans to elect representatives of their choice." *Gill*, 585 U.S. at 56 (citation modified). The Court held that vote-dilution plaintiffs have standing to assert only that their own district had been packed or cracked. *Id.* at 66. But it said nothing on the scope of relief once a vote-dilution plaintiff established standing.

They accuse Tennessee of violating the Equal Protection Clause by "designing districts with the invidious intent to dilute the voting power of voters of particular races." *Tenn. State Conf. of NAACP v. Lee*, 746 F. Supp. 3d 473, 499 (M.D. Tenn. 2024) (per curiam). This is called a vote-dilution claim. At the preliminary-injunction hearing, Plaintiffs disclaimed a racial-gerrymandering claim.

To win a vote-dilution claim, Plaintiffs must show that racial discrimination was a "substantial" or "motivating" factor behind the new map. *Hunter v. Underwood*, 471 U.S. 222, 228 (1985) (citation modified). That is, they must show that Tennessee "enacted a particular voting scheme as a purposeful device to minimize or cancel out the voting potential of racial or ethnic minorities." *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 38 (2024) (quoting *Miller v. Johnson*, 515 U.S. 900, 911 (1995)). So if the state shows that it would've drawn the same map even without considering race, Plaintiffs lose. Plaintiffs must also demonstrate a discriminatory effect. *Lee*, 746 F. Supp. 3d at 499 (vote-dilution plaintiffs must show discriminatory purpose *and* effect); *see also Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264–66 (1977). In sum, Plaintiffs must show that Tennessee was motivated by race when it drew the new maps, and that this caused them discriminatory harm.

Plaintiffs haven't shown a discriminatory purpose, so they aren't likely to succeed on the merits. *See Lee*, 746 F. Supp. 3d at 499 (declining to address discriminatory effects where Plaintiffs

---

Here, Plaintiffs aren't challenging the statewide plan with a statewide theory of harm. They're challenging the cracking of Memphis into three districts. So Plaintiffs' theory of injury doesn't undercut standing in the way that Defendants contemplate, and any effects on the statewide plan fall within the scope of the vote-dilution remedy—which *Gill* didn't address.

failed to establish a discriminatory purpose).  They lack any direct evidence of racial motivation,[2] so they turn to three weaker arguments.

First, they claim that the new map's effects are by themselves evidence of Tennessee's discriminatory purpose.  They say that the new map destroys the only district where Black Memphians could elect their preferred candidate by splitting them into three near-identical slices. R.1, Compl., ¶¶ 66, 87, 94.  But this argument is unavailing.  When a map's effects are "readily explainable on grounds apart from race . . . disproportionate impact alone cannot be decisive." *City of Mobile v. Bolden*, 446 U.S. 55, 70 (1980).  Here, the map's effects—breaking Black Memphians into three separate congressional districts—are readily explainable by political motivations.  It's no secret (supported by Plaintiffs' own statements) that city voters prefer Democratic candidates and that rural voters prefer Republican candidates.  So it makes sense that Tennessee's legislature would split Memphis into thirds when attempting to create a map that favors Republican candidates.  And it's no surprise that the resulting map would also split the Black population of Memphis into thirds.  In all, the map's effects aren't enough because they're "readily explained" by Tennessee's stated political motivations and don't indicate a discriminatory purpose.  *See id.*

But it's virtually impossible to consider the new map's racial effects without isolating those effects—that is, drawing an alternative map that doesn't produce racial effects, yet accomplishes Tennessee's political objectives.  Plaintiffs consistently point to Tennessee's map for their vote-dilution claim and contend that the legislature's purportedly racial motivations *inhere* in the map.

---

[2]  Plaintiffs' evidence is a far cry from the "smoking gun" direct evidence in *Cooper v. Harris*, 581 U.S. 285, 318 (2017).  And Plaintiffs haven't provided "substantial direct evidence of the legislature's racial motivations" to make up for the lack of a smoking gun.  *Id.* (citation modified).

5

*See, e.g.*, R.1, ¶¶ 2 (racial motive is "evident on the face of the hastily enacted congressional map"), 94–95 (noting division of the Black population of Memphis "with mathematical precision"), 108 (describing the May 2026 map as an "obvious dilution of Black Memphians' voting power" without excluding an alternative, political explanation); R.20 at PageID 196 ("the map . . . is unexplainable on grounds other than race"), 200 ("the nearly equal division of the Black voting age population across the three cracked districts demonstrates the General Assembly's racial motivation in drawing the Map").

Importantly, Plaintiffs don't offer their own, alternative map that accomplishes Tennessee's political goals without splitting Memphis and Shelby County. Plaintiffs contend that they aren't required to submit an alternative map because they are making a vote-dilution claim and not a racial-gerrymandering claim. It's true that in *Alexander*, for example, the Court discussed vote dilution separately from racial gerrymandering and did not discuss an alternative map in that section. 602 U.S. at 38–39.

But recently in *Callais*, the Supreme Court emphasized that plaintiffs challenging legislative districts on racial grounds must "rul[e] out the competing explanation that political considerations dominated the legislature's redistricting efforts," and that "if either politics or race could explain a district's contours," Plaintiffs lose. *Louisiana v. Callais*, 146 S. Ct. 1131, 1157 (2026) (citation modified). And although the Court made that statement in the context of a vote-dilution claim under Section 2 of the Voting Rights Act, it cited *Alexander* to support that statement and otherwise made no distinction between claims under the VRA versus the Constitution. *Id.* The Court also noted that "the focus of § 2 must be enforcement of the Fifteenth Amendment's prohibition on *intentional* racial discrimination." *Id.* at 1155. Finally, it wouldn't make much

6

sense for the Court to endorse a "disentanglement burden" in a Section 2 case and not in a constitutional one.

So Plaintiffs are wrong that they don't need to provide an alternative map here—at least in the face of the credible state political objectives that Defendants assert. But even if an alternative map isn't required generally in these types of cases, it would be required in this case. Why? Because if Plaintiffs want to rely on a map-based vote-dilution theory, which they do here, they should offer map-based evidence. *See Easley v. Cromartie*, 532 U.S. 234, 258 (2001) ("In a case such as this one where majority-minority districts (or their approximate equivalent) are at issue and where racial identification correlates highly with political affiliation, the party attacking the legislatively drawn boundaries must show at the least that the legislature could have achieved its legitimate political objectives in alternative ways.").

And the problem for Plaintiffs is that they haven't provided an alternative map—because they can't. The population of Memphis is roughly 610,000 people, and a Tennessee congressional district holds 768,000 people. U.S. Census Bureau, *Memphis, Tenn.*, https://www.census.gov/quickfacts/fact/table/memphiscitytennessee/PST045224 [https://perma.cc/E62W-JXPA]; R.43-3, PageID 688. The city favors Democratic candidates by about fifty points. *See* R.43-3, PageID 687. So Memphis can single-handedly carry a Democratic congressional candidate to victory, regardless of the surrounding area it's grouped with. As a result, the road to a reliably 9-0 map runs through Memphis. Thus, political motivations readily explain the map's dilutive effects.

Instead, Plaintiffs invoke affidavits from Black Memphians who attest to supporting Democratic candidates, explaining that Tennessee's new map will prevent Democrats—who they prefer over Republicans—from being elected. But that's exactly the stated purpose behind the

new map. So the affidavits show the new map's surgical ability to accomplish its purported political purpose: preventing Democrats from being elected to Congress. And Plaintiffs don't show how the new map strays from that purpose. Of course, the only way to accomplish this purpose is by disadvantaging Democratic voters, some of whom are Black. But once again, Plaintiffs chart no path for Tennessee to accomplish this purpose without the disproportionate racial effects they cite.

Second, they rely on circumstantial evidence to get at discriminatory purpose. We analyze this evidence with a presumption that the legislature acted in good faith, without racial animus. *Abbott v. Perez*, 585 U.S. 579, 603 (2018). Here, the plaintiffs invoke scattered datapoints: The map's sponsors admitted to using only 2020 Census data, which shows race but not party, R.1, ¶ 65, some legislators wouldn't answer questions, *id.* ¶¶ 61–63, 65, 68, the map's timing was unprecedented, *id.* ¶¶ 32, 35, 51, 81, and a committee chairman pitched the map as likely to reduce crime—which Plaintiffs heard as a racial dog whistle, *id.* ¶ 70. This evidence is consistent with Plaintiffs' story, but it's not evidence of racial animus. Instead, there's an obvious alternative explanation. Throughout the legislative process, the Republican-controlled legislature often explained its solely political motivation. *See id.* ¶¶ 48, 50, 60, 63, 64. And Plaintiffs' evidence doesn't refute that. Any all-Republican congressional map would share each of these characteristics: It would use 2020 census data to equalize district populations, give legislators pause before answering questions on the floor,[3] and seem to Republicans as promoting public

---

[3] Our reapportionment doctrine triggers a strange game between Republican and Democratic legislators. When a legislature draws a new map, the minority party's legislators attempt to coerce the majority party into saying something about race—attempting to lay the groundwork for a lawsuit. And the majority party, aware that any mention of race could invalidate the map, coaches its legislators to stay quiet. But here, Republican legislators said nothing about race during the

safety.  Also, the short gap between the Supreme Court's *Callais* decision and Tennessee's primary elections appeared to give the state a brief window to pass a map that favored Republicans.[4]  So because Plaintiffs' evidence matches the legislature's purported political motivations for the new map, they haven't presented any evidence that could overcome our presumption of good faith.

Third, Plaintiffs highlight historical evidence of racism in Tennessee's state legislature.  Notably, "we cannot accept official actions taken long ago as evidence of current intent."  *McCleskey v. Kemp*, 481 U.S. 279, 298 n.20 (1987).  And we've held that "statements and votes of a handful of legislators on unrelated topics do not plausibly suggest that the whole legislature passed the legislative maps to discriminate against racial minorities."  *Lee*, 746 F. Supp. 3d at 506 (citation modified).[5]  Indeed, the plaintiffs in *Lee* cited some of the same evidence that Plaintiffs use here to show intent.  And we rejected it.  *Id.*

---

entire redistricting process.  So it seems strange for Plaintiffs to hold this against them.  Surely, not mentioning race isn't evidence of racial animus.

[4]  Plaintiffs asserted at oral argument that the timing of Tennessee's redistricting—shortly after the *Callais* decision came down—proves that legislators were motivated by racial animus.  It's true that *Callais* was about race, and it's true that *Callais* was one primary impetus behind the timing of the legislature's actions.  But that doesn't show that the actions themselves were motivated by race or racial animus.  Instead, the statements suggest that the legislature thought that they could safely carry out their political goals without having to worry about race or racial balancing.  Indeed, the legislature thought it could *avoid* considering race in light of *Callais*.  That's a far cry from using race to draw districts.  *See Cooper*, 581 U.S. at 318.

[5]  But even if we accepted the tenuous link between Plaintiffs' evidence and their argument, they still fall short.  They cite racially charged comments from legislators (Reps. Sheila Butt, Courtney Rogers, Jerry Sexton, Glen Casada, and Mike Carter) from throughout the past decade.  R.1, ¶ 40.  But this evidence has an obvious problem:  None of those representatives were part of the legislature that passed the 2026 maps.  *See* Tennessee General Assembly, Members and Staff Directory, https://wapp.capitol.tn.gov/Apps/Directories/Index [https://perma.cc/3XQD-TB45].  In fact, they all left the legislature many years ago.  So their comments shed no light on the current legislature's disposition.  And although Plaintiffs cite one insensitive and regrettable remark from Rep. Paul Sherrell, who remains in the legislature, we're "wary of relying on the remarks of a single legislator" to ascertain the intent of the body.  *See Tex. Indus., Inc. v. Radcliff Materials,*

At bottom, Plaintiffs won't succeed on their vote-dilution claim because they haven't presented meaningful evidence that race—not politics—motivated Tennessee's May 2026 map. So they can't overcome our presumption of legislative good faith because they haven't shown that the legislature acted "because of" the map's racial effects.[6]  Plaintiffs are unlikely to succeed on the merits.

Plaintiffs haven't established the other three preliminary injunction factors either. Importantly, the Supreme Court has cautioned lower federal courts not to "alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 589 U.S. 423, 424 (2020) (per curiam).  This is called the *Purcell* principle, after *Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam).

But the Supreme Court recently confirmed that the *Purcell* principle doesn't prevent states from altering their own election rules—it discourages only federal courts from doing so.  That's because "[s]tates are free to decide for themselves whether last-minute changes to an election are in their best interests." *Allen v. Milligan*, 146 S. Ct. 1377, 1381 (2026) (per curiam).  So we should exercise caution before we "interpose[]" ourselves into Tennessee's "ongoing efforts to conduct

---

*Inc.*, 451 U.S. 630, 644 n.17 (1981).  That's especially true of a statement made three years ago, which Rep. Sherrell apologized for.  Nor do the legislature's unrelated policy objectives convince us.  Evidence that a decision affected a member of a racial minority group is not evidence that the decision was made "because of" the person's race.

[6]  This highlights the fatal flaw in Plaintiffs' argument.  It's why vote-dilution claims aren't easy workarounds to racial-gerrymandering claims.  It's also why a "pure" discrimination claim under *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977), which Plaintiffs floated at oral argument and which switches the focus from diluted votes toward simply sussing out an invidious racial motivating factor for the legislature's action, isn't a workaround to a vote-dilution claim.  The same evidentiary problem pervades all three framings:  How can I trace my injury (racial-gerrymandering, vote dilution, racial discrimination) to race instead of partisan politics? Here, Plaintiffs present no direct evidence, weak circumstantial evidence, and no path for Tennessee to accomplish its political aims without producing the same effect.

10

its imminent 2026 congressional elections under maps that its elected representatives selected." *Id.*

This principle touches the other three preliminary injunction factors:  the balance of the equities, the likelihood of irreparable harm, and the public interest.  *See id.*  The balance of the equities favors our decision.  We "are not supposed to change state election rules as elections approach" because states suffer practical harms when we interfere with their ability to print ballots, count signatures, or certify candidates.  *Thompson v. DeWine*, 976 F.3d 610, 619 (6th Cir. 2020) (per curiam) (citation modified); *see Kishore v. Whitmer*, 972 F.3d 745, 751 (6th Cir. 2020).  Tennessee tells us that its ballots have already been sent overseas, and that several other unworkable problems would result from an injunction.

And the other two factors disfavor an injunction too.  Plaintiffs may suffer some harm— lower odds of electing the congressional candidates of their choosing.  But because Plaintiffs sued government officials, the "irreparable harm" suffered by Tennessee merges with the "public interest" factor.  *Wilson v. Williams*, 961 F.3d 829, 844 (6th Cir. 2020).  And "Tennessee will suffer irreparable harm from its inability to enforce the will of its legislature."  *L.W. ex rel. Williams v. Skrmetti*, 73 F.4th 408, 421 (6th Cir. 2023).  For similar reasons, the public interest also favors denying the injunction.  The public is better served by a map created by its elected representatives, not forced upon them by unelected judges.  *See Thompson*, 976 F.3d at 619  ("It's in the public interest that we give effect to the will of the people by enforcing the laws they and their representatives enact." (citation modified)).

**2.**

Count II, which alleges retaliation for protected expression and association in violation of the First Amendment, fails because it implicates a non-justiciable political question. *Rucho v. Common Cause*, 588 U.S. 684, 718 (2019).

First, Plaintiffs' framing of their challenge as a First Amendment retaliation claim doesn't free them from *Rucho*'s grasp. There, the Supreme Court considered and rejected a near-identical theory. The plaintiffs in both consolidated cases there alleged that a redistricting plan "violated their First Amendment rights by retaliating against supporters of Democratic candidates on the basis of their political beliefs." *Id.* at 692, 694–95. But the *Rucho* Court concluded that "there are no restrictions on speech, association, or any other First Amendment activities in the districting plans at issue," and that "[t]he plaintiffs are free to engage in those activities no matter what the effect of a plan may be on their district." *Id.* at 713–14.

Plaintiffs retort that their claim encompasses retaliation against Black Memphians on account of their race. *See* R.47, Reply, PageID 747 n.3 ("[H]ere the entire redistricting process was initiated solely and exclusively to suppress Black Memphians' associational and expressive conduct." (citation modified)). This theory fails. To the extent that Plaintiffs recast Count II as retaliation against Black Memphians because of their race, that theory falls within the justiciable *Arlington Heights* framework. And if the alleged targeting is political—punishing voters for organizing and voting for candidates the legislative majority disfavors—*Rucho* places the claim beyond judicial reach. Plaintiffs can't fuse the two theories to conjure a third category, and merely affixing a First Amendment label doesn't create one.

12

Second, Plaintiffs' attempt to distinguish *Rucho* by noting that their First Amendment retaliation claim attacks the legitimacy of "the hasty . . . decision to redraw the map," rather than "how lines are drawn," R.20 at PageID 201, misses the mark.

Even pre-*Rucho* caselaw casts doubt on this argument, and *Rucho* completely forecloses it. Plaintiffs seek to distinguish *League of United Latin American Citizens (LULAC) v. Perry*, 548 U.S. 399 (2006), as falling within a line of partisan-gerrymandering cases where "state legislators had some non-retaliatory reason that required the drawing of new congressional maps," so "the decision to draw a new map . . . was itself valid" and the only question was "how lines were drawn." R.20 at PageID 208 (citation modified). But doctrinal nuances aside, the plaintiffs in *LULAC* proposed a strikingly similar theory: They sought a presumption of invalidity when a mid-decade redistricting plan is adopted solely for partisan reasons. *Id.* at 417 (opinion of Kennedy, J.). In other words, their proposed test didn't "quibble with the drawing of individual district lines but challenge[d] the decision to redistrict at all." *Id.* And Justice Kennedy, writing for himself, rejected the *LULAC* plaintiffs' sole-motivation challenge to Texas's mid-decade and purely partisan redistricting—which Texas undertook with no census, court order, or obligation to act. *Id.* He reasoned that "there is nothing inherently suspect about a legislature's decision to replace mid-decade a court-ordered plan with one of its own." *Id.* at 419. He pointed to the absurdity that "a highly effective partisan gerrymander that coincided with decennial redistricting would receive less scrutiny than a bumbling, yet solely partisan, mid-decade redistricting." *Id.* So he concluded that the plaintiffs' sole-motivation theory failed to "show a burden, as measured by a reliable standard, on . . . representational rights." *Id.* at 418. Those observations apply with equal force here. And the *Rucho* majority embraced Justice Kennedy's reasoning on this point. *See* 588 U.S.

at 704 ("As noted, the question is one of degree: How to provide a standard for deciding how much partisan dominance is too much." (citation modified)).

Plaintiffs try to limit *LULAC* by suggesting that Texas state legislators had a "non-retaliatory reason" for drawing a new map because they were restoring legislative primacy over a court-drawn map. R.20 at PageID 208. Ostensibly, they base their view on Justice Kennedy's observation in *LULAC* that "if a legislature acts to replace a court-drawn map with one of its own design, no presumption of impropriety should attach to the legislative decision to act." 548 U.S. at 416. But Plaintiffs confuse a sufficient condition with a necessary one. Nothing in Justice Kennedy's opinion converts that observation into a rule that mid-decade redistricting is permissible *only* under an approved justification—like replacing a court-drawn map. *See id.* at 419 ("[T]he fact of mid-decade redistricting alone is no sure indication of unlawful political gerrymanders.").

Third, to the extent that Plaintiffs contend that Tennessee's sudden decision to redraw the map unsettled their expectations and destroyed their associational bonds, that argument goes to standing—specifically to Plaintiffs' injury. But it doesn't move the needle on the political-question doctrine. In essence, Plaintiffs confuse their justiciability doctrines by asking us to weigh the extent of their Article III injury in deciding whether this case implicates the political-question doctrine. Yet the two doctrines are distinct. *See Rucho*, 588 U.S. at 703 (describing standing and political-question justiciability as distinct "threshold questions" (citation modified)).[7] Indeed, the

---

[7] Pre-*Rucho*, a four-Justice concurrence explained what an associational theory of standing might look like in this context: A plaintiff "would not need to show that her particular voting district was packed or cracked for standing purposes," but could point to difficulty fundraising, registering voters, attracting volunteers, and recruiting candidates—which "may be doubly true for party officials and triply true for the party itself (or for related organizations)." *Gill*, 585 U.S. at 74, 81 (Kagan, J., concurring). Plaintiffs' allegations mirror these considerations—"triply" so for the organizational Plaintiffs. *See, e.g.*, R.20, Mot. for TRO & Prelim. Inj., PageID 202–07. But that's

14

*Rucho* Court confronted associational claims with asserted injuries nearly identical to the ones Plaintiffs assert here—"difficulty raising money, attracting candidates, and mobilizing voters to support . . . political causes and issues," 588 U.S. at 713 (citation modified)—yet nonetheless concluded that the claims aren't justiciable.

Plaintiffs' invocation of urgency and election timing also arguably goes to the preliminary-injunction analysis. Specifically to irreparable harm and to the balance of the equities. But Plaintiffs can't get that far because their challenge isn't justiciable. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 98 (1998) (noting the "necessity of determining jurisdiction before proceeding to the merits"). Alternatively, likelihood of success on the merits presupposes a justiciable claim—and there isn't one here.

**III.**

For these reasons, we DENY Plaintiffs' motion for a preliminary injunction.

---

irrelevant because their claim—however acute the asserted injury—implicates a non-justiciable political question.